## IN THE UNITED STATES DISTRICT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICRON TECHNOLOGY, INC., | ) |
| | ) |
| Plaintiff and Counterclaim Defendant, | ) |
| | ) |
| v. | ) C.A. No. 00-792-KAJ |
| | ) |
| RAMBUS INC., | ) |
| | ) |
| Defendant and Counterclaim Plaintiff. | ) |

## SPECIAL MASTER'S REPORT AND RECOMMENDATIONS ON
## MOTION OF MICRON TECHNOLOGY TO COMPEL DEFENDANT RAMBUS TO
## PRODUCE CERTAIN DOCUMENTS, TESTIMONY AND PLEADINGS (RE: D.I. 500)

### GRANT OF MOTION RECOMMENDED, IN PART;
### DENIAL OF MOTION RECOMMENDED, IN PART

This matter comes before me, as Special Master,[1] on the motion of plaintiff Micron

Technology, Inc. ("Micron") to compel the production of certain documents and testimony from

defendant Rambus Inc. ("Rambus"), which Rambus asserts are protected from disclosure under

the attorney-client privilege and/or work product doctrine.

Having read and considered the briefs and memoranda submitted by the parties, having

reviewed the transcripts of arguments made on those papers in hearings before the Court, having

considered relevant facts of record relating to the discovery path in the case before this Court,

having considered the letters and other communications submitted to the Special Master by the

parties, and having examined the treatment of similar issues involving Rambus and the parties to

other proceedings,[2] the Special Master recommends that Micron's motion to compel the

---

[1] The Order Appointing Special Master, dated July 29, 2005, is docketed as item 690 in the captioned case.

[2] Those proceedings are discussed *infra* beginning at p.4.

production of certain documents be granted **in part** and, as to other certain documents be **denied,** for the reasons set forth herein.

## BACKGROUND

Rambus is a technology company and the patentee under numerous patents that relate to computer memory technology known as Dynamic Random Access Memory ("DRAM")[3]. Rambus does not manufacture its own products. Rather, its business model is based upon licensing its intellectual property to others, including DRAM manufacturers, on a royalty basis. Micron is a DRAM manufacturer.

By its complaint, D.I. 1 and 76, Micron asserts that Rambus has engaged in acts of attempted monopolization, fraud, and unfair competition arising from Rambus' alleged efforts to subvert for its own anticompetitive ends an industry standard-setting organization known as the Joint Electronic Devices Engineering Council ("JEDEC")[4] – of which Rambus was a member from approximately December 1991 to June 1996 – with respect to patents issued to Rambus that relate to DRAM technology. Micron seeks declaratory judgment that its Synchronous Dynamic Random Access Memory ("SDRAM") and Double Data Rate Synchronous Dynamic Random Access Memory ("DDR-SDRAM")[5] products and methods do not infringe certain of Rambus' patents, and that those patents are invalid and unenforceable. *Id.* For its part, Rambus denies

---

[3] Rambus filed United States Patent Application Serial Number 07/510,598 with claims directed to DRAM technology in 1990. In 1993, Rambus received its first United States patent resulting from the '898 application. The patents-in-suit are continuation and divisional patents related to the '898 application.

[4] JDEC is "an association of semiconductor manufacturers and designers who collaborate to develop industry-wide technical standards for semiconductor products in order to ensure that DRAM products, made by different manufacturers, are compatible with one another." *Rambus, Inc. v. Infineon Tech. AG.*, 164 F. Supp. 2d 743, 747 (E.D. Va. 2001). JEDEC is currently known as the JEDEC Solid State Technology Association.

[5] These technologies are described in greater detail in *Infineon*, 164 F. Supp. 2d at 747-48.

2

Micron's claims, and asserts counterclaims accusing certain of Micron's computer memory products and methods of infringing Rambus' patents.[6]  D.I. 90.

By the instant motion,[7] Micron seeks to compel Rambus to produce privileged documents, testimony and pleadings, including those (a) within the scope of this Court's May 16, 2001 Order issued by former Judge Roderick R. McKelvie,[8] including any materials previously produced by Rambus in *Rambus Inc. v. Infineon Technologies AG*, Case No. 3:00cv524 (E.D. Va.) ("*Infineon*") and *Hynix Semiconductor Inc. v. Rambus Inc.*, Case No. 00cv20905 (N.D. Cal.) ("*Hynix*"), and before the Federal Trade Commission in *In the Matter of Rambus, Inc.*, FTC Docket No. 9302 (the "*FTC* case"); (b) as are further set forth in Micron's November 13, 2001 Motion to Compel, D.I. 500, including materials that post-date Rambus' June 1996 withdrawal from JEDEC and communications between Rambus and foreign patent attorneys regarding Rambus' efforts to amend claims in foreign patent applications to cover JEDEC standards; and (c) that relate to Rambus' destruction and alleged spoliation of documents and, on that basis, are subject to production orders by the *Infineon* and *Hynix* courts.  D.I. 637 at p.1.  On February 10, 2006, this Court ruled with respect to this last category (the "spoliation" documents) by granting Micron's motion to compel and ordering that Rambus produce those documents.  D.I. 711.

---

[6]  The patents-in-suit identified in Micron's complaint are United States Patent Nos. 5,915,105; 5,953,263; 5,954,804; 5,995,443; 6,032,214; 6,032,215; 6,034,918; and 6,038,195.  By Order dated January 13, 2006, this Court lifted a condition that had limited Rambus' ability to bring additional infringement claims against Micron as to U.S. Patent Nos. 6,324,120; 6,378,020; 6,426,916; and 6,452,863 which had issued during a stay of this action.  D.I. 706.  Rambus subsequently asserted its infringement claims with respect to the second group of patents by separate action filed in the United States District Court for the Northern District of California, styled as *Rambus Inc. v. Micron Technology, Inc. and Micron Semiconductor Products, Inc.*, Case No. C-06-0244 (N.D. Ca.).

[7]  Micron's original motion to compel and opening brief are docketed at 500-01.  Before ruling on Micron's motion, the Court agreed on February 27, 2002 to delay trial and continue this action pending the outcome of the appeal before the Federal Circuit in the *Infineon* case.  D.I. 529.  Following the entry of a new Scheduling Order, Micron was permitted to renew its motion and submit additional briefing, which is docketed at 637.

[8]  This case was originally assigned to the Honorable Roderick R. McKelvie.  Following his retirement, the case was reassigned to the Honorable Kent A. Jordan.  D.I. 543.

3

Accordingly, the Special Master does not further address herein the production of the "spoliation" documents to Micron.

The issues *sub judice* are whether the privilege asserted by Rambus with respect to the remaining so called JEDEC-related documents should be abrogated for at least one of the following reasons: (1) the documents were previously ordered to be produced by Judge McKelvie in this case; (2) the documents are excepted from the protections of privilege pursuant to the crime/fraud exception; and/or (3) Rambus has waived any applicable privilege with respect to the documents.

In considering Micron's request, the Special Master has examined – at the behest of the parties – the extensive history developed in the treatment of similar or related issues between Rambus and the parties to the *Infineon, Hynix* and *FTC* cases. Each of these cases involve allegations that Rambus fraudulently used its participation in JEDEC to further its own anticompetitive goals. The most pertinent decisions in those cases that address issues similar to those raised by Micron in its motion to compel are briefly summarized as follows:

1.  **The *Infineon* Case**

    • **March 7, 2001** – The United States District Court for the Eastern District of California concludes that Rambus has forfeited attorney-client privilege "under the crime/fraud exception as to certain topics" and orders that depositions go forward with respect to:

    > [1] the legal advice provided about disclosures of patents and patent applications to JEDEC by Rambus, Inc., the disclosure policy of JEDEC and about the efforts by Rambus, Inc. to broaden its patents to cover matters pertaining to the JEDEC standards; . . .
    >
    > [2] the September 2000 presentation made to stockholders, financial analysts and members of the public;

4

> [3] the preparation of [Rambus'] withdrawal letters from
> JEDEC; and . . .
>
> [4] the drafting of letters relating to the patent disclosures
> to JEDEC and IEEE, the information and documents relied
> upon in drafting those letters, patent disclosures to JEDEC
> and IEEE and the efforts by Rambus, Inc. to broaden its
> patent claims to the extent that any of those conversations
> took place within the context of the drafting of the
> withdrawal letters.

*Rambus Inc. v. Infineon Technologies AG*, Civ. No. 3:00cv524, Order at pp. 1-2,

¶3(a)-(d) (E.D. Va. March 7, 2001). The *Infineon* court also orders Rambus to

produce any previously withheld documents relating to the above subject matters.

*Id.* at p.3, ¶5. The Order expressly excepts from the scope of its order testimony

and documents related to "any legal advice received by Rambus, Inc. respecting

the scope of its patent applications pending from 1991 to 1995." *Id.* at p.2, ¶ 4.

Rambus first sought reconsideration and then review of the March 7, 2001 Order,

by filing a Petition for Mandamus with the Federal Circuit. The petition was

denied.

- **August 9, 2001** – Following jury verdicts of constructive fraud and actual fraud,
  the *Infineon* court addresses post-trial motions and (a) grants JMOL in favor of
  Rambus on the issue of constructive fraud under Virginia law, and (b) denies
  Rambus' motion for JMOL on the issue of actual fraud under Virginia law.
  *Rambus, Inc. v. Infineon Technologies AG*, 164 F. Supp. 2d 743 (E.D. Va. 2001).

- **January 29, 2003** – On appeal, the Federal Circuit (1) vacates the *Infineon* court's
  judgment of non-infringement based on errors in claim construction; (2) affirms
  the trial court's grant of JMOL that set aside the verdict of constructive fraud; and
  (3) reverses the trial court's denial of JMOL that had allowed the verdict of actual

5

fraud to stand. *Rambus Inc. v. Infineon Technologies AG*, 318 F. 3d 1081 (Fed. Cir. 2003) *cert. denied,* 540 U.S. 874, 124 S. Ct. 227 (2003). With respect to its reversal of the actual fraud verdict, the Federal Circuit explicates:

> [S]ubstantial evidence does not support the jury's verdict that Rambus breached its duties under the EIA/JEDEC policy. Infineon did not show the first element of a Virginia fraud action and therefore did not prove fraud associated with the SDRAM standard. No reasonable jury could find otherwise.

318 F.3d at 1105. Specifically, the Federal Circuit concludes that Infineon failed to meet its "burden of proving the existence of a disclosure duty and a breach of that duty by clear and convincing evidence." *Id*. at 1104.

*   **March 17, 2004** – Following remand on the patent infringement claims, the *Infineon* court issues its opinion[9] addressing two motions by Infineon to compel the production of several groups of documents as to which Rambus asserts privilege. *Rambus, Inc. v. Infineon Technologies AG*, 220 F.R.D. 264 (E.D. Va. 2004). Infineon's first motion to compel is directed at documents listed on Rambus' privilege log. 220 F.R.D. at 270. After examining the circumstances under which Rambus produced documents in the *Hynix* and *FTC* cases, the *Infineon* court concludes that Rambus waived any argument for reinstatement of privilege over the subject documents because its production to its adversaries was voluntary in both the *Hynix* and *FTC* cases. *Rambus, Inc. v. Infineon Technologies AG*, 220 F.R.D. 264, 264-77 (E.D. Va. 2004).

Infineon's second motion is directed to Rambus' document retention policy and other "spoliation" documents. The *Infineon* court analyzes this category

---

[9] The *Infineon* court's written Opinion and Order which issued on February 26, 2004 was vacated and replaced by the Amended Memorandum Opinion and Amended Order dated May 17, 2004.

6

under both the crime/fraud and waiver doctrines, but reserves opinion pending completion of an *in camera* review of the subject documents. *Id.* at 290-91.

- **May 18, 2004** – The *Infineon* court issues a Memorandum Opinion following its *in camera* review of the spoliation documents, and concludes that the crime/fraud exception extends to materials or communications created in the planning and/or furtherance of spoliation of evidence. Applying the crime/fraud analysis, the *Infineon* court then concludes that "Infineon has made a prima facie showing that Rambus intentionally has engaged in the spoliation of evidence and that the crime/fraud exception should operate to pierce Rambus' asserted privileges." The court grants Infineon's motion to compel the production of "spoliation" documents and also permits Infineon to conduct discovery addressed to the subject of appropriate sanctions. *Rambus, Inc. v. Infineon Technologies A.G.*, C.A. No. 3:00cv524, Memo. Op. at 49-51 (E.D. Va. May 18, 2004).

- **August 18, 2004** -- The Federal Circuit denies Rambus' Petition for Writ of Mandamus to direct the United States District Court for the Eastern District of Virginia to vacate its orders directing Rambus to produce certain documents that Rambus asserts are protected by the attorney-client privilege and/or work product doctrine. The Federal Circuit, applying the standards governing petitions for writs of mandamus, concludes that Rambus has not met its burden to show "that the district court's relevant determinations, factual and legal, were clearly and indisputably incorrect" and denies Rambus' petition. *In re Rambus, Inc.*, Misc. Docket Nos. 762, 772, Order at p. 2 (Fed. Cir. Aug. 18, 2004).

7

- **March 1, 2005** – The *Infineon* court concludes that Rambus is guilty of and liable for unclean hands that bar Rambus' access to the Court, thereby striking Rambus' infringement claims:

> [Infineon] has proved, by clear and convincing evidence, a spoliation that warrants dismissal of [the patent infringement case] as the only appropriate sanction after having . . . considered the alternatives.

*Rambus, Inc. v. Infineon Technologies A.G.*, C.A. No. 3:00cv524, Transcript at 1139:1-6 (E.D. Va. Mar. 1, 2005). Following the hearing, but before the issuance of a written opinion and order, the parties reach an agreement to settle the litigation.

- **March 21, 2005** – The *Infineon* court enters final judgment dismissing all claims between Rambus and Infineon, with prejudice, in accordance with the parties' stipulation.

2.    **The *FTC* Case**

- **June 18, 2002** – FTC issues a Complaint alleging that Rambus has violated Section 5 of the FTC Act, 15 U.S.C. § 45, and charges that Rambus has engaged in a "pattern of anticompetitive and exclusionary acts and practices with intent to monopolize and restrain trade in the synchronous DRAM technology market and the narrower markets encompassed therein." The FTC charges stem from Rambus' participation in JEDEC:

> Without making it known to JEDEC or to its members . . . Rambus sought to obtain patents on technologies adopted in the relevant JEDEC standards. [Rambus'] alleged scheme further entailed perfecting its patent rights over these same technologies and then, once the standards had

8

> become widely adopted within the DRAM industry, enforcing such patents worldwide against companies manufacturing memory products in compliance with the JEDEC standards.

*In the Matter of Rambus Inc.*, Docket No. 9302 (before the Federal Trade Commission, Complaint filed June 18, 2002) at ¶¶ 2,43, 44, 45, 46.

- **May 13, 2003** – The FTC Chief Administrative Law Judge ("ALJ") addresses Complaint Counsel's motion to compel discovery.[10]  In opposing this motion, Rambus "narrows the issues to be resolved by conceding that Complaint Counsel is entitled to receive the [1991 to June 1996 JEDEC-related] materials and to conduct discovery consistent with what occurred in the *Infineon*, *Micron* and *Hynix* matters." *In re Rambus Inc.*, Docket No. 9302, Order on Reconsideration of Complaint Counsel's Motion to Compel Discovery Relating to Subject Matters for which Respondent Asserts Privilege at p. 2 (FTC May 13, 2003).

    Because Rambus resists Complaint Counsel's attempts to take additional discovery "for the post-June 1996 time period" the ALJ addresses Complaint Counsel's arguments that additional discovery is warranted under theories of collateral estoppel, crime/fraud exception and waiver. The ALJ concludes that, as a result of the Federal Circuit's reversal of the *Infineon* fraud verdict, "there no longer is any support for Complaint Counsel's collateral estoppel theory." *Id.* at p. 13. The ALJ also concludes that the crime/fraud exception does not apply because "there is sufficient evidence of record to rebut [the presumption of a

---

[10]  This motion was first addressed by an ALJ order dated February 28, 2003. That order was revisited on May 13, 2003 because the February 28 order was erroneously based on the theory of crime/fraud exception rather than the waiver theory briefed by the parties.

9

*prima facie* case] and to create a material question of fact on the issue of whether [Rambus] had a duty to disclose." *Id*. at p. 11.

The ALJ also concludes that Rambus has waived its privilege by voluntarily producing certain documents to Hynix and that Rambus' disclosure of pre-1996 information "opens the door to the discovery of post-1996 information in the instant case." *Id*. at p. 5.   The ALJ, however, concludes that the subject matter waiver is limited to the period before December 31, 1999 when Rambus did not anticipate litigation, and that the subject matter waiver would not apply to its attorneys' work product after that date. *Id*. at pp. 9-10.

- **May 29, 2003** – The ALJ revisits its May 13, 2003 Order and reverses its decision on subject matter waiver.  The ALJ narrows its waiver ruling to a conclusion that the "scope of discovery to which Complaint Counsel is entitled is HEREBY LIMITED to the documents created between December 1991 and June 1996 and which were previously produced in the *Hynix* litigation." *In re Rambus Inc.*, Docket No. 9302, Order Granting Request for Reconsideration at p. 4 (FTC May 29, 2003).

- **February 23, 2004** –ALJ issues an Initial Decision on the issues raised by the FTC Complaint, following 54 days of administrative hearing on a voluminous evidentiary record that includes 44 live witnesses, 1,770 admitted exhibits, and nearly 12,000 pages of trial transcript. *In re Rambus Inc.*, Docket No. 9302 (FTC Feb. 23, 2004) [available at WL 390647].   The ALJ dismisses the FTC's Complaint[11] based on numerous and detailed findings of fact and conclusions of

---

[11] On March 1, 2004, Complaint Counsel filed its Notice of Appeal of the Initial Decision and dismissal of the Complaint. That appeal is still pending before the FTC.

062038.00613/40158322v.1

law, including an express finding that Rambus was not in violation of any JEDEC rule, *id.* at pp. 134-148. (*See e.g.*, ¶ 902: "Rambus was not in violation of the JEDEC patent policy because that policy merely encouraged the voluntary disclosure of patents essential to practice JEDEC standards. Not disclosing patents conformed not only to the policy, but was also consistent with the conduct of other JEDEC members.") *Id.* at p.134.

3.      **The *Hynix* Case**

- **June 22, 2001** – In response to Hynix's motion to intervene in the *Infineon* litigation, Rambus agrees to produce to Hynix, for use in the *Hynix* case, its privileged JEDEC-related documents for 1991 to June 1996 and related testimony, pursuant to the terms of a letter agreement. The production is intended to provide Hynix with the same documents that Rambus was previously ordered to produce by the *Infineon* and *Micron* courts.

- **January 26, 2004** – The United States District Court for the Northern District of California denies Rambus' motion for a protective order seeking to reinstate privilege over the 1991 to June 1996 JEDEC-related documents and testimony. The *Hynix* court concludes that the circumstances of Rambus' disclosure of those materials to Hynix in this case, and to Complaint Counsel in the *FTC* case, constitute voluntary disclosures and "necessitate the conclusion that confidentiality as to the 1991-1996 documents has been waived." *Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905, Order Denying Defendant's Motion for Protective Order (N.D. Ca. Feb. 26, 2004).

11

- **January 31, 2005** – Based on an *in camera* review of Rambus' "spoliation" documents, the *Hynix* court concludes that "there is sufficient cause to believe that Rambus has engaged in spoliation [so as] to justify discovery of certain otherwise privileged documents" and orders that:

> Rambus shall produce to Hynix all discovery previously ordered produced in the *Infineon* litigation pertaining to Rambus' document retention plan, including the plan's conception, development, adoption, implementation and relationship to Rambus' patent litigation strategy . . . [and] all deposition transcripts and orders of the *Infineon* court which discuss or relate to the[se] topics.

*Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905, Order Compelling Production of Documents at pp. 2, 14 (N.D. Ca. Jan. 31, 2005). Production is ordered based on the *Hynix* court's conclusion that Rambus anticipated litigation at the time it implemented its document retention policy. *Id*. at p. 6. The *Hynix* court opines that its conclusion is a "close one," and emphasizes that it has "only found reasonable cause to believe spoliation occurred, which is not the same as finding that Rambus did, in fact, spoliate evidence." *Id*. at p. 13.

- **April 22, 2005** – The *Hynix* court considers a motion by Hynix to dismiss Rambus' patent infringement claims on the basis of "unclean hands". Hynix argues that the *Infineon* court's finding of spoliation and unclean hands, which resulted in the dismissal of Rambus' patent infringement claims against Infineon, should be given effect in the *Hynix* case under the doctrine of collateral estoppel. The *Hynix* court denies Hynix's motion to dismiss on the basis that it does not find the elements of collateral estoppel to be clearly met and, even if they are, the *Hynix* court is disinclined to grant preclusive effect to the *Infineon* court's ruling.

062038.00613/40158322v.1

*Hynix Semiconductor Inc. v. Rambus Inc.,* No. CV-00-20905, Order Denying Hynix's Motion to Dismiss Patent Claims for Unclean Hands on the Basis of Collateral Estoppel (N.D. Ca. Apr. 22, 2005).

- **August 26, 2005** – The *Hynix* court considers a motion by Hynix to compel the production of privileged documents recently discovered by Rambus in backup tapes and other removable media. Rambus concedes that the documents are responsive to the March 7, 2001 order by the *Infineon* court ordering production under the crime/fraud exception, but argues that the March 7, 2001 order no longer applies in light of the Federal Circuit's reversal of the trial court's fraud judgment in *Infineon*. The *Hynix* court does not address whether the March 7, 2001 order is applicable. Rather, the court orders production on the basis that "Rambus cannot demonstrate that it has not waived the attorney-client privilege with regard to documents responsive to the [March 7,] 2001 Crime/Fraud Order." *Hynix Semiconductor Inc. v. Rambus Inc.,* No. CV-00-20905, Order Compelling Production of Documents Withheld by Rambus from Removable Media at p. 4 (N.D. Ca. Aug. 26, 2005).

- **January 4, 2006** – Following a two-week trial on whether Rambus' patent infringement claims should be dismissed as sanction under the unclean hands defense, the *Hynix* court concludes that:

> Here, the court does not find dismissal to be an appropriate sanction because it **does not find the application of the unclean hands doctrine to be warranted**. Further, the evidence presented does not bear out Hynix's allegations that Rambus adopted its Document Retention Policy in bad faith. The evidence also does not demonstrate that Rambus targeted any specific document or category of relevant documents with the intent to prevent production in a

13

> lawsuit such as the one initiated by Hynix. The evidence
> here does not show that Rambus destroyed specific,
> material documents prejudicial to Hynix's ability to defend
> against Rambus' patent claims. Therefore, Hynix's unclean
> hands defense fails.

*Hynix Semiconductor Inc, v. Rambus Inc.,* No. CV-00-20905, Findings of Fact

and Conclusions of Law on Unclean Hands Defense at p. 41 (N.D. Ca. Jan. 4,

2006) (Whyte, J.).[12]

## DISCUSSION

By its motion, Micron asks that Rambus be compelled to produce documents in

derogation of the oldest of the privileges recognized in American jurisprudence. As noted by the

United States Supreme Court:

> We have recognized the attorney-client privilege under federal
> law, as **"the oldest of the privileges for confidential
> communications known to the common law."** Although the
> underlying rationale for the privilege has changed over time, courts
> long have viewed its central concern as one "to encourage full and
> frank communication between attorneys and their clients and
> thereby promote broader public interests in the observance of law
> and administration of justice." That purpose, of course, requires
> that clients be free to "make full disclosure to their attorneys" of
> past wrongdoings, in order that the client may obtain "the aid of
> persons having knowledge of the law and skilled in its practice."

*United States v. Zolin*, 491 U.S. 554, 562-63, 109 S. Ct. 2619, 2621 (1989) (emphasis added)

(quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 682 (1981)).

Similar deference to the privilege is afforded by the Third Circuit which, in *Haines v.*

*Liggett Group Inc.*, 975 F.2d 81 (3d Cir. 1992), granted a petition for writ of mandamus to direct

the district court to vacate an order compelling production of documents under the crime/fraud

---

[12] Hynix moved for a new trial, or in the alternative, for permission to appeal the January 4, 2006 Order. On
February 23, 2006, the *Hynix* court denied Hynix's motion for both forms of relief. *Hynix Semiconductor Inc. v.
Rambus Inc.*, No. C-00-20905, Order on Motion for New Trial or Permission to Appeal (N.D. Ca. Feb. 23, 2006).

14

exception to the attorney-client, work product and joint defense privileges. As noted by the

Third Circuit:

> The interest here, of course, is extremely important. It concerns
> attorney-client, attorney work product and joint defense matters,
> and it goes to the heart of the professional relationship between
> one trained in the law and the lay person or entity who may bare
> intimate confidences to the professional so that the professional
> will be fully informed. It is grounded in ethics, endorsed by
> centuries of tradition and enforced by codes of professional
> conduct and professional responsibility. It recognizes that in the
> adversary system, the professional's strategy, individually or in
> concert with others, is irrevealable.

975 F. 2d at 89. With respect to attorney work product, the Third Circuit states:

> **This court has accorded an attorney's work product almost
> absolute protection from discovery,** because "any slight factual
> content that such items may have is generally outweighed by the
> adversary system's interest in maintaining the privacy of an
> attorney's thought processes and in ensuring that each side relies
> on its own wit in preparing their respective cases."

975 F. 2d at 94 (quoting *Sporck v. Peil*, 759 F. 2d 312, 316 (3d Cir.), *cert. denied*, 474 U.S. 903,

106 S. Ct. 232 (1985)).

Against the backdrop of this jurisprudence, the Special Master turns to Micron's

arguments that the privilege asserted by Rambus as to certain categories of JEDEC-related

documents should be disregarded because each document sought falls within at least one of the

three previously stated reasons or exceptions, which the Special Master will address *seriatim*.

## I.   Conclusion:   Rambus Must Produce Certain Documents Previously Ordered Produced by Judge McKelvie's May 16, 2001 Order

The Special Master turns first to Micron's argument that Rambus should be ordered to

produce the documents and testimony addressed by Judge McKelvie's May 16, 2001 Order (D.I.

269) that granted Micron's motion to compel Rambus to produce documents and testimony

within the scope of the March 7, 2001 Order in the *Infineon* case.

15

## A.     The May 16, 2001 Order

On May 16, 2001, Judge McKelvie held a teleconference with counsel for Micron and

Rambus to address Micron's request to compel the production of "crime/fraud" documents. D.I.

267 at 3:21-24. Micron described the documents as falling into two categories: "ones that were

discussed in court [during the *Infineon* trial], and the second is the category that weren't,"

referring to documents that were produced by Rambus and within the scope of the March 7, 2001

Order in *Infineon*, but that were not discussed in open court during that trial. *Id.* at 3:24-25.

Based on representations that Rambus had recently produced to Micron the documents that were

discussed in open court during the *Infineon* trial, *id.* at 5:19-23, the Court turned its attention to

the "second category" and asked Micron to define the universe of documents in that category.

Micron responded that the category encompassed documents within:

> the time frame that Rambus was participating in JEDEC meetings,
> which is from roughly December of 1991 through December of
> 1995. I think the [*Infineon*] Court may have expanded it through
> June of 1996, which was the date that the letter was sent
> confirming that Rambus is not going to be renewing its
> membership . . . .
>
>      With regard to the types of documents, the [*Infineon*] Court
> described them in three categories . . . one, communications with
> the lawyers concerning advice concerning disclosures at JEDEC,
> second being communications with the lawyers concerning
> resignation or participation at JEDEC. And the third was any
> communications relating to – I think the Judge described it as the
> broadening of patent applications during that time frame.

D.I. 267 at 8:2-20. The Court then clarified:

> JUDGE MC KELVIE:  So now what we are talking about is the
> documents that were not used in court that were produced pursuant
> to Judge Payne's [March 7, 2001] order that can be identified as
> those three categories plus you are talking also about deposition
> transcripts where there is testimony relating to the communications
> identified in these three categories of documents, but which may
> not have been offered into evidence at the trial?

16

[RAMBUS]: Precisely.

D.I. 267 at 9:14-21.

Following the parties' arguments in support of their respective positions, Judge McKelvie

concluded:

> I think what I'm going to do is **order Rambus to produce the documents that we've identified.** That is, using the definition that Judge Payne used [and] adding into the definition, deposition transcripts where testimony was given about the subject matter, where Judge Payne made a finding that there was no privilege.

> \* \* \*

> The impact of ordering discovery of these materials isn't in the end a finding on my part that . . . the documents will necessarily be admissible, there won't be any privilege later. That is, that Rambus can't assert privilege later at a trial or a jury trial.

> \* \* \*

> So I think **the better approach is to go ahead and order Rambus to produce the documents as we've defined during the coarse of the telephone conference call, but to limit the use that Micron can make for the purposes of this litigation for now,** and then to explore as we go forward what the impact of ordering the documents to be produced would be, meaning that it's a litigation-based decision as opposed to generally opening up the documents that Rambus continues to assert are protected [by] the privilege.

D.I. 267 at 24:3-8; 24:22 to 25:1-2; and 25:9-17 (emphasis added). Judge McKelvie's written

order memorializing this conclusion is dated May 16, 2001 and states:

> For the reasons set forth in the telephone conference on May 16, 2001, IT IS HEREBY ORDERED that **Rambus, Inc. shall produce to Micron Technology, Inc. the documents identified during the telephone conference.**

D.I. 269 (emphasis added). Rambus did not timely appeal, or otherwise seek relief from, Judge

McKelvie's May 16, 2001 Order.

17

## B.    Documents Sought

Pursuant to Judge McKelvie's May 16, 2001 Order, Micron now seeks the production of

an additional 46 pages of documents that were subsequently produced by Rambus in the *Infineon*

case following orders entered by that court on February 26, 2004[13] (ordering the production of 27

additional documents) and on April 5, 2004 (ordering the production of 19 additional

documents). D.I. 637 at p.25, n.5. The *Infineon* court ordered the production of these additional

documents based on its conclusion that they are responsive to the March 7, 2001 Order.[14]

Micron also seeks the production of any other documents it argues are within the scope of Judge

Payne's March 7, 2001 Order. Specifically, Micron seeks the production of JEDEC-related

documents that post-date Rambus' June 1996 resignation from JEDEC, as well as documents that

concern Rambus' efforts to amend claims in its foreign patent applications to cover JEDEC

standards.

## C.    Rambus' Opposition

In response, Rambus does not dispute Micron's contention that the 46 additional

documents sought by Micron fall within the description of documents discussed during the May

16, 2000 hearing before Judge McKelvie or that they are within the definition of documents

encompassed by his Order of the same day. To the contrary, Rambus admitted during the July

14, 2005 hearing before the Court that these documents – referred to as the "asterisked"

---

[13]   The February 26, 2004 Order was vacated and replaced by the Memorandum Opinion and Amended Order
reported as *Rambus Inc. v. Infineon Technologies AG*, 220 F.R.D 264, 267 (E.D. Va. 2004) ("it is hereby
ORDERED that the February 26 Opinion and the Order implementing it (Docket No. 536) are vacated and that the
Amended Memorandum Opinion and Amended Order issued herewith shall be filed to replace them.").

[14]   The *Infineon* court describes 27 of the documents as follows:

> Rambus also is refusing to produce twenty-seven documents **that admittedly
> fall within the reach of the March 7 Order that have never been produced
> to anyone, assertedly because of their belated discovery**. The reason given
> for so doing was that the Federal Circuit's [January 29, 2003] opinion rendered
> the March 7 Order a nullity and, . . . therefore, Rambus need not produce those
> twenty-seven documents.

*Infineon*, 220 F.R.D. at 270 (emphasis added).

documents on the privilege log before the Court – clearly come within the reach of Judge McKelvie's May 16, 2001 Order. Rambus explains that they have not been produced thus far because they were belatedly discovered:

> In the newly discovered backup media that Rambus discovered, there are some documents that are in fact within the scope of Judge Payne's [March 7, 2001] order and would have been produced in 2001 had they been discovered at that time. That's why we asterisked them to make it clear. Those documents have not been produced. They were discovered after the *Infineon* case was resolved. They have not been produced to Hynix.

D.I. 686 at 70:12-19.

Rambus, however, opposes the production of these and any additional documents under Judge McKelvie's May 16, 2001 order by arguing that the landscape has changed since the entry of that Order. Rambus asserts that the basis relied upon by Judge McKelvie in entering that order – that being the *Infineon* court's March 7, 2001 Order – "has been swept away in its underpinnings." D.I. 645 at p. 16. In this regard, Rambus relies on the opinion by the Federal Circuit in *Rambus, Inc. v. Infineon Techs. A.G.*, 318 F. 3d 1081, 1102-05 (Fed. Cir. 2003) that reversed the jury verdict of fraud entered by the *Infineon* trial court and concluded that no reasonable jury could find fraud on that record.

### D.   **Special Master's Analysis**

Rambus is correct that Judge McKelvie's May 16, 2001 Order was based upon the March 7, 2001 Order in the *Infineon* case, as well as the later jury verdict of fraud in that case[15]:

> **The basis for the decision is,** I think, **one,** we've got a Judge who has already looked at this one time and made a finding that there are sufficient facts to show that the documents should be produced.

---

[15] At least one court has described Judge McKelvie's May 16, 2001 Order as an application of collateral estoppel. *Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905 at 2 (N.D. Ca. Feb. 26, 2004) (Whyte, J.) ("In . . . *Micron*, the court compelled production of these same documents under a collateral estoppel theory.").

> **Two**, while there's not a perfect fit between the jury verdict
> and the issues raised in this case, . . . I think I could look to the jury
> verdict as confirming that there appears to have been a factual
> basis, is a sufficient factual basis to find fraud by Rambus for the
> purpose of finding that they are not entitled to the protection of the
> attorney/client [privilege] for these communications.

D.I. 267 at 24:9-21 (emphasis added).

The Special Master does not, however, conclude that Judge McKelvie's May 16, 2001

Order is "swept away" by the Federal Circuit opinion that reverses the *Infineon* jury verdict for

several reasons. First, the record on appeal presented to the Federal Circuit required the Court to

analyze the question of whether Rambus had a duty to disclose certain information to JEDEC as

a question of fact rather than as a matter of law.[16] *See* 318 F. 3d at 1087 ("although Virginia has

not stated clearly whether detecting the existence of a duty to disclose is a question of law or

fact, the district court considered the issue a question of fact . . . On appeal, neither party

contests the district court's submission of this issue to the jury. Therefore this Court will analyze

the existence of a duty to disclose as a question of fact.") (footnotes omitted). As a consequence,

the Federal Circuit's opinion reviews only a factual determination by the *Infineon* jury that a duty

existed. The Federal Circuit's opinion stops short of concluding that Rambus did not have a duty

to disclose to JEDEC as a matter of law because that issue was not squarely before it.

Second, there is a distinction between the higher standard of proof required to establish

liability for fraud as compared to the lesser showing required to establish a *prima facie* case

under the crime/fraud exception. *See, e.g. RCA Corp. v. Data General Corp.*, Civ. A. No. 84-

270-JJF at *2 (D.Del., Oct. 27, 1986) (Farnan, J.) [available as 1986 WL 15684] ("the standard

---

[16] The Federal Circuit notes that "a review of the relevant laws of other states and Virginia's law on other tort duties
strongly suggests that this issue may well be a legal question with factual underpinnings. For example, according to
the Restatement [(Second)] of Torts, 'whether there is a duty to the other to disclose the fact in question is always a
matter for the determination of the court.' . . . A number of states treat the existence of a disclosure duty as a
question of law, and the breach of that duty as a question of fact." 318 F.3d 1087 n. 3 (internal citations omitted).

20

of proof required for the prima facie showing of fraud 'need not be such as to actually prove the disputed fact, but it [only] must be such as to subject the opposing party to the risk of non-persuasion if the evidence as to the disputed fact is left unrebutted'." (quoting *Hercules Inc. v. Exxon Corp.*, 434 F. Supp. 136, 155 (D.Del. 1977)). The Federal Circuit did not address or reverse the *Infineon* court's conclusion that a *prima facie* case of fraud had been established. Indeed, that issue was not before the Court.

Third, the Federal Circuit did not expressly reverse the March 7, 2001 Order that formed the basis, in part, for Judge McKelvie's May 16, 2001 Order. Rather, the record reflects that Rambus never directly appealed the *Infineon* court's March 7, 2001 Order. *Infineon*, 220 F.R.D. at 269 ("Rambus, however, did not seek review of the March 7 Order on its direct appeal at the end of the initial proceedings in this Court."). Additionally, Rambus never timely appealed, or sought other relief from, Judge McKelvie's May 16, 2001 Order.

Finally, the Special Master has considered the key inquiry posed to the parties by this Court: whether any differences exist between the record that was before Judge McKelvie in May 2001 and the record that was before the Federal Circuit when it reviewed and reversed the *Infineon* fraud verdict.[17] In briefing and argument, the parties have focused on the numerous decisions that issued in the *Infineon, Hynix* and *FTC* cases subsequent to the entry of Judge McKelvie's May 16, 2001 Order. The parties have **not** clarified whether any substantial differences exist between the evidentiary record that was before Judge McKelvie in May 2001

---

[17] At the July 14, 2005 hearing on Micron's motion to compel, the Court framed the issue as follows:
> [T]he JEDEC arguments that have been made to me show that there is still a significant factual dispute about what it was that the Federal Circuit had as a record before it when it made a determination as opposed to what was the record before Judge McKelvie when he made his ruling in May of 2001 in this case and whether or not that factual distinction, if there is one, because there is a dispute about that, is such as to warrant a different legal conclusion and, therefore, I'm going to need some more development of a record about what the record is.

D.I. 686 at 80:9-18.

21

and the *Infineon* record that was before and considered by the Federal Circuit. For example, despite arguing that this Court should adopt the Federal Circuit's opinion reversing the fraud judgment of the *Infineon* court, Rambus has failed to establish that the records before the Federal Circuit and Judge McKelvie were so substantially similar as to warrant the same conclusion. For its part, Micron argues that this Court should sustain the May 16, 2001 Order even in the face of the Federal Circuit's reversal in *Infineon*, without establishing whether there are factual differences between the two records that should result in different legal conclusions.[18]

In the absence of the requested clarification, the Special Master *sua sponte* considers the law of the case doctrine in assessing whether it is appropriate to disturb the *status quo* of the May 16, 2001 Order. Under the law of the case doctrine, any reconsideration[19] of the May 16, 2001 Order would require new evidence:

> The law of the case doctrine "limits relitigation of an issue once it has been decided" in an earlier stage of the same litigation . . . Reconsideration of a previously decided issue may, however, be appropriate in certain circumstances, including when the record contains new evidence. This exception to the law of case doctrine makes sense because when the record contains new evidence, "the question has not really been decided earlier and is posed for the first time." But **this is so only if the new evidence differs materially from the evidence of record when the issue was first decided and if it provides less support for that decision.** Accordingly, **if the evidence at the two stages of litigation is "substantially similar," or if the evidence at the latter stage provides more support for the decision made earlier, the law of the case doctrine will apply.**

*Hamilton v. Leavy*, 322 F. 3d 776, 786-87 (3d Cir. 2003) (citations omitted). Thus, although the subsequent factual and non-binding legal developments recited in the *Infineon*, *FTC* and *Hynix*

---

[18] The "new evidence" addressed by Micron in its recent briefing relates to the spoliation documents and not to JEDEC-related issues. The parties agree that these are completely separate categories of documents having no overlap. D.I. 686 at 64:8-18.

[19] In opposing Micron's motion to compel, Rambus has not expressly moved for reconsideration of the May 16, 2001 Order.

22

cases might lead the Special Master to a different determination than that contained in the May 16, 2001 Order,[20] the Special Master concludes that the parties have not provided sufficient evidence addressing the differences, if any, between the respective records that were before Judge McKelvie and the Federal Circuit so as to permit appropriate reconsideration of the May 16, 2001 Order.

Having stated the above, the Special Master concludes that Judge McKelvie's May 16, 2001 Order remains the law of the case and that Rambus must produce the 46 JEDEC-related documents that Rambus admits are within the scope of the Order and that, but for a lapse in diligence by Rambus during its 1991 production, could and should have been produced in 1991.

Having concluded that Judge McKelvie's May 16, 2001 Order remains the law of the case, the question then becomes whether JEDEC-related documents (i) for the period after June 1996 and (ii) with respect to foreign patent applications are encompassed by that Order. The Special Master concludes that they are not. To the contrary, the Order expressly provides that "Rambus, Inc. shall produce to Micron Technology, Inc. **the documents identified during the [May 16, 2001] telephone conference.**" D.I. 269 (emphasis added). The transcript of the referenced May 16, 2001 teleconference makes clear that the documents ordered produced were within the time period of December 1991 through June 1996. D.I. 267 at 8:2-20. Further, the transcript makes clear that there was no discussion of communications or documents related to foreign patent applications. D.I. 267. In reaching this conclusion, the Special Master is mindful that the March 7, 2001 Order of the *Infineon* court also does not order production of either of those categories of documents.

---

[20] The Special Master's crime/fraud analysis addressing categories of JEDEC-related documents not within the scope of the May 16, 2001 Order is discussed *infra* at pages 24 to 39.

Finally, the Special Master addresses what may be interpreted as an attempt by Micron to broaden the reach of Judge McKelvie's May 16, 2001 Order based on subsequent orders and rulings of the *Infineon* court with respect to its own March 7, 2001 Order. In this regard, the Special Master is mindful of Rambus' arguments that Judge McKelvie's May 16, 2001 Order was not solely the product of an independent determination but, rather, relied in large part upon factual determinations reached by the *Infineon* court, and that the Federal Circuit concluded that "no reasonable jury" could find fraud on that record. The Special Master is also mindful that Rambus' decision not to appeal, or seek other relief from, the May 16, 2001 Order was necessarily based, at least in part, upon Rambus' understanding of the universe of documents reasonably encompassed by the Order at the time it issued. The Special Master, therefore, concludes that equitable considerations weigh against broadening the universe of documents encompassed by Judge McKelvie's May 16, 2001 Order after that date by, for example, adopting any rationale of the *Infineon* court that may have broadened the reach of the underlying March 7, 2001 Order.

In summary, the Special Master concludes that, pursuant to Judge McKelvie's May 16, 2001 Order, Rambus must produce to Micron only the 46 JEDEC-related documents referred to as the "asterisked" documents. The Special Master also concludes that Micron's request for the production of any additional documents under Judge McKelvie's May 16, 2001 Order should be denied.

## II.   Conclusion: Micron Has Not Established a Duty to Disclose Necessary to Compel Production Under the Crime/Fraud Exception

The Special Master next addresses Micron's argument that Rambus should be ordered to produce its privileged post-June 1996 and foreign patent application documents pursuant to the crime/fraud exception. As discussed *supra*, the Special Master has concluded that the Court's

24

May 16, 2001 Order does not encompass these categories of documents. Additionally, because the May 16 Order gives collateral estoppel effect to the *Infineon* court's March 7, 2001 Order and fraud verdict, the May 16 Order is not accompanied by an opinion or any analysis of whether Micron met the showing necessary to establish a *prima facie* case. The Special Master therefore undertakes this analysis as a predicate to determining Micron's demand for production of JEDEC-related documents created after June 1996 and documents addressed to foreign patent applications.

The Special Master begins with a discussion of the governing law.

## A. Governing Law

The Special Master will analyze whether Micron has made the showing required to pierce Rambus' attorney-client and work product privileges in accordance with principles of federal common law, since the patent enforceability and infringement claims that form the basis of the underlying litigation arise under the patent laws of the United States, and the litigation is governed by the procedural, evidentiary and local rules, and the rules of decision that govern litigation in this federal Court. Fed. R. Evid. 501; *Willemijn Houdstermaatschaapij BV v. Appollo Computer Inc.*, 707 F. Supp. 1429, 1444 (D.Del. 1989) ("federal common law principles . . . determine the availability of the attorney-client privilege in patent infringement actions"). *See also, Hynix Semiconductor Inc. v. Rambus Inc.,* No. CV-00-20905 at 7 (N.D. Ca. Feb. 26, 2004) (Whyte, J.) ("as federal law provides the rule of decision, application of the attorney-client privilege here is governed by federal common law.").

Specifically, the Special Master will apply federal common law as construed by this Circuit. *In re Regents of University of California*, 101 F. 3d 1386, 1390, n. 2 (Fed. Cir. 1996)

25

("For procedural matters that are not unique to patent issues, we apply the perceived law of the

regional circuit.").[21]

## B.    The Crime/Fraud Exception Doctrine

The purposes underlying the crime/fraud exception to attorney-client privilege were

analyzed by the United States Supreme Court in *United States v. Zolin:*

> The attorney-client privilege is not without its costs. "[S]ince the
> privilege has the effect of withholding relevant information from
> the factfinder, it applies only where necessary to achieve its
> purpose." The attorney-client privilege must necessarily protect
> the confidences of wrongdoers, but the reason for that protection –
> the centrality of open client and attorney communication to the
> proper functioning of our adversary system of justice – "ceas[es] to
> operate at a certain point, namely, where the desired advice refers
> *not to prior wrongdoing, but to future wrongdoing.*" **It is the
> purpose of the crime-fraud exception to the attorney-client
> privilege to assure that the "secret of secrecy," between lawyer
> and client does not extend to communications "made for the
> purpose of getting advice for the commission of a fraud" or
> crime.**

491 U.S. at 562-63 (1989) (emphasis added) (citations omitted) (footnotes omitted).

Succinctly stated, attorney-client privilege "does not extend to communications from the

*lawyer* to the client made by the *lawyer* for the purpose of giving advice for the commission of a

fraud or crime.  The seal [of secrecy] is broken when the lawyer's communication is meant to

facilitate future wrongdoing by the client."  *Haines* 975 F.2d at 90 (emphasis in original).

However, "[w]here the client commits a fraud or crime for reasons completely independent of

legitimate advice communicated by the lawyer, the seal is not broken, for the advice is, as the

logicians explain, *non causa pro causa.*"  *Id.*

---

[21]  In contrast, Federal Circuit law applies when deciding when a particular or other materials are discoverable in a
patent case if that issue implicates substantive patent law.  *In re Spalding Sports Worldwide, Inc.*, 203 F. 3d 800, 803
(Fed. Cir. 2000).

The Third Circuit has also held that, although the attorney-client and work product privileges are separate and distinct, there is an overlap between the two privileges for the purposes of a crime/fraud analysis because information shared between the client and lawyer may merge into the work product. Under these circumstances, the rationale supporting the crime/fraud exception to both privileges "is virtually identical." Accordingly, the Third Circuit instructs that courts should apply the same principles to determinations of whether the crime/fraud exception applies to defeat both the attorney-client and work product privileges:

> [W]e have held that the work product privilege is a qualified one that can be overcome by a showing of good cause. We have no doubt that the crime-fraud exception comes within "good cause" to deny applicability of the work product doctrine. In reaching this conclusion, we **find most helpful the principles followed by courts in determining whether the exception applies to defeat the attorney-client privilege**. For in a case such as this, where the two privileges substantially overlap, there appears to be **no compelling reasons for employing different standards**.

*In re Grand Jury Proceedings*, 604 F.2d 798, 802-803 (3d Cir. 1979) (citation omitted) (emphasis added).

### C.   The Showing Required to Establish a *Prima Facie* Case

In this District, a party seeking discovery of otherwise privileged communications or documents based upon the crime/fraud exception to either the attorney-client or work product privileges must show: (1) "a prima facie case of fraud," and (2) that the communications at issue "were made in furtherance of the fraud." *Hercules Inc. v. Exxon Corp.*, 434 F. Supp. 136, 155 (D.Del. 1977).

**First Prong** – In order to meet the first prong, Micron must show that a reasonable basis exists to establish the elements of a case of *fraud*:

> (1)   A misrepresentation of a material fact;

27

    (2)  An *intent* to deceive or a state of mind so reckless regarding consequences as to be the equivalent of intent (scienter);

    (3)  A justifiable reliance on the misrepresentation; and

    (4)  An injury to the deceived party resulting from the reliance.

*RCA Corp. v. Data General Corp.*, Civ. A. No. 84-270-JJF at *2 (D.Del., Oct. 27, 1986) (Farnan, J.) [available as 1986 WL 15684] (emphasis in original).

  **Second Prong** – The second prong which Micron must meet to establish a *prima facie* case requires a showing that the privileged communication and fraud are connected, specifically that the communication is intended to obtain or advice from the lawyer in *furtherance* of the fraud. *Finley Associates, Inc. v. Sea & Pines Consolidated Corp.*, 714 F. Supp. 110, 117 (D. Del. 1989) ("[A] party contending a communication falls within the crime or fraud exception to the privilege must make a preliminary *prima facie* showing that a reasonable basis exists to believe the attorney-client communication was in furtherance of a crime or fraud.") (citation omitted).

  **Persuasion Rather than Proof** – This Court has held that it is not necessary for the party seeking to invoke the production of privileged communications under the crime/fraud exception to actually prove the disputed facts that establish each prong of the *prima facie* case. Rather, this Court has adopted the following standard of proof:

> The standard of proof required for the prima facie showing of fraud " . . . **need not be such as to actually prove the disputed fact, but it must be such as to subject the opposing party to the risk of non-persuasion if the evidence as to the disputed fact is left unrebutted."**

*RCA*, 1986 WL 15684 at *2 (emphasis added) (quoting *Hercules*, 434 F. Supp. at 155).

  **Right of Rebuttal** – Contrary to Micron's arguments that Rambus is not, or should not be, permitted to rebut Micron's evidence, the law in this Circuit provides:

For *in camera,* it would be sufficient for the district court, in its discretion, to consider only the presentation make by the party challenging the privilege. The court may decide on this admission alone whether a factual basis is present to support a good faith belief by a reasonable person that the materials may reveal evidence of a crime or fraud.

**Deciding whether the crime-fraud exception applies is another matter. . . .** The importance of the privilege, as we have discussed, as well as fundamental concepts of due process require that the party defending the privilege be given the opportunity to be heard, by evidence and argument, at the hearing seeking an exception to the privilege. We are concerned that the privilege be given adequate protection, and this can be assured only when the district court undertakes a thorough consideration of the issue, with the assistance of counsel on both sides of the dispute. *See Matter of Feldberg,* [862 F.2d 622, 626 (7th Cir. 1988)] **(after prima facie showing that exception applies, party asserting privilege should have opportunity to rebut; "[i]f the court finds the explanation satisfactory, the privilege remains.").**

We therefore must agree with petitioners' contention that where a fact finder undertakes to weigh evidence in a proceeding seeking an exception to the privilege, **the party invoking the privilege has the absolute right to be heard by testimony and argument.**

*Haines,* 97 F.2d at 96-97 (emphasis added).

## D.   Special Master's Crime/Fraud Analysis

Applying these principles, the Special Master examines whether Micron has met its burden to establish a *prima facie* showing that production of additional Rambus documents should be compelled under the crime/fraud exception. For the following reasons, the Special Master concludes that Micron has failed to make the required showing.

### 1.   Elements of Fraud

The lynchpin of Micron's fraud argument as it pertains to the JEDEC-related documents is that, in violation of JEDEC policy and a duty owed to the members of JEDEC, Rambus committed fraud by not disclosing to JEDEC and its members certain of Rambus' pending and/or

29

planned patent applications related to SDRAM and DDR-SDRAM while JEDEC was adopting standards for that technology. Under the principles set forth in the *Restatement (Second) of Conflicts of Law*, the Special Master applies the "most significant relationship" test and concludes that the law of the Commonwealth of Virginia applies, because Virginia has the most significant relationship to JEDEC and the participation of its members in JEDEC meetings.

Under Virginia Law, the elements of fraud are (1) a false representation, (2) of material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled and (6) damages resulting from that reliance. *Van Duesen v. Snead*, 247 Va. 324, 441 S.E. 2d 207, 209 (1994); *accord ITT Hartford Group, Inc. v. Virginia Fin. Assocs., Inc.*, 258 Va. 193, 520 S.E. 2d 355, 361 (1999).

Virginia also recognizes fraud by omission, sometimes called fraud by "concealment." Unlike fraud based on affirmative misrepresentation, fraud by concealment requires a showing of intent to conceal a material fact. Reckless nondisclosure is not actionable. *Norris v. Mitchell,* 255 Va. 235, 495 S.E. 2d 809, 812 (1998) ("Therefore, we have required either an allegation or evidence of a knowing and a deliberate decision not to disclose a material fact.").

Importantly, under Virginia law, silence does not constitute concealment in the absence of a duty to disclose. *Norris v. Mitchell,* 495 S.E. 2d at 812-13; *accord Bank of Montreal v. Signet Bank*, 193 F.3d 818, 827 (4th Cir. 1999).

### 2.   Duty to Disclose

Because silence does not constitute fraudulent concealment in the absence of a duty to disclose under Virginia law, the foundation for any fraud argument is whether Rambus had a duty to disclose. Therefore, as a starting point for analysis, the Special Master considers whether Rambus had a legally enforceable duty to disclose information about any pending or planned

30

patent applications to JEDEC and its members.[22] The Special Master concludes that, in the absence of a legally enforceable duty, it is not possible to conduct a crime/fraud analysis because there is no basis to evaluate whether any alleged failure to disclose by Rambus can arise to the level of a misrepresentation of material fact. Simply stated, if there is no duty there can be no fraud.

In this regard, the Special Master is mindful of the Federal Circuit's opinion in its review and reversal of the *Infineon* fraud judgment.[23] Although the Federal Circuit was required to consider on review whether the *Infineon* jury correctly determined that Rambus had a duty to disclose as a matter of fact because neither party had contested the district court's submission of this issue to the jury, the Federal Circuit nonetheless strongly suggested that the question of duty should be analyzed as a matter of law:

> While this court reviews this as a factual question, a review of the relevant law of other states and Virginia's law on other tort duties strongly suggests that this issue may well be a legal question with factual underpinnings. For example, according the Restatement, "whether there is a duty to the other to disclose the fact in question is always a matter for the determination of the court." Restatement (Second) of Torts § 551 [comment] m (1976 Main Vol.). Moreover, Virginia, like most states, considers contract construction a legal question for the court, *Craig v. Dye*, 259 Va. 533, 526 S.E. 2d 9, 11 (2000), and the asserted duty in this case arises from a written contract. A number of states treat the existence of a disclosure duty as a question of law, and the breach of that duty as a question of fact . . . Finally, Virginia treats many

---

[22] The Special Master afforded the parties an opportunity to respond to this issue, by argument (during the September 23, 2005 teleconference with the Special Master) and written submission. (D.I. 697 and letter from F. Cottrell, Esquire, dated October 5, 2005).

[23] Subsequent to this Court's May 16, 2001 Order, the Federal Circuit issued its opinion in *Rambus Inc. v. Infineon Technologies AG*, 318 F.3d 1081 (Fed. Cir. 2003). In the *FTC* case, the ALJ also issued an opinion in the form of an Initial Decision. *In Re Rambus Inc.*, Docket No. 9302, Initial Decision (FTC Fed. 23, 2004). These opinions contain, respectively, a review and an initial decision addressing many of the same issues raised by Micron's instant motion to compel, and both opinions are based upon voluminous and well-developed evidentiary records. Both opinions have also been raised by the parties in briefing on the instant motion and in additional submissions to the Special Master. The Special Master does not give collateral estoppel effect to either opinion. Rather, the Special Master conducts an independent analysis of whether Rambus owed a duty in the first instance.

31

> tort duties as questions of law. *Burns v. Johnson,* 250 Va. 41, 458
> S.E. 2d 448, 451 (1995) ("The question whether a duty of care
> exists in a negligence action is a pure question of law."); *Acme
> Markets, Inc. v. Remschel,* 181 Va. 171, 24 S.E. 2d 430, 434
> (1943).

318 F. 3d 1087, n. 3 (internal citations omitted).

Accordingly, the Special Master examines whether Rambus had a legally enforceable duty to disclose certain information. By its Amended Complaint and briefing, Micron alleges that Rambus' duty to disclose arose from JEDEC policy[24] and/or the relationship that existed between Rambus and the other members of JEDEC.

With respect to JEDEC policy, both the Federal Circuit and FTC reviewed extensive evidentiary records detailing JEDEC policy and manuals.[25] The Federal Circuit Opinion recites that JEDEC's general counsel considered JEDEC's patent disclosure to be contained in three manuals. 318 F. 3d at 1096 ("John Kelly, EIA's general counsel since 1990 and the person responsible for implementing the EIA/JEDEC patent policy, testified that three manuals, namely, EP-3-F, EP-7-A, and JEP 21-I, contain the patent disclosure policy."). The Special Master begins by considering these policy statements *seriatim*.[26]

## EP-3-F and EP-7-A

"EP-3-F" is an October 1981 EIA manual that outlines the following procedure for using patented items in the standard setting process:

8.3 Reference to Patented Product in EIA Standards

---

[24] During Rambus' membership in JEDEC, JEDEC was a standard-setting body that operated under the auspices of the Electronic Industries Association ("EIA"). The EIA is currently known as the Electronic Industries Alliance.

[25] The Initial Decision in the *FTC* case details the ALJ's examination of each and every JEDEC manual and policy, and the ALJ's conclusion that none "impose an obligation to disclose intellectual property." *See In re Rambus, Inc.,* Docket No. 9302, Initial Decision at pp. 83-117 (FTC Feb. 23, 2004).

[26] The complete text of JEDEC policy provisions cited herein is reported in *In re Rambus, Inc.*, Docket 9302, Initial Decision pp. 83-87 (FTC Feb. 23, 2004). Relevant portions are also recited in *Rambus Inc. v. Infineon Technologies AG*, 318 F. 3d 1081, 1096-99 (Fed. Cir. 2003).

Requirements in EIA Standards which call for the use of patented
items should be avoided. No program of standardization shall
refer to a product on which there is a known patent unless all the
technical information covered by the patent is known to the
Formulating committee, subcommittee or working group. The
Committee Chairman must also receive a written expression from
the patent holder that he is willing to license applicants under
reasonable terms and conditions that are demonstrably free of any
unfair discriminations. Additionally, when a known patented item
is referred to in an EIA Standard, A Caution Notice, as outlined in
the Style Manual, EP-7, shall appear in the EIA Standard.

"EP-7-A" is taken from the 1990 EIA manual and similarly provides:

3.4     Patented Items or Processes

Avoid requirements in EIA standards that call for the exclusive use
of a patented item or process. No program [of] standardization
shall refer to a patented item or process unless all of the technical
information covered by the patent is known to the formulating
committee or working group, and the committee chairman has
received a written expression from the patent holder that one of the
following conditions prevails:

(1)     a license shall be made available without charge to
        applicants desiring to utilize the patent for the purpose of
        implementing the standard, or

(2)     a license shall be made available to applicants under
        reasonable terms and conditions that are demonstrably free
        of any unfair discrimination.

. . . An appropriate footnote shall be included in the standard
identifying the patented item and describing the conditions under
which the patent holder will grant a license (see 6.5.2).

Both the EP-3-F manual and the EP-7-A manual were in effect when Rambus joined JEDEC.

Both require that no standard refer to a product on which there is a known patent unless all of the

technical information covered by the patent is known to the committee or working group, and

that licenses shall be made available on certain terms. The Special Master concludes, however,

33

that neither of these manuals reference or create an obligation on the part of an EIA or JEDEC member to disclose pending patents or patent applications.[27]

## JEP 21-H and JEP 21-I

Before addressing JEP 21-I, the Special Master turns to "JEP 21-H" which was in effect when Rambus began attending JEDEC meetings in late 1991 and joined JEDEC in 1992. JEP 21-H is the JEDEC Manual of Organization and Procedure (21-H) dated July 1988. It contains the following legend: "Electronic Industries Association. Engineering Department."

Appendix D to JEP 21-H is a non-liability disclaimer incorporated into JEDEC standards. This disclaimer states:

> JEDEC standards are adopted without regard to whether or not their adoption may involve patents on articles, materials or processes. By such action JEDEC does not assume any liability to any patent owner, nor does it assume any obligation whatever to parties adopting the Standards.

JEP 21-H also states that "[a]ll meetings of the JEDEC Solid State Products Engineering Counsel and its associated Committees, Subcommittees, Task Groups and other units shall be conducted within the current edition of the EIA Legal Guides adopted by the EIA Board of Governors and incorporated hereby by reference." The Special Master concludes that JEP 21-H does not create any obligation on the part of JEDEC members to disclose patents, patent applications, or the intent to file patent applications.

"JEP 21-I," JEDEC Manual of Organization and Procedure (21-I) dated October 1993, also contains the legend: "Electronic Industries Association. Engineering Department." It displays the trademarks of both JEDEC and the EIA. JEP 21-I states, in relevant part:

---

[27] It is undisputed that Rambus advised the Committee of the issuance of its U.S. Patent No. 5,243,703, a divisional patent of its '898 application, in September 2003. What Micron asserts is that Rambus had a duty to disclose pending and/or planned patent applications.

34

> [A]ll meetings of the JEDEC Solid State Products Engineering
> Council and its associated committees, subcommittees, task groups
> and other units shall be conducted within the current edition of
> EIA legal guides adopted by the EIA Board of Governors and
> incorporated herein by reference.

JEP 21-I, Section 9.1.

Section 9.3 of JEP 21-I discusses the use of patented products in EIA Standards as

follows:

> EIA and JEDEC standards and nonproduct registrations (e.g.,
> package outline drawings) that require the use of **patented** items
> should be considered with great care. While there is no restriction
> against drafting a proposed standard in terms that include the use
> of **patented** item [FN 1] if technical reasons justify the inclusion,
> committees should ensure that no program of standardization shall
> refer to a product on which there is a **known patent** unless all the
> relevant technical information covered by the **patent** is known to
> the formulating committee[,] subcommittee, or working group. If
> the committee determined that the standard requires the use of
> **patented** items, then the committee chairperson must receive a
> written assurance from the organization holding rights to such
> **patents** that a license will be made available without compensation
> to applicants desiring to implement the standard, or written
> assurance that a license will be made available to all applicants
> under reasonable terms and conditions that are demonstrably free
> of any unfair discrimination.   Additionally, when a **known
> patented** item is referred to in an EIA/JEDEC standard, a
> cautionary note as outlined in this document, shall appear in the
> EIA/JEDEC standard (see 9.3.1.).
>
> All correspondence between the patent holder and the formulating
> committee, subcommittee, or working group, including a copy of
> the written assurance from the patent holder discussed above, shall
> be transmitted to the EIA Engineering Department and the EIA
> General Counsel at the earliest possible time and, in any case,
> before the standard is otherwise ready for subcommittee or
> committee ballot circulation. (See the Style Manual, EP-7-A, 3.4
> for the required language in an EIA Standard that cites a product
> with a known patent.)
>
> [FN 1]: For the purposes of this policy, the word "patented" also
> includes items and processes for which a patent has been applied
> and may be pending.

35

JEP 21-I, Section 9.3 (emphasis added).  The Special Master concludes that, notwithstanding the

footnote, this section does not impose an obligation to disclose pending or planned patents.

Rather the purpose of this section is to describe the requirements for incorporating known

patented products into EIA/JEDEC standards.

Finally, the Special Master turns to Section 9.3.1 of JEP 21-I which states:

9.3.1   *Committee Responsibility Concerning Intellectual Property*

**The Chairperson** of any JEDEC committee, subcommittee, or
working group **must call to the attention** of all those present the
requirements contained in the EIA Legal Guides, and call attention
**to the obligation of all participants to inform the meeting of
any knowledge they may have of any patents, or pending
patents, that might be involved in the work they are
undertaking.     Appendix E (Legal Guidelines Summary)
provides copies of viewgraphs that should be used at the
beginning of the meeting to satisfy this requirement.**
Additionally, all participants must be asked to read the statement
on the back of each EIA Sign-in/Attendance Roster.

JEP 21 I, Section 9.3.1.  The Special Master concludes that this provision imposes an obligation

upon the Committee chairperson, which obligation should be satisfied by showing JEDEC

members viewgraphs containing Appendix E.  The test of Appendix E provides as follows:

*EIA/JEDEC PATENT POLICY SUMMARY*

Standards that call for use of a **patented** item or process may not
be considered by a JEDEC committee unless all of the relevant
technical information **covered by the patent or pending patent** is
known to the committee, subcommittee, or working group.   In
addition, the committee Chairperson must have received written
notice from the patent holder or applicant that one of the following
conditions prevails:

\* A license shall be made available without charge to applicants
desiring to utilize the patent for the purpose of implementing the
standards(s),

or

\* A license shall be made available to applicants under reasonable
terms and conditions that are demonstrably free of any unfair
discrimination.

36

> In either case, the terms and conditions of the license must be submitted to the EIA General Counsel for review.
>
> An appropriate footnote shall be included in the standard identifying the patented item and describing the conditions under which the patent holder will grant a license.

JEP-21-I, Appendix E. The Special Master also concludes that read together, the provisions of

9.3.1 also fail to create a legally enforceable duty that JEDEC members disclose pending or

planned patents to JEDEC and its members. Rather, the Special Master concludes that 9.3.1

describes the procedure to be followed when a patented item is to be used in a standard.

The Federal Circuit's discussion of these policies in *Infineon* is compelling:

> The language of these policy statements actually does **not** impose any direct duty on members. While the policy language advises JEDEC as a whole to avoid standards "calling for the use of" a patent and the manual **obligates the chairperson** to remind members to inform the meeting of any patents or applications relevant to the work of the committee, this court finds no language – in the membership application or manual excerpts – expressly requiring members to disclose information.
>
> * * *
>
> In this case there is a staggering lack of defining details in the EIA/JEDEC patent policy. When direct competitors participate in an open standards committee, their work necessitates a written patent policy with clear guidance on the committee's intellectual property position. **A policy that does not define clearly what, when, how, and to whom the members must disclose does not provide a firm basis for the disclosure duty necessary for a fraud verdict**. Without a clear policy, members form vaguely defined expectations as to what they believe the policy requires – whether the policy in fact so requires or not. [FN] **JEDEC could have drafted a patent policy with a broader disclosure duty. It could have drafted a policy broad enough to capture a member's failed attempts to mine a disclosed specification for broader undisclosed claims. It could have. It simply did not.**
>
> [FN] Just as a lack of compliance with a well-defined patent policy would chill participation in open standard-setting bodies, after-the-fact morphing of a vague, loosely defined policy would chill participation in open standard-setting bodies.

37

318 F. 3d at 1098, 1102 (emphasis added).

Based on the Special Master's independent review of JEDEC policy, the Special Master concludes that it did not create a legally enforceable duty that required Rambus to disclose its pending and/or planned patent applications to JEDEC or its members. The Special Master further concludes that, in the absence of such a duty, any omission or failure by Rambus to disclose this information cannot as a matter of law constitute fraudulent concealment under Virginia law.

As a final point, the Special Master considers Micron's assertions that a legally enforceable duty to disclose arose from the expectations attendant upon the relationship between JEDEC members. The Special Master concludes that this theory of "implied contract" is inapplicable in the face of written JEDEC policy. *See, e.g., The Chase Manhattan Bank v. Iridium Africa Corp.*, 294 F. Supp. 634, 636 (D. Del. 2003) (holding "no implied-in-fact contract can be found when . . . the parties have an express agreement dealing with the same subject . . . [T]o be valid, the implied contract must be 'entirely unrelated to the express contract'.") (*quoting ITT Fed. Support Serv., Inc. v. United States*, 531 F. 2d 522, 528 (Ct. Cl. 1996)). *See also, In re Penn Central Transportation Co.*, 831 F. 2d 1221, 1229 (3d Cir. 1987) ("no implied-in-fact contract can be found when, as here, the parties have an express agreement dealing with the same subject."). JEDEC policy expressly provides that [a]ll meetings of the JEDEC . . . and its associated committees, subcommittees, task groups and other units shall be conducted within the current edition of EIA legal guides adopted by the EIA Board of Governors and incorporated herein by reference." JEP 21-I, Section 9.1. Thus, the Special Master concludes that the

38

vagaries of an implied policy will not be substituted for the provisions of an express policy, even one that fails to articulate an enforceable standard.[28]

In summary, the Special Master concludes that Micron did not make a *prima facie* showing of fraud in the absence of a showing that Rambus had a duty to disclose the information that Micron alleges Rambus fraudulently concealed. As a result, the Special Master recommends that Micron's motion to compel the production of documents under the crime/fraud exception be denied.

## III.   Conclusion: Rambus Has Waived Its Privilege Only as to Certain 1991 to June 1996 JEDEC-Related Documents

The Special Master now turns to Micron's alternative argument, that Rambus should be compelled to produce privileged JEDEC-related documents under the theory that Rambus has waived any applicable privilege. The Special Master concludes that Rambus has waived its privilege only with respect to certain 1991-June 1996 JEDEC-related documents.

### A.   The Governing Law

For the same reasons discussed in the analysis of the crime/fraud exception herein, *supra* at pages 25-26, the Special Master will analyze whether Rambus has waived any asserted privilege with respect to these additional categories of documents in accordance with principles of federal common law, as construed in this Circuit.

---

[28] Micron argues that, in the *Infineon* case, the Federal Circuit did find a duty of disclosure. The Special Master's reading of that opinion does not support Micron's argument. To the contrary, the Federal Circuit was forced to analyze the existence of a duty to disclose as a question of fact because "neither party contest[ed] the district court's submission of this issue to the jury." 318 F. 3d at 1087. The Federal Circuit actually stated that "[t]he language of these [JEDEC] policy statements actually does **not** impose any direct duty on members." 318 F.3d at 1098 (emphasis added). The Federal Circuit then went on to review the jury's factual findings that a duty existed and had been breached by Rambus with the caveats that it was "treat[ing policy] language as imposing a disclosure duty" and "Assuming such a duty . . . ." *Id* . 318 F. 3d at 1098.

39

## B.     Doctrine of Waiver

The waiver doctrine provides that disclosure to third parties is an absolute waiver of the

attorney-client privilege unless the disclosure serves the purpose of enabling clients to obtain

informed legal advice.  As noted by the Third Circuit:

> The [attorney-client] privilege "protects only those disclosures
> necessary to obtain informed legal advice – which might not have
> been made absent the privilege."     Accordingly, voluntary
> disclosure to a third party of purportedly privileged
> communications has long been considered inconsistent with an
> assertion of the privilege.     As one commentator cogently
> explained:  If clients themselves divulge such information to third
> parties, chances are that they would also have divulged it to their
> attorneys, even without the protection of the privilege.  Thus, once
> a party has revealed privileged information to a third party, the
> basic justification for the privilege no longer applies . . .
> Consequently, **it is well-settled that when a client voluntarily
> discloses privileged communications to a third party, the
> privilege is waived.**

*Westinghouse Electric Corp. v. Republic of the Philippines*, 951 F. 2d 1414, 1423-24 (3d Cir.

1991) (*quoting Fisher v. United States*, 425 U.S. 391, 403, 96 S. Ct. 1569, 1577 (1976)) (internal

citations and footnotes omitted) (emphasis added).

## C.     The Disclosures At Issue

With respect to the JEDEC-related documents, there are two disclosures upon which

Micron primarily relies in arguing that Rambus has waived any asserted privilege.     Both

disclosures occurred subsequent to the entry of (a) the March 7, 2001 Order of the *Infineon* court

that compelled Rambus to produce the 1991 to June 1996 JEDEC-related privileged documents

and testimony with respect to those documents; and (b) the May 16, 2001 Order of this Court

that granted Micron's motion to compel the same production.     The Special Master briefly

summarizes the two disclosures – referenced as the *Hynix* and *FTC* disclosures – neither of

which was compelled by court order.

                **1.**      **Disclosure to Hynix** – Hynix filed suit in the United States District Court for the Northern District of California one day after Micron filed the instant action. After filing suit, Hynix filed a motion to intervene in the *Infineon* case. By this intervention motion, Hynix sought an order from the *Infineon* court to compel Rambus to produce to Hynix the same 1991 to 1996 JEDEC-related documents and testimony that the *Infineon* court had ordered Rambus to produce to Infineon under its March 7, 1991 Order.

      "Rather than opposing [Hynix's intervention] motion, Rambus agreed to a limited disclosure of these documents to Hynix in exchange for [Hynix's] withdrawal of its intervention motion in *Infineon*. Prior to production, counsel for Rambus and counsel for Hynix executed a letter on June 22, 2001 stating the conditions under which documents would be produced." *Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905, Order Denying Defendant's Motion for Protective Order at pp. 4-5 (N.D. Ca. Feb. 26, 2004).

      Following the Federal Circuit's decision reversing the fraud verdict in the *Infineon* case, Rambus sought a protective order to reinstate the privilege over the documents it had previously produced to Hynix pursuant to the June 22, 2001 letter agreement. In considering Rambus' motion, the *Hynix* court examined the circumstances of Rambus' production to Hynix, as well as Rambus' production of the same group of documents to the FTC:

> Here, Rambus has chosen to disclose documents to both Hynix and the FTC. It is unclear that any precautions were taken in the FTC proceedings to maintain any claims of privilege over the 1991-1996 documents, and as discussed above, the only precaution taken in this litigation was execution of the June 22 waiver letter that is, at best, ambiguous regarding reservation of rights. Such agreements, however, "do not alter the fact that the confidentiality has been breached voluntarily." Thus, even accepting Rambus' argument that the June 22 letter reserves its rights to reclaim privilege, voluntary disclosure in this case and FTC proceedings necessitates the conclusion that confidentiality as to the 1991-1996 documents has been waived.

\* \* \*

More telling, however, is Rambus' failure to dispute the production of the 1991-1996 documents in the FTC proceedings. Even assuming the June 22 letter adequately preserved Rambus' privilege rights, its failure subsequently to seek protection over these same documents in the FTC proceedings waives these rights. In three separate proceedings before the ALJ court, all of them decided after the Federal Circuit handed down its *Infineon* opinion on January 29, 2003, the ALJ court made clear that the privilege covering the 1991-1996 documents had been waived. Rambus on all occasions disputed the subject matter waiver of post-1996 documents, but at no point disputed the court's finding of waiver of privilege regarding the 1991-1996 documents. Further, Rambus has never requested that the subject records introduced into evidence be sealed from public view.

*Hynix, id.* at pp. 9-10. Thus, the *Hynix* court concluded that Rambus' productions to both Hynix and the FTC were voluntary and that those voluntary productions waived any privilege with respect to the subject documents.

**2.     Disclosure to the FTC** – Rambus' disclosure to the FTC arose in the context of the briefing on FTC Complaint Counsel's motion to compel discovery. As noted by the ALJ, in the responsive brief filed by Rambus, "Rambus narrows the issues to be resolved by **conceding that Complaint Counsel is entitled to receive the [1991 to June 1996 JEDEC-related] materials** and to conduct discovery consistent with what occurred in the *Infineon*, *Micron* and *Hynix* matters." *In re Rambus Inc.*, Docket No. 9302, Order on Reconsideration of Complaint Counsel's Motion to Compel Discovery Relating to Subject Matters for which Respondent Asserts Privilege at p. 2 (FTC May 13, 2003) (emphasis added).

The ALJ went on to conclude that Rambus' earlier production to Hynix, pursuant to the June 22, 2001 letter agreement, also constituted a waiver of these materials:

While the Court appreciates the judicial economy that resulted from [Rambus'] decision to produce materials and persons for discovery in *Hynix*, its decision to produce the materials (even subject to a confidentiality agreement with counsel for Hynix) still

> remains a voluntary production. **Any disclosure to an adversary absent direct judicial compulsion is a voluntary disclosure**. *Chubb Integrated Sys. Ltd. V. Nat'l Bank of Washington*, 103 F.R.D. 52, 63 n. 2, 67 (D.D.C. 1984) **("[v]oluntary disclosure means the documents were not judicially compelled")**; *see also In re Chrysler Motors Corp. Overnight Evaluation Program Litigation*, 860 F.2d 844, 846-47 (8th Cir. 1988) (finding that **once privileged materials are turned over to an adversary, the confidential nature of the materials and the privilege as to third parties is waived even if the initial disclosure was subject to a confidentiality agreement**). Distinctions between various degrees of "voluntariness" in waivers of the attorney-client privilege do not exist. *In re Sealed Case*, 877 F. 2d 976, 980 (D.C. Cir. 1989) ("if a [party] wishes to preserve the privilege, it must treat the confidentiality of attorney-client communications like jewels – if not crown jewels"); *In re Subpoena Duces Tecum*, 738 F. 2d 1367, 1370 (D.C. Cir. 1984). By voluntarily producing the materials in *Hynix*, [Rambus] forfeited some of the traditional protections of the adversary system, but avoided some of the burden of litigating the privilege issue and potentially facing a more adverse result than in *Infineon* and *Micron*. *See In re Sealed Case*, 676 F. 2d 793, 822-23 (D.C. Cir. 1982).

*FTC*, *id*. at p. 4 (emphasis added).

The ALJ then concluded that, because Rambus had previously and voluntarily disclosed pre-June 1996 materials to an adversary (Hynix), it had opened the door to limited discovery of post-1996 materials involving the same subject matter. The ALJ concluded the FTC would be permitted to obtain discovery of Rambus' privileged documents for the post-June 1996 period, subject to certain limitations, and ordered production only as to those JEDEC-related documents "that came into existence on or before December 31, 1999." Production of attorney work product documents after that date were excluded, based on the ALJ's conclusion that Rambus did not anticipate litigation – and, therefore, was not preparing documents in anticipation of litigation – until at least December 31, 1999. FTC*, id*. at pp. 14-15. However, this opinion and order would not stand.

43

A few weeks later, the ALJ revisited its May 13, 2003 Order and reversed its decision on subject matter waiver with respect to the post-June 1996 documents. The ALJ ultimately narrowed its waiver ruling to a conclusion that the "scope of discovery to which Complaint Counsel is entitled is HEREBY LIMITED to the documents created between December 1991 and June 1996 and which were previously produced in the *Hynix* litigation." *In re Rambus Inc.*, Docket No. 9302, Order Granting Request for Reconsideration at p. 4 (FTC May 29, 2003).

### D.    Special Master's Analysis

The Special Master separately considers whether Rambus has waived its asserted privileges with respect to JEDEC-related documents and testimony (i) for the period of 1991 to June 1996 and (ii) for the period after June 1996 and with respect to documents pertaining to foreign patent applications.

#### 1.    The 1991 to June 1996 Documents

The Special Master concludes that Rambus has waived its asserted privilege with respect to the 1991 to June 1996 JEDEC-related documents based upon the following actions by Rambus which the Special Master concludes are inconsistent with an intent to preserve privilege and, taken together, evidence instead a waiver of privilege:

- Rambus never directly appealed the *Infineon* court's March 7, 2001 Order that compelled production of the 1991 to June 1996 JEDEC-related documents to the Federal Circuit. *Infineon*, 220 F.R.D. at 269 ("Rambus, however, did not seek review of the March 7 Order on its direct appeal at the end of the initial proceedings in this Court.").

- After the Federal Circuit reversed the *Infineon* fraud verdict, "for over one year, Rambus made no attempt to have the subject documents that had been introduced

44

into evidence – and into the public record – placed under seal." *Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905, Order Denying Defendant's Motion for Protective Order at p. 4 (N.D. Ca. Feb. 26, 2004).

- Rambus never appealed, or sought other relief from, this Court's May 16, 2001 Order.

- In response to a motion by Hynix to intervene in the *Infineon* litigation, Rambus voluntarily agreed to disclose privileged 1991 to June 1996 JEDEC-related documents to Hynix pursuant to a letter agreement dated June 22, 2001. *Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905, Order Denying Defendant's Motion for Protective Order (N.D. Ca. Feb. 26, 2004).

- In response to a motion to compel by FTC Complaint Counsel, Rambus "conceded" in its responsive brief that it would produce to the FTC the 1991 to June 1996 JEDEC-related documents. *In re Rambus Inc.*, Docket No. 9302 (Order on Reconsideration of Complaint Counsel's Motion to Compel Discovery Relating to Subject Matters for which Respondent Asserts Privilege at p. 2 (FTC May 13, 2003).

- For at least a year following its production of privileged documents in the *FTC* case, Rambus did not seek to seal the subject documents that had been introduced into evidence. *Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905, Order Denying Defendant's Motion for Protective Order at p. 7 (N.D. Ca. Feb. 26, 2004) ("Notably, none of the subject documents that were introduced into evidence in the *FTC* proceeding had ever been subject to a sealing request by Rambus. They are presumably available to the public even today.").

45

The most compelling to the Special Master of the points recited are Rambus' voluntary production to Hynix under the June 22, 2001 letter agreement and Rambus' concession in briefing that it would produce privileged documents to the FTC. Rambus does not dispute that (i) each of these productions was made; (ii) each was made to a litigation adversary and, therefore, was certainly not for the purpose of obtaining legal advice; and (iii) each was made in the absence of a court order compelling the production.

Under the well-settled law of this Circuit, the Special Master concludes that both of these productions were voluntary and have the legal effect of waiving privilege with respect to each and every document actually produced to Hynix or the FTC. *Westinghouse*, 951 F.2d at 1424 ("when a [party] voluntarily discloses privileged communications to a third party, the privilege is waived"). This is true even though the production to Hynix was pursuant to an agreement limiting disclosure. *See, e.g., In re Chrysler*, 860 F.2d at 846-47 (turning over materials to an adversary waives privilege even if the disclosure is subject to a confidentiality agreement). And the waiver is effective even though the disclosure to the FTC involved an investigation by a governmental agency. *See, e.g., Westinghouse*, 951 F.2d at 1425-26 (no exception for disclosures to governmental agencies).

Accordingly, the Special Master concludes that, to the extent Rambus has not previously produced them to Micron, Rambus must produce to Micron any and all documents that were produced to either Hynix or the FTC in the absence of an express order compelling that production.

## 2.    JEDEC-Related Post-June 1996/Foreign Patent Application Documents

Having concluded that Rambus has waived its privilege with respect to the 1991 to June 1996 JEDEC-related documents that it produced voluntarily to Hynix and the FTC, the Special

Master turns to Micron's argument that this waiver opens the door to the post-June 1996 JEDEC-related documents and documents relating to foreign patent applications.

Micron argues that Rambus' pattern of fraud with respect to its patent prosecution activities continued after it left JEDEC, and that communications between Rambus and its foreign patent agents may show that Rambus also manipulated its foreign patent application claims to cover JEDEC standards. Micron's argument is one that the ALJ for the FTC found at least temporarily persuasive in ordering – by an order that the ALJ later reversed on reconsideration – that Rambus must produce JEDEC-related documents through December 31, 1999.[29]

For its own assessment, the Special Master finds the Third Circuit's opinion in *Westinghouse Electric Corp. v. Republic of the Philippines* to be instructive:

> When a party discloses a portion of otherwise privileged materials while withholding the rest, **the privilege is waived only as to those communications actually disclosed, unless a partial waiver would be unfair to the party's adversary**. If a partial waiver does disadvantage the disclosing party's adversary by, for example, allowing the disclosing party to present a one-sided story to the court, the privilege will be waived as to all communications on the same subject.

951 F.2d at 1426 n.12 (emphasis added).

Like any adversary, Micron might receive an advantage in proving up its claims if it is permitted access to more of its opponent's privileged documents. However, the Special Master concludes that Micron has not made the necessary particularized showing that it has been *disadvantaged* by the disclosure of the 1991 to June 1996 JEDEC-related documents in the absence of the disclosure of the additional categories of documents it seeks.

---

[29] As set forth *supra* at pp. 43-44, the ALJ reversed its decision on subject matter waiver and concluded that Rambus had waived its privilege only with respect to the 1991 to June 1996 JEDEC-related documents. *In re Rambus Inc.*, Docket No. 9302 (Order Granting Request for Reconsideration at p. 4) (FTC May 29, 2003).

Accordingly, absent the showing required of Micron, the Special Master concludes that Micron's motion directed to JEDEC-related documents after June 1996 and documents relating to foreign patent applications should be denied. In summary, the Special Master concludes that Rambus has waived its privilege only with respect to the JEDEC-related documents that Rambus previously produced to Hynix or the FTC in the absence of an express order compelling that production.

48

## CONCLUSION

For the reasons set forth above, the Special Master concludes that Rambus must produce to Micron the "Documents to be Produced," which the Special Master defines as (a) the 46 JEDEC-related documents that Rambus admits are within the scope of Judge McKelvie's May 16, 2001 Order and (b) to the extent that any have not been previously produced to Micron, all JEDEC-related documents that Rambus previously produced to Hynix or the FTC in the absence of an express order by the *Hynix* court or the FTC Administrative Law Judge, as applicable, compelling that production.

IT IS, THEREFORE, HEREBY RECOMMENDED THAT:

(b)     Micron's motion to compel be GRANTED, in part, as it relates to the Documents to be Produced, as defined above;

(c)     Micron's motion to compel be DENIED, in part, to the extent it relates to any privileged document not within the scope of the Documents to be Produced, as defined above;

(d)     All Documents to be Produced shall be produced to Micron within thirty (30) days of the date entered below; and

(e)     The costs for the Special Master's services shall be shared equally by the parties.

**The Special Master's Report and Recommendation will become a final order of the Court unless objection is timely taken in accordance with the provisions of Fed. R. Civ. P. 53(g).**

ENTERED this
6th day of March, 2006

_____
Vincent J. Poppiti (DSBA No. 100614)
Special Master

49