IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MICRON TECHNOLOGY, INC.,

        Plaintiff and
        Counterclaim Defendant,

     v.

RAMBUS INC.,

        Defendant and
        Counterclaim Plaintiff.

C. A. No. 00-792- SLR

**DEMAND FOR JURY TRIAL**

## SECOND AMENDED COMPLAINT

### I.

### NATURE OF THE ACTION

1.    This is an action by plaintiff Micron Technology, Inc. ("Micron") against Rambus Inc. ("Rambus") seeking (1) relief under the federal antitrust laws for violations of Section 2 of the Sherman Act; (2) a declaratory judgment (a) that certain Rambus patents are not infringed, are invalid, and/or are unenforceable due, among other reasons, to Rambus' fraudulent conduct in obtaining, misusing and enforcing those patents, (b) that Micron has an implied license to those patents, and (c) that Rambus is estopped from enforcing those patents against Micron; and (3) damages and declaratory relief for Rambus' breach of contract, fraud, deceptive trade practices, negligent misrepresentation, unfair competition and conduct requiring the application of equitable estoppel.

2.    Micron is one of the world's leading manufacturers of semiconductor memory products, including computer chips known as dynamic random access memory ("DRAM"). Micron is the sole remaining U.S.-based DRAM manufacturer.

3.     Rambus does not manufacture or sell DRAM or any other semiconductor device.   Instead, Rambus derives its revenues from licensing its proprietary technology and its patents.

4.     Rambus has engaged in illegal and anti-competitive acts to acquire and maintain control over the high-performance DRAM interface technology market and the high-performance DRAM market.

5.     Rambus' illegal and anti-competitive acts have included misconduct relating to the setting of industry standards in the semiconductor memory industry.   In the 1990s, both Micron and Rambus participated in a semiconductor industry association, JEDEC, that was developing industry-wide technical standards for high-performance DRAMs.   One of the primary goals of the association was to develop open standards that could be utilized by everyone in the semiconductor industry.   Eventually, JEDEC developed two standards for high-performance DRAMs: JESD 21-C, for DRAM chips known as "SDRAM," and JESD-79, for a subsequent type of chips known as "DDR SDRAM."

6.     Open standards foster competition and technological innovation.   Open standards allow standardization.   Standardization permits interchangeability among high-performance DRAM chips, which in turn promotes efficiency and lowers prices.

7.     To ensure that the new standards were truly "open" and not blocked by any member's patents, each member of JEDEC agreed to inform the association of all patents and patent applications in areas which might be involved in the association's work.   Members further agreed to license their patents to other association members, either without charge or under reasonable and non-discriminatory terms, if JEDEC were to decide upon a standard implicating such patents.

8.     Rambus subverted the open standards process so that it could gain monopoly control over the high-performance DRAM interface technology and the high-performance DRAM markets.   Rambus applied for patents that purported to cover the subject matter of the standards under development.   Rambus breached its agreement to disclose any

2

knowledge it had of such patents or patent applications. Rambus kept its patents and applications secret, while participating in the open standards meetings of the association. Having participated in the standards-development discussions of JEDEC, Rambus added, amended and/or revised claims in its patent applications in an attempt to target certain features of the standards then under development which Rambus now contends that its patents cover.

9.     Rambus defrauded and misled Micron and other members of the association into believing that it did not have any patent rights relevant to the standards and/or which it would assert against manufacturers under the standards. In its attempt to monopolize the high-performance DRAM interface technology market and the high-performance DRAM market, Rambus intentionally withheld information it was required to reveal and made misleading disclosures in violation of both the antitrust laws and its contractual obligations.

10.    Rambus' failure to disclose prevented the other association members from (1) negotiating reasonable license terms at the time, before Rambus gained the enormous leverage it now has because of the billions of dollars the industry has invested in reliance on Rambus' non-disclosure of its patent claims and/or (2) developing standards that avoided the asserted scope of Rambus' patents.

11.    Rambus has initiated, and continues to pursue, a campaign against the semiconductor memory industry by asserting its patents against manufacturers of high-performance DRAMs, as to products other than Rambus' proprietary memory technology, Rambus DRAM ("RDRAM"). Rambus' campaign is designed to exact essentially non-negotiable licenses bearing exorbitant royalties from these manufacturers. Rambus has filed lawsuits against those manufacturers who do not agree to its terms, and has threatened to refuse to license those manufacturers who litigate against Rambus.

12.    Rambus' anti-competitive behavior constitutes the willful acquisition and maintenance of monopoly power or attempted acquisition of monopoly power, in violation of Section 2 of the Sherman Antitrust Act, making Rambus liable for treble damages and entitling Micron to injunctive relief pursuant to 15 U.S.C. § 16. Moreover, Rambus has (a) breached its

3

contractual obligations to disclose its relevant patent applications, (b) defrauded Micron and other JEDEC members, and (c) engaged in deceptive trade practices, negligent misrepresentation, unfair competition and conduct warranting application of equitable estoppel. In addition, during its prosecution of the relevant patent applications, Rambus failed to cite to the United States Patent and Trademark Office information that is and was relevant to the patentability of these applications. Rambus's failure to cite this information was inequitable conduct on Rambus's part and renders all the relevant patents unenforceable.

13.    By virtue of its conduct, Rambus is estopped from asserting any Rambus patents, issued or pending, that claim priority to Rambus' original 1990 patent application, specifically including at least the following patents: United States Patent Nos. 5,915,105; 5,953,263; 5,954,804; 5,995,443; 6,032,214; 6,032,215; 6,034,918; and 6,038,195 (all of the patents or patent applications implicated by Rambus' misconduct, whether filed or issued in the United States or elsewhere, shall be referred to as "Rambus Patents." The patents identified by patent number herein shall be referred to as "Patents in Suit"). Alternatively, Micron is entitled to an implied, royalty-free license to these patents and pending or future applications claiming priority through the Rambus Patents. In addition, the Patents in Suit are not infringed, are invalid, and/or are unenforceable.

## II.

### THE PARTIES

14.    Micron is a corporation incorporated and existing under the laws of Delaware. Micron's principal place of business is in Boise, Idaho.

15.    Rambus is a corporation incorporated and existing under the laws of Delaware. Rambus' principal place of business is in Mountain View, California.

## III.

### JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over Micron's federal antitrust and patent claims pursuant to 15 U.S.C. §§ 4, 15, 16, and 26, and 28 U.S.C. §§ 1337 and 1338,

4

and pursuant to 28 U.S.C. §§ 2201 and 2202.  This Court has supplemental jurisdiction over Micron's state law claims pursuant to 28 U.S.C. § 1367.

17.   This Court has personal jurisdiction over Rambus by virtue of its incorporation in the State of Delaware.

18.   Venue properly lies in this Court under 15 U.S.C. § 22 and under 28 U.S.C. §§ 1391 and 1400.

## IV.

## BACKGROUND AND RELEVANT CONDUCT

### A.   The Technology

19.   The semiconductor industry comprises firms that manufacture component computer parts, including memory chips, logic chips (such as microprocessors), and devices or systems utilizing such chips.   Those components must be compatible with one another.

20.   Memory chips store data.  Logic chips process the data.  One type of logic chip is the microprocessor chip that controls the operation of computers and other systems. Memory chips serve as a "holding place" for data that the microprocessor chips use.  The efficiency with which a memory chip can retrieve stored data for a microprocessor is important; a fast microprocessor is of little value unless its memory chips can transmit and store the data in a manner commensurate with the demands of the microprocessor.  To function, memory chips must interact with the microprocessor.  Interface technology provides the means by which data is transferred between memory chips and logic chips.

21.   Memory chips are critical to a broad spectrum of computing devices, including  personal computers, workstations, servers, and telecommunications equipment.

22.   "Dynamic Random Access Memory" ("DRAM") is the most widely-used form of memory chip.  The performance of computing systems and microprocessors sold today require the use of a specific subset of DRAM chips known as "high-performance DRAMs."

5

This category of DRAMs is also sometimes referred to as "high-speed DRAMs" or "high-bandwidth DRAMs."

23.     There are only three types of high-performance DRAMs: (1) "synchronous DRAM," or "SDRAM," which is the principal form of high-performance DRAM sold today; (2) "double data rate SDRAM," or "DDR SDRAM," which is a newer form of SDRAM; and (3) "Rambus DRAM," or "RDRAM," which is promoted by, and employs proprietary technology licensed by, Rambus.  In contrast to the proprietary RDRAM, both SDRAM and DDR SDRAM are industry standard devices, conforming to standards established by an industry association, JEDEC.  The costs of manufacturing SDRAM and DDR SDRAM are significantly less than the cost of manufacturing RDRAM.

24.     DRAM chip sales in the United States were projected to be $15 billion when this action was originally filed in 2000, and approximately 90% of these sales were expected to be of high-performance DRAM chips.  High-performance DRAMs were expected to account for nearly 100 percent of all DRAM sales within the following few years.

25.     Because of the need to use DRAM chips that match the performance demands of the latest high-speed microprocessors and that are compatible with those microprocessors, there are currently no commercially viable alternatives to high-performance DRAM chips for most applications.

26.     "High-performance DRAM interface technology" is technology that facilitates communication between high-performance DRAM chips and logic chips.  This communication is essential for the retrieval and storage of information in the memory chips. Without the necessary interface technologies, high-performance DRAMs are not commercially viable.

**B.     The Relevant Markets**

27.     There are at least two relevant markets that have been and will be adversely affected by Rambus' unlawful conduct.

6

28.    The first relevant market is the market for those critical interface technologies necessary to produce commercially viable high-performance DRAMs that Rambus claims to own, and any technologies that are substitutable for the critical interface technologies Rambus claims to own.  This market will be referred to as the market for "high-performance DRAM interface technology."  Such technology is a necessary input into the production of high-performance DRAMs and is used by all manufacturers of high-performance DRAMs. High-performance DRAM Interface Technology is developed by DRAM manufacturers and/or licensed from others or is obtained through the use of freely-available technology in the public domain.

29.    High-performance DRAM interface technology is essential for the production of high-performance DRAMs.  Other currently-existing technology either is not technologically viable or will not yield high-performance DRAMs that will interface or function with the microprocessors now being manufactured and sold; therefore, other technology that currently exists is not reasonably interchangeable with or substitutable for high-performance DRAM technology.

30.    The relevant geographic market for high-performance DRAM interface technology is the world.  The same such technology is used worldwide, and relevant industry standards apply to products manufactured around the world.  In the alternative, the relevant geographic market for high-performance DRAM technology is the United States.

31.    The second relevant market is the product market for high-performance DRAMs themselves.  As explained above, without the right to use high-performance DRAM interface technology that can interface with the microprocessors presently being manufactured, a high-performance DRAM manufacturer cannot produce a marketable product.

32.    The relevant geographic market for high-performance DRAMs is the world.  The same products are purchased and sold worldwide and comply with common industry standards around the world.  In the alternative, the relevant geographic market for high-performance DRAMs is the United States.

7

33.     In the alternative, the second relevant market is the market for all DRAMs. Although certain less-capable DRAM chips are not substitutable for high-performance DRAMs generally, they may be substitutable for purposes of some uses.   Such less-capable chips make up a relatively small portion of the market for all DRAMs.   The relevant geographic market for all DRAMs is the world or, in the alternative, the United States.

**C.     Rambus' Initial Efforts To Acquire And Maintain Control Over The High Performance DRAM Interface Technology Market And The High Performance DRAM Market**

34.     Intel is the world's largest producer of microprocessors.  In 1996, Intel announced that its next generation of microprocessors would eventually be compatible only with RDRAM.   According to the announcements, Intel would first develop high-end, high-performance microprocessors that would work only with RDRAM.   Eventually, substantially all Intel microprocessors were to work only with RDRAM.

35.     As a result of Intel's announcements, DRAM manufacturers were effectively forced to license the RDRAM technology from Rambus.   Micron licensed this technology from Rambus in 1997.

36.     Through its license agreement, Rambus required Micron to provide it with a cross-license on certain Micron improvements to the Rambus technology, and on certain other Micron patents that the use of current or future generations of Rambus technology would necessarily require.   Upon information and belief, Rambus required all other high-performance DRAM manufacturers that licensed RDRAM technology to provide Rambus with similar cross-licenses under their patents.   The licensing scheme is part of Rambus' overall ongoing plan to stifle innovation in the markets for high-performance DRAMs and high-performance DRAM interface technology.

37.     SDRAM and DDR SDRAM are more efficient and much less expensive to manufacture than RDRAM.   With industry support for RDRAM eroding, Intel recently

announced that its next generation of microprocessors will be compatible with both RDRAM and DDR SDRAM chips.

38.     Rambus has recently increased its attempts to control the critical interface technologies that compete with RDRAM – SDRAM and DDR SDRAM.

**D.     Rambus' Illegal Efforts To Acquire And Maintain Control Over The High Performance DRAM Interface Technology Market And The High Performance DRAM Market**

**1.     JEDEC and the Development of High-Performance DRAM Standards**

39.     Rambus' attempts to monopolize the high-performance DRAM interface technology market and the high-performance DRAM market actually began in secret years prior to Rambus' licensing of  RDRAM technology in 1996-97, and did not become known until the recent issuance of certain Rambus patents and the recent assertions by Rambus that those patents cover all current high-performance DRAMs.

40.     The JEDEC Solid State Technology Association ("JEDEC") is an association of semiconductor manufacturers and designers that works to develop industry-wide technical standards for semiconductor products.   JEDEC was formed years before the events at issue here.

41.     In 1991, JEDEC began developing open industry standards for SDRAM devices to ensure that SDRAM devices from different suppliers would be compatible with one another, as well as with the logic chips, such as microprocessors, that use such memory.   The development of these standards was designed to foster competition and technological innovation. Such standardization allows for interchangeability among SDRAM devices made by the various manufacturers, which in turn promotes efficiency and lowers prices.

42.     Rambus was founded in 1990 and in its early years was known principally for developing memory interfaces for used in computer games.

43.     By December 1991, Rambus began attending JEDEC meetings.   In 1992, Rambus officially joined and became a JEDEC member.

9

44.    All JEDEC members, including those participating on committees establishing standards, were obliged to disclose any knowledge of patents or pending patent applications that might be involved in the work JEDEC was undertaking. (This disclosure obligation is referred to herein as the "JEDEC Disclosure Policy.") Holders of such patents or patent applications were further required to license their patents to all manufacturers as to products made in accordance with the JEDEC standards, either without charge or under reasonable and non-discriminatory terms. (This licensing obligation is referred to herein as the "EIA Licensing Policy.") The JEDEC Disclosure Policy is a continuing obligation whereby the members are obliged to disclose any patent or pending patent application that may relate to the work being performed by JEDEC, whenever they become aware of it, including after the adoption of any open standard which may be affected by it.

45.    A primary purpose of the JEDEC Disclosure Policy was to prevent any single company from secretly capturing the industry standard and to prevent an unscrupulous member from manipulating the standards-setting process to its advantage. Collectively, the JEDEC Disclosure Policy and the EIA Licensing Policy serve two important purposes: (1) they provide the industry an opportunity to develop standards free from potential blocking patents and (2) they ensure that licenses to patent rights that do exist are offered to members of JEDEC for free or for a reasonable and non-discriminatory royalty. The JEDEC Disclosure Policy also allows JEDEC and its members to design around such potential or actual patent rights if JEDEC members are unable to obtain a license under satisfactory terms.

46.    When Rambus joined JEDEC, the association's disclosure requirement was well known. Indeed, it was already the subject of well-publicized litigation between two JEDEC members, Wang and Mitsubishi. *See Wang Lab, Inc v Mitsubishi Elec Amer Inc*, No. CV 92-4698 JGD (C.D. Cal. 1993). In that case, Mitsubishi raised equitable estoppel and antitrust claims against Wang Laboratories, Inc. ("Wang"), based on Wang's failure to disclose pending patent applications relating to standard-setting work undertaken by JEDEC and then subsequently asserting resulting patents against products compliant with the standard. The

10

district court rejected Wang's summary judgment challenge to the equitable estoppel claim, and Mitsubishi eventually prevailed at trial, without the court resolving the antitrust claims.

47.    Shortly after the *Wang* decision, JEDEC forcefully reiterated its policy. The October 1993 JEDEC Manual of Organization and Procedure instructs the Chairperson of any JEDEC committee, sub-committee or working group to:

> call attention to the *obligation of all participants* to inform the meeting of any knowledge they may have of *any* patents, or pending patents, that might be involved in the work they are undertaking.

(JEDEC Manual of Organization and Procedure JEP 21-I (Revision of 21-H) October 1993) (emphasis added).   Consistent with the JEDEC   Disclosure Policy and the EIA Licensing Policy, JEDEC called for "viewgraphs" to be posted at committee meetings.   The recommended viewgraphs stated:

> Standards that call for use of a patented item or process may not be considered by a JEDEC committee unless all of the relevant technical information covered by the patent or pending patent is known to the committee, subcommittee, or working group.   In addition, the committee Chairperson must have received written notice from the patent holder or applicant that one of the following conditions prevails:
>
> - A license shall be made available without charge to applicants desiring to utilize the patent for the purpose of implementing the standard(s),
>
> or
>
> - A license shall be made available to applicants under reasonable terms and conditions that are demonstrably free of any unfair discrimination.

(EIA/JEDEC Patent Policy Summary, JEDEC Manual No. 21-I at 23).   Viewgraphs of that nature were regularly posted at JEDEC meetings, including those attended by Rambus.   Rambus was fully aware of the JEDEC Disclosure Policy Requirements. In particular:

a.     Rambus, through its officers or employees, was present at numerous meetings of the JEDEC committees and subcommittees at which JEDEC's Disclosure Policy was presented and discussed by the sub-committees.

b.     During the period in which Rambus was a member of JEDEC, all individuals who attended a meeting of a JEDEC committee or sub-committee were expected to sign a Meeting Attendance Roster. During the relevant period, this Roster specifically pointed out to all participants that they were required to conform with the JEDEC Disclosure Policy, which was specifically described on the form. Representatives of Rambus who attended JEDEC committee and sub-committee meetings regularly signed such Meeting Attendance Rosters.

c.     During JEDEC committee and sub-committee meetings attended by Rambus, other JEDEC members disclosed patents and patent applications that might be involved in the standard-setting work of JEDEC pursuant to the JEDEC Disclosure Policy and representations were made by JEDEC members of their intention to comply with the EIA Licensing Policy as to disclosed patent rights.

d.     Minutes of committee and sub-committee meetings were routinely distributed to JEDEC members, including Rambus. These minutes regularly recorded that the JEDEC Disclosure Policy had been presented. In addition, a tracking list which identified patents and pending patents related to Committee proposals was attached to the minutes.

e.     The JEDEC Disclosure Policy and EIA Licensing Policy were also set forth in several EIA and JEDEC publications that were distributed to and/or made available to Rambus.

f.     JEDEC committee and sub-committee ballot forms required members to state whether they were aware of any patents that related to the ballot under consideration. Rambus was aware of this reminder on the ballot because all members who participated on a committee or sub-committee received ballot forms for all proposals voted on, and during its membership, Rambus voted on ballots under consideration by the JC-42.3 sub-committee.

48.     Members of JEDEC benefit in many ways from participation in JEDEC and from the existence of the disclosure obligations imposed on all members. Rambus benefited directly from its membership in JEDEC, including receiving detailed and timely information about the direction of standards under development and the product plans of JEDEC members. Joining JEDEC was part of Rambus' plan to dominate the high-performance DRAM market and high-performance DRAM interface technology market.

### 2.   Rambus' Violation of JEDEC Obligations

49.   As set forth below, Rambus is pursuing a strategy of demanding exorbitant license fees from all of the world's leading makers of high-performance DRAMs. Rambus has admitted that a purpose of charging discriminatory royalties is to eliminate competitive alternatives to Rambus' RDRAM. If Rambus' strategy is successful, the cost of high-performance DRAMs and the products that use them is likely to increase.

50.   On April 18, 1990, Rambus filed patent application No. 07/510,898 in the United States Patent and Trademark Office (the "Initial Application"). Throughout the 1990s, Rambus filed many additional patent applications, including patent applications claiming priority to the Initial Application. Additionally, in 1990 and 1991, Rambus filed International and European patent applications claiming priority to its Initial Application.

51.   As early as 1992, Rambus knew and intended that it had patent applications on file that purported to cover features of the standards being discussed in JEDEC. Rambus also specifically and intentionally amended or revised its patent claims in an attempt to cover features being discussed in JEDEC.

52.   Notwithstanding its disclosure obligations as a member of JEDEC and its awareness of those obligations, while Rambus was a JEDEC member it failed to disclose that patent applications it was prosecuting included claims it intended to read directly on JEDEC standards and on features proposed for incorporation into the standards.

53.   Not only did Rambus fail to disclose its patents and patent applications as required by JEDEC rules, it also made affirmatively misleading statements that led JEDEC members into believing that it had no rights to the technology reflected in the JEDEC SDRAM and DDR SDRAM standards. Rambus made clear that products made pursuant to these standards were competitors to its technology and, therefore, threats to its business. These statements exacerbated Rambus' violation of JEDEC rules, further inducing Micron and others to believe that Rambus had no intellectual-property claims to SDRAM and DDR SDRAM technology.

54.     Although Rambus eventually abandoned the Initial Application, it filed at least one continuation and various divisional applications in 1992, and then filed numerous additional continuation and divisional applications in subsequent years, each claiming the benefit of the April 18, 1990, filing date of the Initial Application. Some of these subsequent applications specifically targeted features being discussed in JEDEC. To date, at least 28 United States and foreign patents have issued claiming priority to the Initial Application.

55.     Rambus violated its disclosure obligations by failing to inform JEDEC and its members of those patent applications. Rambus elected not to disclose those applications with the intent to lull and defraud JEDEC and its members into believing that Rambus did not have any actual or potential blocking patent rights. This conduct deprived JEDEC of the opportunity to develop standards that avoided Rambus' potentially standards-blocking claims.

56.     On May 20, 1996, the FTC issued an antitrust complaint against Dell Computer Corporation ("Dell") based on Dell's failure to disclose patents relating to a standard-setting organization akin to JEDEC. The FTC simultaneously issued a consent decree and order resolving the matter, which prohibited Dell from enforcing the patents it improperly failed to disclose. *In re Dell Computer Corp.*, 121 F.T.C. 616, FTC LEXIS 291 (May 20, 1996). Less than one month after the announcement of the Dell consent order, Rambus announced it was leaving JEDEC. Rambus made the announcement in a letter in which it listed certain issued Rambus patents and stated that "Rambus has also applied for a number of additional patents in order to protect Rambus technology," but failed to disclose any information about its pending applications claiming priority to the Initial Application. None of the disclosed patents relates to the SDRAM or DDR SDRAM standards. Rambus specifically failed to disclose a patent which had issued prior to the date of the letter, and which related to dual clock edge operation, which had been discussed as part of the work undertaken by JEDEC and which became a part of the DDR SDRAM standard.

57.     By participating in the JEDEC standards-development process without disclosing its pending patent applications relating to features that it now claims its patents cover,

14

and by revising its applications and later filing related applications to attempt to make its patent portfolio cover all products manufactured in accordance with the JEDEC standards, Rambus intentionally misled JEDEC members, who promulgated standards that Rambus now claims are covered by its patents.

58.     Rambus' subversion of JEDEC's rules in fact misled JEDEC members, including Micron, into believing that products compatible with the open JEDEC standards for high-performance DRAMs would not be subject to any undisclosed claim of patent rights by Rambus.

59.     Micron and other high-performance DRAM manufacturers relied on Rambus' silence at JEDEC meetings. Micron and the other JEDEC members continued to participate in the development of certain JEDEC standards they believed would be open, instead of exploring alternative standards.

60.     Instead of offering a royalty-free or other reasonable license when it was obligated to do so (at a time before the JEDEC standards had been developed, when JEDEC could have designed around Rambus' patent rights), Rambus waited until the standards had been adopted and the industry had spent billions of dollars in reliance on the standards before asserting its patents against manufacturers of high-performance DRAMs.

61.     Rambus' misconduct at JEDEC meetings, and its subsequent exploitation of the information it learned at those meetings, has given it monopoly power, or a dangerous probability of obtaining such power, in the relevant markets. If Rambus' patent assertions are upheld, Rambus will control the market for high-performance DRAM interface technology and the high-performance DRAM market itself.

62.     Manufacturers of high-performance DRAMs will have no alternative but to license Rambus technologies or risk an injunction that would put them out of business if Rambus' patent assertions are upheld.

63.     Had Rambus complied with its disclosure obligations, JEDEC would have had the opportunity and been able to develop alternative high-performance DRAM standards that

15

would have avoided Rambus' patent rights.  Upon information and belief, had Rambus then wrongly refused to license its patent rights to the JEDEC members for free or upon reasonable terms acceptable to the members, as it was obligated to do, or had Rambus not disclosed the specific terms at which it was willing to license or had those terms been unreasonable, JEDEC would have developed such alternative standards and/or alternative standards would have prevailed.

64.    Instead, as a result of Rambus' illegal scheme described above, Rambus now asserts that it holds patents covering standardized high-performance DRAM technology. Such assertions, if upheld, would allow Rambus to control the world and United States high-performance DRAM interface technology markets and the world and United States high-performance DRAM markets.

65.    Rambus' conduct during the relevant period establishes that it was aware of its obligation to disclose, and that it knowingly violated this obligation.

### 3.    Rambus' Patents

66.    The Rambus Patents include the following Patents in Suit:

(a)    United States Patent No. 5,915,105, entitled "Integrated Circuit I/O Using A High Performance Bus Interface," which issued on June 22, 1999, and was assigned to Rambus (the "'105 Patent") (a copy of the '105 Patent is attached to this Complaint as Exhibit A);

(b)    United States Patent No. 5,953,263, entitled "Synchronous Memory Device Having A Programmable Register And Method Of Controlling Same," which issued on September 14, 1999, and was assigned to Rambus (the "'263 Patent") (a copy of the '263 Patent is attached to this Complaint as Exhibit B);

(c)    United States Patent No. 5,954,804, entitled "Synchronous Memory Device Having An Internal Register," which issued on September 21, 1999, and was

assigned to Rambus (the "'804 Patent") (a copy of the '804 Patent is attached to this Complaint as Exhibit C);

(d)     United States Patent No. 5,995,443, entitled "Synchronous Memory Device," which issued on November 30, 1999, and was assigned to Rambus (the "'443 Patent") (a copy of the '443 Patent is attached to this Complaint as Exhibit D);

(e)     United States Patent No. 6,032,214, entitled "Method Of Operating A Synchronous Memory Device Having A Variable Data Output Length," which issued on February 29, 2000, and was assigned to Rambus (the "'214 Patent") (a copy of the '214 Patent is attached to this Complaint as Exhibit E);

(f)     United States Patent No. 6,032,215, entitled "Synchronous Memory Device Utilizing Two External Clocks," which issued on February 29, 2000, and was assigned to Rambus (the "'215 Patent") (a copy of the '215 Patent is attached to this Complaint as Exhibit F);

(g)     United States Patent No. 6,034,918, entitled "Method Of Operating A Memory Having A Variable Data Output Length And A Programmable Register," which issued on March 7, 2000, and was assigned to Rambus (the "'918 Patent") (a copy of the '918 Patent is attached to this Complaint as Exhibit G);

(h)     United States Patent No. 6,038,195, entitled "Synchronous Memory Device Having A Delay Time Register And Method Of Operating Same," which issued on March 14, 2000, and was assigned to Rambus (the "'195 Patent") (a copy of the '195 Patent is attached to this Complaint as Exhibit H).

**4.     Rambus' Current Anti-competitive Attempts to Utilize Its Asserted Monopoly Power to Control the Relevant Markets Through Threats and Intimidation**

67.     If Rambus' patent scheme to establish absolute and exclusive control over technology for high-performance DRAMs is not enjoined, Rambus has and will have achieved

monopoly power in the high-performance DRAM interface technology market and the high-performance DRAM market.

68.     Rambus has asserted exclusive patent rights with respect to all existing high-performance DRAMs, including all chips that are manufactured pursuant to the JEDEC standards.   Therefore, even though Rambus does not manufacture or sell any high-performance DRAMs (or any other memory chips), by achieving monopoly control over essential high-performance DRAM interface technology, Rambus has asserted the power to control and exclude entry into the market for high-performance DRAMs.

69.     Rambus' entire course of conduct has been and is being undertaken with the purpose of controlling and manipulating the high-performance DRAM interface technology market and the high-performance DRAM market with an anti-competitive intent and purpose, including creating a monopoly for Rambus, excluding manufacturers who refuse to pay Rambus royalties and raising the prices of high-performance DRAMs.

70.     Rambus has publicly acknowledged its anti-competitive intent.   It has admitted that it intends to charge more for licenses to high-performance DRAM products that it views as threats to its own RDRAM interface technology.

71.     In addition to monopolization of the high-performance DRAM interface technology market and the high-performance DRAM market, Rambus' anti-competitive conduct has had and will have adverse effects on products that utilize high-performance DRAMs.   For example, the additional costs incurred by high-performance DRAM manufacturers and sellers may yield higher prices for personal computers and the other products, such as workstations and servers, that utilize those DRAMs.   Rambus' anti-competitive conduct includes attempting to extract higher royalty rates on high-performance DRAMs utilizing the JEDEC standards as a means to induce manufacturers of personal computers and other products to design their products to utilize RDRAMs, rather than alternative, more cost-effective high-performance DRAMs.

72.     Rambus has used lawsuits and requests for investigations as means of publicizing its assertion that products compatible with the JEDEC standards infringe Rambus'

18

patents. These lawsuits and requests for investigations are part of Rambus' attempt to control the high-performance DRAM interface technology market and the high-performance DRAM market.

73. Rambus has attempted (a) to coerce essentially non-negotiable licenses bearing exorbitant royalties from all semiconductor memory manufacturers for sales of SDRAMs and DDR SDRAMs, and (b) to file lawsuits against those manufacturers who do not agree to Rambus' non-negotiable license terms.

74. In January and February 2000, Rambus initiated two lawsuits in this Court against Hitachi Ltd. and Hitachi Semiconductor (America), Inc. (collectively "Hitachi") (the "Hitachi Actions"). In these lawsuits, Rambus alleged that Hitachi's SDRAM and DDR SDRAM high-performance DRAM memory products infringed six of the Patents in Suit, namely the '214, '215, '105, '263, '804, and '443 Patents. After filing the Hitachi Actions, Rambus publicly asserted that all high-performance DRAM manufacturers are subject to the same allegations as those asserted against Hitachi.

75. In March 2000, Rambus initiated proceedings before the United States International Trade Commission ("ITC") in which Rambus requested an investigation of the alleged "unlawful importation . . . of articles covered by" two of the Patents in Suit (the "ITC Action"), namely the '918 and '195 Patents. In the ITC Action, Rambus named Hitachi, Sega Enterprises, Ltd., and Sega of America, Inc. as proposed respondents. Rambus claimed that the '918 and '195 Patents broadly cover any product which incorporates high-performance DRAM interface technology (such as a microprocessor or video game console). In the complaint that initiated the ITC Action, Rambus stated its intent to investigate yet another semiconductor memory manufacturer (a joint venture between Hitachi and NEC) for possible "involvement with the accused products."

76. The law suits and the press releases and statements issued along with their filing were for the purpose of coercing the defendants in those suits and the other high-performance DRAM manufacturers into capitulating to Rambus' unlawful demands.

77.    Since the filings of the Hitachi Actions and the ITC Action, Rambus has heightened its public campaign against all companies that manufacture memory products utilizing high-performance DRAMs, including SDRAMs and DDR SDRAMs.

78.    For example, Rambus' CEO, Geoff Tate, has been quoted numerous times as stating that the Rambus Patents are "fundamental" and that most high-performance DRAM manufacturers and their customers "will violate these patents."   Other articles report that Rambus believes the Rambus Patents "entitle it to royalties on virtually all memory products and controllers using a synchronous memory interface."   Additionally, Avo Kanadjian, a vice president of Rambus, has claimed that the likelihood of any synchronous DRAM product, such as SDRAMs and DDR SDRAMs, incorporating the Rambus patented features is high.   Other reports echo the reality that "Rambus' aggressive strategy stems from its assertion that any Synchronous DRAM manufacturer using technology that either provides or is designed to accept a connection based on Synchronous DRAM technology is crossing into an intellectual-property hot zone."

79.    Upon information and belief, Rambus has engaged in a pattern of conduct in which it has (a) contacted high-performance DRAM manufacturers to schedule meetings under the pretense of negotiating licenses under the Rambus Patents, including the Patents in Suit, (b) demanded from the manufacturers unreasonable and non-negotiable licenses, (c) set short deadlines for the manufacturers to accept Rambus' non-negotiable licenses, and (d) filed one or more patent infringement lawsuits against the manufacturers when Rambus' "take-it-or-leave-it" licenses were not accepted.

80.    Upon information and belief, earlier when this action was originally filed in 2000, Rambus contacted Infineon Technologies AG and Infineon Technologies North America Corp. (collectively "Infineon") to schedule a meeting under the pretense of negotiating a license agreement with respect to the Rambus Patents, including the Patents in Suit.

81.    Infineon, like Micron, is a major manufacturer of SDRAMs and DDR SDRAMs.

20

82.     Upon information and belief, after the initial contact by Rambus, a meeting took place between Infineon and Rambus at which Rambus told Infineon that its SDRAMs and DDR SDRAMs are covered by the Rambus Patents, including the Patents in Suit; that Infineon needed a license from Rambus to sell SDRAMs and DDR SDRAMs; and that Rambus' license terms were non-negotiable. Rambus then gave Infineon a short deadline within which to accept or reject Rambus' license terms.

83.     Upon information and belief, Infineon did not accept the non-negotiable license terms demanded by Rambus. Immediately thereafter, Rambus filed an action in the United States District Court for the Eastern District of Virginia (Richmond Division) against Infineon (the "Infineon Action"). In the Infineon Action, Rambus alleges that Infineon's sale of SDRAMs and DDR SDRAMs infringes the '263 and '804 patents.

84.     Upon information and belief, other high-performance DRAM manufacturers have been similarly contacted by Rambus to set up meetings under the pretense of opening licensing discussions regarding the Rambus Patents, including the Patents in Suit. Meetings have taken place between these other memory manufacturers and Rambus at which Rambus maintained an essentially non-negotiable stance with respect to the terms of a license and set a deadline within which the license must be accepted.

85.     On August 18, 2000, just days after Rambus filed suit against Infineon, Micron's CEO received an e-mail from Rambus requesting a "meeting" in September 2000 to discuss the Rambus Patents. Based on information and belief, this "notice" is similar to the notice that Rambus sent to Infineon and other high-performance DRAM manufacturers to set up a meeting at which Rambus would present non-negotiable license terms for the Rambus Patents, including the Patents in Suit.

86.     Micron now believes that Rambus will sue Micron for allegedly infringing the Patents in Suit based on Micron's sale of SDRAMs and DDR SDRAMs. In fact, shortly after this action commenced, Rambus brought infringement actions against Micron in Germany,

21

Italy, France and the United Kingdom. These actions reflected Rambus' scheme to exclude competitors from the relevant markets.

87. Upon information and belief, Rambus perceives Micron to be a high-performance DRAM manufacturer that poses a significant competitive, business, and/or financial threat to Rambus. Micron is a strong proponent of DDR SDRAM memory products. Rambus has indicated that it views DDR SDRAMs as a competitive threat to its RDRAM interface technology. Rambus has stated that it would not dispute that it was charging higher royalties for DDR SDRAMs to head off a potential rival to RDRAM. Micron's endorsement of DDR SDRAMs makes it an even more likely target of a patent lawsuit by Rambus.

88. Micron continues to make, use, sell, and/or offer for sale SDRAMs and DDR SDRAMs. These are the very products that Rambus has said are covered by the Rambus Patents, including the Patents in Suit, and over which Rambus has already sued Hitachi and Infineon.

89. Because the Rambus Patents, including the Patents in Suit, are not infringed, are unenforceable, and/or are invalid, and because the license terms are exorbitant and anti-competitive, Micron cannot and will not accept the "take-it-or-leave-it" license which Rambus has sought from other semiconductor memory manufacturers for the Rambus Patents. Rather, Micron will continue to make, use, sell, and/or offer for sale its SDRAMs and DDR SDRAMs.

90. As a result of these and other circumstances, Micron is under a reasonable and serious apprehension that it faces imminent suit by Rambus for infringement of the Patents in Suit. Accordingly, an actual controversy exists between Rambus and Micron concerning whether the Patents in Suit are not infringed, are invalid, and/or are unenforceable.

5. **The Effects of Rambus' Illegal and Anti-competitive Acts**

91. If Rambus is correct that its patents are required to produce SDRAMs and DDR SDRAMs, high-performance DRAM manufacturers must now license Rambus' patents or

be driven from the market. The only other high-performance DRAM interface technology is the proprietary RDRAM. There currently are no viable alternatives available in the market over which Rambus does not assert control through its patents. If Rambus' patents are valid and enforceable and have the scope Rambus asserts, Rambus will have the complete ability to exclude any chipmaker from producing *any* current high-performance DRAMs.

92.     Rambus' misconduct has caused injury to Micron, and Micron will continue to be injured in the future if the relief requested herein is not granted. Micron's injuries include incurring costs in developing and promoting technology that is subject to claims by Rambus which Micron reasonably believed would be free of such claims and incurring research and development costs in investigating designs to avoid any patent claims of Rambus in amounts far greater than would have been incurred had Rambus made the disclosures it was required to make from the beginning.

93.     Rambus' conduct threatens to thwart the development of any non-Rambus standard. The competition between Rambus' proprietary RDRAM architecture and the architecture promoted by competing high-performance DRAM manufacturers is at a critical juncture. Rambus' anti-competitive actions threaten to suppress industry acceptance of anything but Rambus' proprietary technology. The uncertainty created by Rambus over alternatives to its own technology poses the potential for raising the costs of rival standards and reducing the likelihood that those standards will be adopted.

94.     Rambus' abuse of the JEDEC standards-setting process harms competition by discouraging participation in industry standards-setting procedures that otherwise would foster competition. Competition results in lower costs. Competition would lower the cost of manufacturing and selling high-performance DRAMs, allowing manufacturers to engage in fair and aggressive competition based on the merits of their technologies. If Rambus' patent assertions are successful, Rambus will have succeeded in converting the JEDEC standards-setting process from a pro-competitive process to one that will serve anti-competitive ends.

23

95.    If Rambus' patent rights cover JEDEC's SDRAM and DDR SDRAM standards, Rambus' subversion of the industry standards-setting process will be felt in higher costs to high-performance DRAM manufacturers, and ultimately higher prices to consumers. Rambus' conduct, if successful, will minimize or eliminate the cost advantages which SDRAMs and DDR SDRAMs currently enjoy relative to RDRAMs.

96.    The injuries described above are injuries of the type the antitrust laws were designed to prevent.

97.    Micron is one of the companies that has been targeted by Rambus' exclusionary conduct.

**E.    Rambus' Inequitable Conduct and Fraud on the PTO**

98.    On information and belief, prior to the issuance of the Patents in Suit, the named inventors of the Patents in Suit and/or others substantively involved in prosecuting the applications leading to the Patents in Suit were aware of information material to the patentability of the claims of the Patents in Suit, but withheld that information from the U.S. Patent and Trademark Office ("PTO") with the intention of deceiving the PTO, and made affirmative representations to the PTO during the prosecution of the Rambus Patents in Suit or patents related to the Rambus Patents in Suit with the intention of deceiving the PTO, including without limitation, the conduct described in paragraphs 99 to 107, below.

**1.    Failure to Cite Material Prior Art Patents and Publications**

99.    Rambus failed to disclose U.S. Patent Nos. 5,361,277 ("the '277 Grover Patent") (filed March 30, 1989, foreign application priority date April 27, 1988) during the prosecution of the Rambus '804, '215, and '195 Rambus Patents in Suit. On information and belief, the '277 Grover Patent is material to the patentability of one or more of the Rambus '804, '215, or '195 Patents in Suit, was known to the named inventors and/or those substantively involved in the prosecution of the Rambus '804, '215, and '195 Patents in Suit prior to the issuance of those patents, and was withheld from the PTO with intent to deceive the PTO. The

24

'277 Grover Patent was not cited during the prosecution of the Rambus '804, '215, or '195 Patents in Suit, but was cited during the prosecution of other Rambus patents, including those issued to the named inventors, before the issuance of the Rambus '804, '215, and '195 Patents in Suit.

100.   Rambus failed to disclose U.S Patent No. 5,140,688 ("the '688 White Patent") (filed January 3, 1989, continuation of Ser. No. 929,690, filed November 10, 1986) during the prosecution of the Rambus '105, '263, and '804 Patents in Suit.   On information and belief, the '688 White Patent is material to the patentability of one or more of the Rambus '105, '263, or '804 Patents in Suit, was known to the named inventors and/or those substantively involved in the prosecution of the Rambus '105, '263, and '804 Patents in Suit prior to the issuance of those patents, and was withheld from the PTO with intent to deceive the PTO.   The '688 White Patent was not cited during the prosecution of the Rambus '105, '263, or '804 Patents in Suit, but was cited during the prosecution of other Rambus patents, including patents issued to the named inventors, before the issuance of the '105, '263, and '804 Patents in Suit.

101.   Rambus failed to disclose U.S. Patent No. 4,998,262 ("the '262 Wiggers Patent") (filed October 10, 1989) during the prosecution of the '804, '443, '214, '215, '918, and '195 Rambus Patents in Suit.   On information and belief, the '262 Wiggers Patent is material to the patentability of one or more of the Rambus '804, '443, '214, '215, '918, or '195 Patents in Suit, was known to the named inventors and/or those substantively involved in the prosecution of the Rambus '804, '443, '214, '215, '918, and '195 Patents in Suit prior to the issuance of those patents, and was withheld from the PTO with intent to deceive the PTO.   The '262 Patent was not cited during the prosecution of the Rambus '804, '443, '214, 215, '918, or '195 Patents in Suit, but was cited during the prosecution of other Rambus patents, including patents issued to the named inventors, before the issuance of the '804, '443, '214, 215, '918, and '195 Patents in Suit.

102.   Rambus failed to disclose U.S. Patent No. 5,021,985 ("the '985 Hu Patent") during the prosecution of the Rambus Patents in Suit.   On information and belief, the

25

'985 Hu Patent is material to the patentability of one or more of the Rambus Patents in Suit, was known to those substantively involved in the prosecution of the Rambus Patents in Suit prior to the issuance of those patents, and was withheld from the PTO with intent to deceive the PTO. The '985 Hu Patent was not cited during the prosecution of any of the Rambus Patents in Suit. The '985 Hu Patent was cited in U.S. Patent No. 5,838,990, assigned to Samsung Electronics Co., Ltd., which issued on November 17, 1998, and on which Neil A. Steinberg is listed as the responsible prosecuting attorney. Mr. Steinberg was substantively involved in the prosecution of the Rambus Patents in Suit.

103. Rambus failed to disclose Mark Johnson et al., *A Variable Delay Line PLL for CPU-Coprocessor Synchronization*, IEEE J. Solid State Circuits, Vol. 22, No. 5, Oct. 1988 ("Johnson et al.") during the prosecution of the Rambus '214, '215, '263, '195, '918, '443, and '804 Patents in Suit. On information and belief, Johnson et al. is material to the patentability of one or more of the Rambus Patents in Suit, was known to the named inventors and/or those substantively involved in the Rambus Patents in Suit prior to the issuance of those patents, and was withheld from the PTO with intent to deceive the PTO. The issue of the IEEE Journal of Solid State Circuits in which Johnson et al. was published was co-guest-edited by Mark Horowitz. Mr. Horowitz and his co-guest editor wrote a forward to the issue, describing each of the articles in the issue, including Johnson et al. Johnson et al. was also cited in Rambus patents, including the Rambus '105 Patent in Suit issued to the named inventors of the Rambus '214, '215, '263, '195, '918, '443, and '804 Patents in Suit prior to the issuance of one or more of those patents.

2. **Failure to Disclose Information Relating to SCI**

104. Rambus failed to disclose information and publications relating to the Scalable Coherent Interface ("SCI") during the prosecution of the Rambus Patents in Suit. On information and belief, SCI is material to the patentability of the Rambus Patents in Suit, was known to the named inventors and/or those substantively involved in the prosecution of the

26

Rambus Patents in Suit, and was withheld from the PTO with intent to deceive the PTO. The named inventors of the Rambus Patents in Suit were both on the SCI mailing list when SCI publications material to the patentability of the Rambus Patents in Suit were distributed to those on the mailing list, received and, on information and belief, were aware of those SCI publications and their contents, including, without limitation, the following:

- David B. Gustavson et al., *The Scalable Coherent Interface Project (Superbus)*, Aug. 22, 1988;

- David B. Gustavson, *Scalable Coherent Interface*, Nov. 1988;

- Knut Alnes, *SCI: A Proposal For SCI Operation*, Nov. 1988;

- Knut Alnes, *SCI: A Proposal For SCI Operation*, Jan. 1989;

- Bjorn O. Bakka et al., *SCI: Logical Level Proposals*, Jan. 1989;

- Ernst H. Kristiansen et al., *Scalable Coherent Interface*, Feb. 1989;

- Morten Schanke, *Proposal For Clock Distribution in SCI*, May 1989;

- Ernst H. Kristiansen et al., *Scalable Coherent Interface*, Eurobus, London, Sept. 1989; and

- Richard A. Volz et al., *Position Paper on Global Clock For the FutureBus +*, 1989.

105. On information and belief, the named inventors and/or others substantively involved in the prosecution of the Rambus Patents in Suit were aware of SCI, and SCI follow-on initiatives called RamLink and SyncLink, before the issuance of the Rambus Patents in Suit as a result of their professional and publishing activities. For example, Michael Farmwald published an article entitled, *A Fast Path To One Memory*, in a Special Report on Memory in the October 1992 issue of IEEE Spectrum magazine. An article entitled, *A RAM Link for High Speed*, by Gjessing et al. that described the SCI and RamLink projects was published immediately following Mr. Farmwald's article in the same IEEE Spectrum Special Report. Mr. Horowitz published several articles specifically referencing SCI and RamLink, including: Daniel Lenoski et al., *Design of the Stanford DASH Multiprocessor*, Stanford

27

Computer Systems Laboratory Technical Report No. CSL-TR-89-403, Dec. 1989, at 20; and Daniel Lenoski et al., *The Stanford Dash Multiprocessor*, Computer, vol. 25, no. 3, p. 63-79, IEEE Computer Society, Mar. 1992, at 77-78.

### 3.   Failure to Disclose Information Regarding MIPS

106.   Rambus failed to disclose information relating to work done at, and products developed by, MIPS Computer Systems, Inc. ("MIPS") prior to the conception of one or more of the inventions claimed in the Rambus Patents in Suit, including work done by the named inventors themselves and others who worked with them at MIPS and subsequently were employed by Rambus.   On information and belief, prior to the issuance of the Patents in Suit, the named inventors and/or others substantively involved in the prosecution of the Patents in Suit were aware, through their work at and for MIPS, of MIPS developments and products that are material to the patentability of the Patents in Suit, including, without limitation, the R2000, R2010, R3000, R3010, R4000, and R6000 CPUs and FPUs, the R6020 System Bus Chip, and the RC6280 System.   On information and belief, Michael Farmwald was employed at MIPS, and Mark Horowitz consulted for MIPS, with respect to one or more of the above-referenced products prior to the April 18, 1990 filing date of application serial no. 07/510,898 ("the '898 application") from which the Rambus Patents in Suit claim priority.   On information and belief, the named inventors of the Patents in Suit and/or others substantively involved in the prosecution of the Patents in Suit withheld information regarding these MIPS products from the PTO with the intention of deceiving the PTO.

### 4.   Misrepresentations Regarding the Hoff and NuBus References

107.   The named inventors and/or those substantively involved in the prosecution of the Rambus Patents in Suit misrepresented the prior art in applications for the Rambus Patents in Suit and in applications related to those patents.   These misrepresentations were made with intent to deceive the PTO.   Without limitation, they include the characterization of the '715 Hoff et al. Patent and the NuBus as point-to-point systems.

F.      **Spoliation And Other Litigation Misconduct**

1.      **Spoliation**

108.    By at least 1998, Rambus and its senior management – including, among others, Farmwald, Horowitz, then chief executive officer Geoffrey Tate, then vice president Joel Karp, and employee Richard Crisp – developed a plan to extract licensing fees for Rambus on a vast array of current and future DRAM products, including SDRAM and DDR SDRAM products. This plan was developed in coordination with Neil Steinberg, a former outside counsel to Rambus who in April 1999 became in-house patent counsel and later Rambus's vice president for intellectual property, and was executed in part by Lester Vincent, Rambus's patent prosecution counsel.

109.    Consistent with its prior business strategy, Rambus's plan was to seek fees based on a percentage of the value of the entire DRAM product – rather than the fraction of a DRAM product associated with the DRAM interface, where Rambus's claimed inventive contribution lay.  From at least 1998, Rambus understood that the fees it planned to demand were so high that they would inevitably lead to litigation.

110.    Beginning in at least early 1998, Rambus and its management developed a plan to file lawsuits against DRAM manufacturers, such as plaintiff Micron, Infineon, and Hynix. A contemporaneous Rambus document set out the plan:  "Get all infringers to license our IP with royalties, RDRAM (if it is a broad license) OR sue."

111.    At various times, Rambus contemplated complaints based on patent infringement, breach of contract, fraud, unfair competition, and antitrust violations.

112.    Rambus's stated goal was to use litigation to "[c]ollect royalties on all DRAM and controllers forever."

29

113.   Rambus and its management knew, however, that any effort to assert patent rights related to DRAM interface technology would be threatened if harmful evidence were available in discovery.   Thus, Rambus and its management embarked in early 1998 on a scheme to obstruct justice by destroying such evidence.   Rambus vice president Karp prepared a purported "document retention" policy for this purpose.   Contemporaneous documents show that the effort to identify and destroy relevant evidence was often described as the company's "licensing/litigation" or "licensing and litigation" strategy.

### a.   "Shred Day" 1998

114.   The document destruction program got underway by the summer of 1998, when Karp and Rambus's then outside counsel presented the new document program to Rambus' employees.   The presentation included slideshows explaining how the program would work.

115.   During this period, Rambus and its management implemented a destruction program that resulted in the eradication of large numbers of electronic files, including all the backup tapes for the Macintosh computers in use during the first years of Rambus' existence.   In July 1998, Joel Karp at Rambus sent over 1,000 backup tapes to an outside vendor with specific instructions to have those backup tapes "demagnetized" – that is, to have them erased so that the information on those tapes would be permanently destroyed.

116.   Next, in August 1998, Rambus and its management arranged for burlap bags to be distributed to all Rambus employees, with directions that the employees collect for shredding various categories of documents relevant to the patents and patent infringement claims that Rambus was planning to assert against DRAM manufacturers, including Micron.   These categories included:

(a)   Rambus's prosecution of its patents;

30

(b)     the relationship of Rambus's patent applications and pending claims to industry standards;

(c)     presentations to Rambus's board of directors regarding intellectual property and assertion/litigation plans;

(d)     potentially damaging or invalidating prior art related to patents asserted against DRAM manufacturers, including Micron, as part of Rambus's litigation strategy; and

(e)     Rambus's draft license agreements and documents related to the negotiations for such license agreements.

117.    Then, on September 3, 1998, Rambus arranged for a truck from a private shredding company to arrive at Rambus's headquarters to pick up the documents that Rambus's employees had collected in the previously-distributed burlap bags.  So much material was collected – 185 burlap sacks and 60 additional boxes of documents – that the truck had to return another day to haul it all away.

118.    Multiple internal Rambus emails refer to September 3, 1998 as "Shred Day."  At the conclusion of "Shred Day," Rambus held a party with beer and pizza to celebrate the completion of the shredding project.

119.    Following "Shred Day," Rambus vice president Karp conducted "spot checks" to determine whether employees had fully complied with the instructions to collect, bag and destroy the listed categories of documents.

120.    Sworn testimony confirms that the goals of the document destruction included rendering the documents unavailable in upcoming litigation.  On April 14, 2001, Rambus vice president of engineering Allen Roberts testified that Rambus vice president Karp

31

had directed him to purge his files at least in part because "such materials are discoverable in subsequent litigations."

121.    Tony Diepenbrock, a lawyer in Rambus's in-house legal department, testified on April 11, 2001 that he understood that one of the reasons behind "Shred Day" was that "some of that stuff is discoverable."

### b.    "Shred Day" 1999

122.    Rambus, its management and others continued their evidence destruction program in 1999.  They focused on the destruction of evidence that Rambus knew would be at the heart of any antitrust and patent lawsuits that it intended to bring or suspected might be brought against it if its scheme succeeded.

123.    A June 27, 1999 document identifying Rambus's goals for the third quarter of 1999 listed as goals under the heading "Licensing/Litigation Readiness":

"E.    Prepare litigation strategy against 1 of 3 manufacturers (re: 3D)

"F.    Ready for Litigation with 30 days notice

"G.    Organize 1999 shredding party at Rambus."

124.    Consistent with these "goals," Rambus, its management, and others organized a second document shredding event on August 29, 1999 – during which Rambus destroyed an additional 150 burlap bags filled with documents (the equivalent of 188 banker's boxes of documents).

### c.    "Shred Day" 2000

125.    In January 2000, Rambus filed suit against Hitachi, the first of several lawsuits against DRAM manufacturers.  Soon thereafter, Rambus asserted patent infringement

claims against Infineon and several other DRAM manufacturers, including Micron, in the U.S. federal courts, as well as courts in Italy, Germany, France, and the United Kingdom.

126.   Shortly before commencing the litigation against Infineon, Rambus instructed Lester Vincent, Rambus's former outside patent prosecution counsel who had drafted many of Rambus's patent claims, to destroy additional evidence, including documents relating to certain of the patents asserted against Infineon and still being asserted against Micron.

127.   In the spring of 2000, Cecelia Gonzalez, Rambus's outside counsel in the litigation against Hitachi, asked Rambus's then-intellectual property vice president Neil Steinberg why she could not locate within Rambus's files entire categories of documents relevant to the case.   Steinberg told Gonzalez that there had been a large document shredding campaign in 1998.   Gonzales told Steinberg that Rambus had a duty to maintain documents and could not destroy any materials pertaining to the litigation.

128.   Yet, in December 2000, while Rambus was litigating against Micron and other companies on antitrust, fraud, and patent claims, and while pretrial discovery was underway in connection with the then-scheduled 2001 trial in Rambus's case against Infineon, Rambus, its management, and others undertook a third shredding event.   In a repeat of the "Shred Days" in 1998 and 1999, the December 2000 "Shred Day" resulted in the destruction of 460 burlap bags full of documents – the equivalent of 575 banker's boxes.

### d.   The *Infineon* Decisions

129.   In connection with Rambus's litigation against Infineon, Rambus sought to cover up the details of its document destruction by asserting privilege over thousands of documents.   The district court for the Eastern District of Virginia conducted an in camera review of 4,673 documents as to which Rambus had claimed privilege, and concluded that Rambus's document destruction plan was intended "to destroy discoverable documents as part of

33

its litigation strategy." *Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 280, 298 (E. D. Va. 2004).

130.   In an earlier opinion in the case, the Court noted as well that Rambus's "document retention policy" had been implemented, at least in part, "for the purpose of getting rid of documents that might be harmful in litigation." *Rambus, Inc. v. Infineon Techs. AG*, 155 F. Supp. 2d 668, 682 (E. D. Va. 2001).

131.   The Court found that the "crime/fraud" exception was applicable to Rambus's assertions of attorney-client and work product privilege and ordered Rambus to produce documents regarding Rambus' development and implementation of its document destruction program. *Id.* at 680.

## 2. Rambus and Its Management Provide False Testimony to Hide the Document Destruction Scheme

132.   In connection with pending lawsuits against Micron and other DRAM manufacturers, including Rambus's lawsuit against Infineon in the Eastern District of Virginia, Rambus's management testified in a false or misleading manner to cover up the company's document destruction.

133.   For example, in this matter, Neil Steinberg, formerly outside counsel to Rambus and later its in-house counsel and vice president of intellectual property, falsely testified under oath on August 1, 2001 that "Shred Day 1998" was the only time when Rambus employees were given burlap bags to collect documents for shredding.   Mr. Steinberg so testified, despite admitting that he had prepared for his testimony by interviewing a number of Rambus employees who had been involved in the document destruction program, including Geoffrey Tate, David Mooring, Richard Crisp, Allen Roberts, and representatives from Rambus's information technology group, all of whom would have known the falsity of the testimony.

134.    Mr. Steinberg also testified falsely that (a) no slide presentation was shown to Rambus employees regarding its document destruction policy and (b) no instructions regarding the destruction of documents were provided to Rambus employees during that meeting. Documents that Rambus attempted to withhold under claims of privilege (but which Rambus was later forced to produce) establish that Rambus employees had been shown slide presentations that instructed them to destroy e-mails and other evidence.

135.    Robert Kramer, Rambus's 30(b)(6) corporate representative in the Hynix case in California, and Rambus' current director of litigation, like Mr. Steinberg, falsely testified that "Shred Day" 1998 had been the sole instance when Rambus employees had used burlap bags to collect documents for shredding.  Mr. Kramer also falsely testified that Rambus's board of directors had received no presentations regarding "Shred Days."  In addition, Mr. Kramer falsely testified that Rambus had not produced certain documents in litigation simply because those documents had been "corrupted," when in fact Rambus had simply withheld them from production.

136.    Richard Crisp, another Rambus employee, testified in his first deposition in the *Infineon* case that he "never, ever" participated in Rambus' patent drafting efforts. However, when he was confronted with documents obtained after the piercing of the attorney-client privilege, he was forced to admit that he had directed which patent claims should be filed. The district court for the Eastern District of Virginia found Mr. Crisp's testimony to be false or misleading.  *See Rambus, Inc. v. Infineon Techs., AG*, 155 F. Supp. 2d 668, 681 (E. D. Va. 2001).

137.    At a May 2004 deposition, Mr. Crisp refused to answer, on the basis of attorney-client privilege, questions about what Daniel Johnson, Jr., Rambus's outside counsel, said about document retention and destruction at Rambus.  After the Virginia Court ordered Mr. Crisp to answer questions on that topic, Mr. Crisp was deposed the following October and asked

those questions again.   But rather than comply with the Court's order, Mr. Crisp claimed that he had forgotten what he "remembered in May 2004 regarding the comments by Mr. Johnson" merely because five months had gone by.

138.   Geoffrey Tate, then Rambus's chief executive officer, also testified in his first deposition that he did not believe that Rambus drafted claims to cover certain DRAM technology.   Tate even testified that he did not know whether he was aware that patent claims could be modified.   At trial, however, he admitted, upon being confronted with belatedly-obtained impeaching documents, that he knew that Rambus was amending its patent applications to cover that same DRAM technology.   *See Rambus, Inc. v. Infineon Techs., AG*, 155 F. Supp. 2d 668, 681-82 (E. D. Va. 2001).

139.   On March 12, 2001, following the Virginia Court's order piercing the attorney-client privilege under the crime-fraud exception, Rambus took the extraordinary step of filing a mandamus petition with the Federal Circuit Court of Appeals seeking to vacate the order and prevent the disclosure of what it knew to be damning documents.   Consistent with Rambus's previous testimony – including the testimony of Tate and Crisp – Rambus's Federal Circuit brief vehemently denied the conduct underlying this Court's order, stating that Crisp did not counsel any lawyers or other Rambus employees regarding pending patent applications, and that he did not know Rambus had pending patent applications relating to SDRAM at the time. Only after the Federal Circuit denied mandamus relief and Rambus was forced to turn over these harmful documents did Rambus's position and testimony change.

140.   Even after the Virginia court's ruling in the *Infineon* case, Rambus and its management have continued to misrepresent the facts of the company's document shredding.

### 3.    Rambus Co-Founder Farmwald Falsely Testified About the Timing of His Inventions

141.    In various litigations, including the litigation against Infineon in the Eastern District of Virginia, Rambus co-founder Farmwald has falsely testified about the timing of his inventions of DRAM interface technology.   Farmwald's intent has been to conceal that he conceived of and developed those inventions while still employed by MIPS, and that, by operation of an invention assignment obligation, he had in fact assigned to MIPS the ownership of those inventions.

142.    Farmwald falsely testified in the *Infineon* case that he was employed at the University of Illinois and no longer at MIPS at the time of the October 1988 meeting in which he described his DRAM interface inventions to Messrs. Horowitz and Johnson.   However, Farmwald did not terminate his employment with MIPS until December 16, 1988 and was therefore still bound by his assignment obligations at the time he conceived of the '898 inventions.

143.    Rambus improperly withheld from Micron and other litigants evidence that would refute Rambus's false conception and ownership story.   For example, Rambus possessed backup tapes containing information showing that Farmwald developed the '898 inventions while still employed at MIPS.   Yet Rambus withheld these documents from Micron for nearly five years of litigation and only recently produced them.   On information and belief Infineon and the Virginia court did not ever benefit from having these documents.   While Rambus discovered the potential existence of these tapes during the *Infineon* litigation, on information and belief Rambus never informed the Court or Infineon of this fact.   Instead, Rambus rushed to Infineon to enter into a settlement that not only resulted in substantial payments to Rambus, but also preempted the entry of a written decision by the Court regarding Rambus's spoliation and unclean hands.   Rambus ultimately discovered over 1,000 backup tapes, including tapes containing information relevant to the '898 inventions.

144.    Farmwald also falsely testified that he joined the University of Illinois in mid-1988, also before his October 1988 meeting with Horowitz and Johnson.   In fact, Farmwald joined the University of Illinois faculty on November 9, 1988.

## COUNT I

### (Monopolization and Attempted Monopolization under 15 U.S.C. § 2)

145.    Paragraphs 1 through 144 are incorporated herein by reference as if fully set forth herein.

146.    This Count seeks damages and injunctive relief against Rambus by reason of Rambus' monopolization and attempted monopolization of the relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

147.    As explained in detail above, Rambus has engaged and is engaging in predatory and anti-competitive conduct with the specific intent of monopolizing the world and United States markets for high-performance DRAM interface technology and the world market for high-performance DRAMs.   Rambus has already succeeded in coercing certain high-performance DRAM manufacturers to enter into licensing agreements that give Rambus control over the portion of the high-performance DRAM market serviced by those manufacturers.

148.    Rambus has engaged in that conduct with the specific intent of achieving monopoly power over the high-performance DRAM interface technology and high-performance DRAM markets, and has made public statements indicating its intent to monopolize, control, and manipulate those markets to the benefit of Rambus.

149.    Rambus' conduct has a dangerous probability of achieving monopoly power, both in the world and United States markets for high-performance DRAM interface technology and the world and United States markets for high-performance DRAMs, unless such conduct is restrained and enjoined.   If the conduct is not enjoined, the remaining manufacturers of high-performance DRAMs may be forced to enter into anti-competitive license agreements

38

with Rambus, thereby giving Rambus control over 100% of these relevant markets and thereby increasing the defendant's monopoly power and monopoly control over the markets.

150.    Rambus' manipulation of JEDEC and its fraudulent conduct and multiple breaches of its contractual duties to JEDEC and the other participants in JEDEC led microprocessor manufacturers to adopt high-performance DRAM interface technology that is compatible only with the high-performance DRAM interface technology that defendant Rambus claims to have patented and to control.  As a result, substantial barriers to entry have been created for anyone attempting to use high-performance DRAM interface technology in the manufacture of high-performance DRAMs other than the technology that Rambus claims to control.

151.    In fact, if Rambus' asserted positions are accepted, Rambus has already achieved monopoly power and monopoly control over both the world and United States markets for high-performance DRAM interface technology and the world and United States markets for high-performance DRAMs.

152.    Rambus' asserted monopoly power in the world and United States markets for high-performance DRAM interface technology and high-performance DRAMs has not been acquired or achieved as a result of business growth or development or legitimate acquisition and enforcement of patents, or as a consequence of a superior technology, business acumen, or historic accident.  Rather, Rambus has achieved such asserted monopoly power through predatory and exclusionary conduct, which it engaged in with the specific intent to obtain monopoly power.

153.    Rambus' conduct has had a substantial effect on interstate commerce and it will continue to have such an effect.

154.    As a direct and proximate result of Rambus' unlawful monopolization and/or attempted monopolization, Micron has been injured in its business and property in an amount that has yet to be determined but will be established at trial.

RLF1-3178407-1

155.   Unless Rambus is enjoined by a court of law, Rambus' unlawful conduct will continue and Micron will continue to sustain injury and damages.

## COUNT II

### (Monopolization and Attempted
### Monopolization under 15 U.S.C. § 2 -- Walker Process)

156.   Paragraphs 1 through 155 are incorporated by reference as if set forth fully herein.

157.   Rambus failed to disclose material information to the PTO and made material misrepresentations in prosecuting the Initial Application and subsequent applications claiming priority to it, including the applications leading to the Patents-in-Suit.   If Rambus had done so, it would have been apparent to the patent examiner that Rambus's applications should not issue.   Rambus thus violated its duty of candor and committed fraud on the PTO.

158.   Rambus's fraud on the PTO is actionable under Section 2 of the Sherman Antitrust Act.   Through this fraud Rambus has a dangerous probability of achieving monopoly power in the world and United States markets for high-performance DRAM interface technology and high-performance DRAMS.

159.   Rambus' conduct has had a substantial effect on interstate commerce and it will continue to have such an effect.

160.   As a direct and proximate result of Rambus' unlawful monopolization and/or attempted monopolization, Micron has been injured in its business and property in an amount that has yet to be determined but will be established at trial.

161.   Unless Rambus is enjoined by a court of law, Rambus' unlawful conduct will continue and Micron will continue to sustain injury and damages.

## COUNT III

### (Deceptive Trade Practices under
### Del. Code. Ann., Title 6, § 2532 et seq.)

162.   Paragraphs 1 through 161 are incorporated by reference as if set forth fully herein.

163.   Through its misconduct in JEDEC, Rambus engaged in deceptive trade practices because its conduct as a member of JEDEC created a likelihood of confusion and misunderstanding among other JEDEC members.

164.   Micron has been harmed by Rambus' deceptive trade practices and will continue to be harmed in the future by this conduct.

## COUNT IV

### (Breach of Contract)

165.   Paragraphs 1 through 164 are incorporated by reference as if set forth fully herein.

166.   JEDEC requires that its members disclose patents and patent applications involved in its work.

167.   This policy protects JEDEC and its members from unscrupulous conduct by any member who seeks to unfairly benefit from, or to manipulate, the standards setting process to its advantage.

168.   By joining JEDEC, and in consideration for the receipt of the numerous benefits of being a member of JEDEC, each member of JEDEC, including Rambus, agreed to abide by the rules and policies governing the organization.   In addition, JEDEC members agree that if they fail to disclose relevant patents or patent applications, they will not enforce any such patent against JEDEC members.

169.   These agreement created a contract among each of the members and between each member and JEDEC.   In addition, Micron was a third-party beneficiary of the agreement between JEDEC and Rambus.

41

170. Rambus breached its contractual obligations by violating this policy and/or the implied covenant of good faith and fair dealing, including at least by not disclosing its patent rights relating to high-performance DRAMs and/or after not disclosing its patent rights by asserting such patent rights and claiming entitlement to a royalty.

171. As a result, Micron has incurred damages, and will be further damaged in the future due to Rambus' breach of contract.

## COUNT V

### (Fraud)

172. Paragraphs 1 through 171 are incorporated by reference as if set forth fully herein.

173. Rambus, as a member of JEDEC, had a duty to disclose its patents and patent applications, including applications underlying the Patents in Suit, to JEDEC and other JEDEC members including Micron.

174. Rambus failed to make such disclosures despite knowing that it was required to disclose such information, and such information was material. Rambus knew that JEDEC and its members would reasonably rely on its failure to disclose its patents and patent applications, including the Rambus Patents, in adopting standards. Rambus further knew that JEDEC and its members would consider its failure to disclose patents and patent applications as a representation that it had no such patents or patent applications for which disclosure was required and/or that it would not assert claims to any such patents against JEDEC members in the future.

175. Rambus intended to induce the other members of JEDEC, including Micron, to adopt standards covered by its patents and/or to keep such JEDEC members from adopting standards which would avoid Rambus' patent assertions.

176. JEDEC and its members, including Micron, adopted standards in justifiable reliance on Rambus' silence, conduct, and/or misrepresentations that high-

42

performance DRAM manufactured pursuant to such standards did not and would not infringe any patents of Rambus, or any other members of JEDEC that did not disclose its patent portfolio, and/or that such patents would not be asserted against the members.

177.    Micron has suffered damages as a result of Rambus' failure to disclose its patents and patent applications, and Micron will be further damaged in the future due to Rambus' fraudulent conduct.

**COUNT VI**

**(Equitable Estoppel)**

178.    Paragraphs 1 through 177 are incorporated by reference as if set forth fully herein.

179.    By joining JEDEC, attending JEDEC meetings, and paying membership dues to JEDEC, Rambus impliedly consented to abide by the rules and policies governing the organization, and led other JEDEC members, including Micron, to believe that it would comply with those rules and policies.

180.    Rambus failed to disclose its relevant patents and patent applications to JEDEC and its members as required by JEDEC's rules and policies.

181.    Micron detrimentally and justifiably relied on Rambus' omissions by incurring costs in developing and promoting technology that is subject to assertions by Rambus which Micron would not have incurred if Rambus had disclosed its patents and patent applications and will incur additional damages in the future.

182.    Because of Rambus' omissions and Micron's detrimental reliance on them, Rambus should be estopped from asserting the Rambus Patents against Micron.

43

## COUNT VII

### (Negligent Misrepresentation)

183.    Paragraphs 1 through 182 are incorporated by reference as if set forth fully herein.

184.    As described above, Rambus failed to make disclosures it was required to make as a member of JEDEC, and it made false and misleading statements which reasonably led Micron, and the other members of JEDEC, to believe that Rambus had no intellectual-property rights as to products conforming to the SDRAM and DDR SDRAM standards.

185.    In addition, when Rambus purported to withdraw from JEDEC by letter on June 17, 1996, it provided a list of its U.S. and foreign patents for the benefit of JEDEC members who were "interested in the patents of Rambus." Rambus acknowledged in its letter that its patents had been the subject of discussion at JEDEC meetings, and therefore knew that JEDEC members would rely on the disclosure. Nevertheless, Rambus failed to disclose a patent that had issued prior to the date of the letter and which was related to the work of a committee of JEDEC.

186.    This omission made Rambus' disclosure of its patents false, and this omission was material as it encompassed an area in which the committee had been working.

187.    Micron believed that Rambus had accurately and completely identified all of its patents it could or would assert, and justifiably relied on Rambus' statements and omissions described above.

188.    Micron has suffered damages as a result of Rambus' negligent misrepresentations and will suffer additional damages in the future.

44

## COUNT VIII

### (Declaratory Judgment of Invalidity, Unenforceability, and Noninfringement of the '105 Patent)

189.    Paragraphs 1 through 188 are incorporated by reference as if stated fully herein.

190.    Micron has an objectively reasonable apprehension that Rambus will sue Micron for the alleged infringement of the '105 Patent.

191.    The claims of the '105 Patent are not infringed by Micron; are invalid for failure to meet the requirements of the patent laws of the United States, including 35 U.S.C. §§ 102, 103, and/or 112; and/or the '105 Patent is unenforceable based upon, among other reasons, patent misuse, equitable estoppel, inequitable conduct, unclean hands, waiver, laches, laches in the Patent and Trademark Office, and violations of the antitrust laws.

192.    Accordingly, there exists an actual controversy between Micron and Rambus concerning whether the claims of the '105 Patent are not infringed by Micron, are invalid, and/or are unenforceable.

193.    Micron seeks a declaration that the '105 Patent is not infringed by Micron, is invalid, and/or is unenforceable.

## COUNT IX

### (Declaratory Judgment of Invalidity, Unenforceability, and Noninfringement of the '263 Patent)

194.    Paragraphs 1 through 193 are incorporated by reference as if stated fully herein.

195.    Micron has an objectively reasonable apprehension that Rambus will sue Micron for the alleged infringement of the '263 Patent.

196.    The claims of the '263 Patent are not infringed by Micron; are invalid for failure to meet the requirements of the patent laws of the United States, including 35 U.S.C. §§ 102, 103, and/or 112; and/or the '263 Patent is unenforceable based upon, among other reasons,

45

patent misuse, equitable estoppel, inequitable conduct, unclean hands, waiver, laches, laches in the Patent and Trademark Office, and violations of the antitrust laws.

197.    Accordingly, there exists an actual controversy between Micron and Rambus concerning whether the claims of the '263 Patent are not infringed by Micron, are invalid, and/or are unenforceable.

198.    Micron seeks a declaration that the '263 Patent is not infringed by Micron, is invalid, and/or is unenforceable.

## COUNT X

### (Declaratory Judgment of Invalidity, Unenforceability, and Noninfringement of the '804 Patent)

199.    Paragraphs 1 through 198 are incorporated by reference as if stated fully herein.

200.    Micron has an objectively reasonable apprehension that Rambus will sue Micron for the alleged infringement of the '804 Patent.

201.    The claims of the '804 Patent are not infringed by Micron; are invalid for failure to meet the requirements of the patent laws of the United States, including 35 U.S.C. §§ 102, 103, and/or 112; and/or the '804 Patent is unenforceable based upon, among other reasons, patent misuse, equitable estoppel, inequitable conduct, unclean hands, waiver, laches, laches in the Patent and Trademark Office, and violations of the antitrust laws.

202.    Accordingly, there exists an actual controversy between Micron and Rambus concerning whether the claims of the '804 Patent are not infringed by Micron, are invalid, and/or are unenforceable.

203.    Micron seeks a declaration that the '804 Patent is not infringed by Micron, is invalid, and/or is unenforceable.

46

## COUNT XI

**(Declaratory Judgment of Invalidity, Unenforceability,
and Noninfringement of the '443 Patent)**

204.    Paragraphs 1 through 203 are incorporated by reference as if stated fully
herein.

205.    Micron has an objectively reasonable apprehension that Rambus will sue
Micron for the alleged infringement of the '443 Patent.

206.    The claims of the '443 Patent are not infringed by Micron; are invalid for
failure to meet the requirements of the patent laws of the United States, including 35 U.S.C. §§
102, 103, and/or 112; and/or the '443 Patent is unenforceable based upon, among other reasons,
patent misuse, equitable estoppel, inequitable conduct, unclean hands, waiver, laches, laches in
the Patent and Trademark Office, and violations of the antitrust laws.

207.    Accordingly, there exists an actual controversy between Micron and
Rambus concerning whether the claims of the '443 Patent are not infringed by Micron, are
invalid, and/or are unenforceable.

208.    Micron seeks a declaration that the '443 Patent is not infringed by Micron,
is invalid, and/or is unenforceable.

## COUNT XII

**(Declaratory Judgment of Invalidity, Unenforceability,
and Noninfringement of the '214 Patent)**

209.    Paragraphs 1 through 208 are incorporated by reference as if stated fully
herein.

210.    Micron has an objectively reasonable apprehension that Rambus will sue
Micron for the alleged infringement of the '214 Patent.

211.    The claims of the '214 Patent are not infringed by Micron; are invalid for
failure to meet the requirements of the patent laws of the United States, including 35 U.S.C. §§
102, 103, and/or 112; and/or the '214 Patent is unenforceable based upon, among other reasons,

47

patent misuse, equitable estoppel, inequitable conduct, unclean hands, waiver, laches, laches in the Patent and Trademark Office, and violations of the antitrust laws.

212.    Accordingly, there exists an actual controversy between Micron and Rambus concerning whether the claims of the '214 Patent are not infringed by Micron, are invalid, and/or are unenforceable.

213.    Micron seeks a declaration that the '214 Patent is not infringed by Micron, is invalid, and/or is unenforceable.

**COUNT XIII**

**(Declaratory Judgment of Invalidity, Unenforceability,
and Noninfringement of the '215 Patent)**

214.    Paragraphs 1 through 213 are incorporated by reference as if stated fully herein.

215.    Micron has an objectively reasonable apprehension that Rambus will sue Micron for the alleged infringement of the '215 Patent.

216.    The claims of the '215 Patent are not infringed by Micron; are invalid for failure to meet the requirements of the patent laws of the United States, including 35 U.S.C. §§ 102, 103, and/or 112; and/or the '215 Patent is unenforceable based upon, among other reasons, patent misuse, equitable estoppel, inequitable conduct, unclean hands, waiver, laches, laches in the Patent and Trademark Office, and violations of the antitrust laws.

217.    Accordingly, there exists an actual controversy between Micron and Rambus concerning whether the claims of the '215 Patent are not infringed by Micron, are invalid, and/or are unenforceable.

218.    Micron seeks a declaration that the '215 Patent is not infringed by Micron, is invalid, and/or is unenforceable.

## COUNT XIV

### (Declaratory Judgment of Invalidity, Unenforceability, and Noninfringement of the '918 Patent)

219.    Paragraphs 1 through 218 are incorporated by reference as if stated fully herein.

220.    Micron has an objectively reasonable apprehension that Rambus will sue Micron for the alleged infringement of the '918 Patent.

221.    The claims of the '918 Patent are not infringed by Micron; are invalid for failure to meet the requirements of the patent laws of the United States, including 35 U.S.C. §§ 102, 103, and/or 112; and/or the '918 Patent is unenforceable based upon, among other reasons, patent misuse, equitable estoppel, inequitable conduct, unclean hands, waiver, laches, laches in the Patent and Trademark Office, and violations of the antitrust laws.

222.    Accordingly, there exists an actual controversy between Micron and Rambus concerning whether the claims of the '918 Patent are not infringed by Micron, are invalid, and/or are unenforceable.

223.    Micron seeks a declaration that the '918 Patent is not infringed by Micron, is invalid, and/or is unenforceable.

## COUNT XV

### (Declaratory Judgment of Invalidity, Unenforceability, and Noninfringement of the '195 Patent)

224.    Paragraphs 1 through 223 are incorporated by reference as if stated fully herein.

225.    Micron has an objectively reasonable apprehension that Rambus will sue Micron for the alleged infringement of the '195 Patent.

226.    The claims of the '195 Patent are not infringed by Micron; are invalid for failure to meet the requirements of the patent laws of the United States, including 35 U.S.C. §§ 102, 103, and/or 112; and/or the '195 Patent is unenforceable based upon, among other reasons,

patent misuse, equitable estoppel, inequitable conduct, unclean hands, waiver, laches, laches in the Patent and Trademark Office, and violations of the antitrust laws.

227.    Accordingly, there exists an actual controversy between Micron and Rambus concerning whether the claims of the '195 Patent are not infringed by Micron, are invalid, and/or are unenforceable.

228.    Micron seeks a declaration that the '195 Patent is not infringed by Micron, is invalid, and/or is unenforceable.

## COUNT XVI

### (Unfair Competition under Cal. Bus. & Prof. Code § 17200 et seq.)

229.    Paragraphs 1 through 228 are incorporated by reference as if fully stated herein.

230.    Micron asserts this claim of unfair competition under Cal. Bus. & Prof. Code § 17200 et seq. in its own name only and does not act for the interest of any other person or entity or for the general public.  Micron has suffered injury in fact and has lost money and property as a result of Rambus's unfair business practices.

231.    Rambus's above-described conduct amounts to an unlawful business act or practice under Cal. Bus. & Prof. Code § 17200 *et seq.* based on Cal. Code Civ. Proc. § 2023.010, 18 U.S.C. §§ 1341 *et seq.*, 18 U.S.C. §§ 1341, 1343, 1503, & 1512, Cal. Pen Code § 135, Del. Code Ann., Title 11 § 1269, common law spoliation, common law fraud, and other claims of unlawfulness herein.

232.    Rambus's above-described conduct amounts to an unfair business act or practice under Cal. Bus. & Prof. Code § 17200 et seq.  This unfair conduct lead Micron, and other DRAM manufactures, to adopt a DRAM standard which Rambus now claims infringes its patents.  Micron now must also defend against Rambus's allegations of infringement prejudiced by Rambus's destruction of relevant evidence and other litigation misconduct.  Rambus's unfair

50

conduct threatens an incipient violation of an antitrust law, violates the policy or spirit of one of these laws because its effects are comparable to or the same as a violation of the law, and otherwise significantly threatens or harms competition.

233.    Rambus's above-described conduct amounts to a fraudulent business act or practice under Cal. Bus. & Prof. Code § 17200 et seq. by creating a likelihood that Micron and the public would be mislead as to the scope of Rambus's patents.

234.    As a result of Rambus's unfair competition, Micron and the public have suffered damages, and will continue to suffer such damages if Rambus's conduct is not enjoined.

235.    Micron seeks an injunction and other equitable relief preventing further harm to itself and the public, and preventing Rambus from continuing its unlawful, harmful and anti-competitive conduct.    Micron further seeks restitution of all money and property that Rambus has received from Micron as a result of Rambus's wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

a)    Declare that Rambus has attempted to monopolize and has monopolized the world market for high-performance DRAM interface technology and the world market for high-performance DRAMs in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

b)    Award Micron compensatory damages as a consequence of Rambus' conduct in an amount to be determined and trebled, as provided by Section 4 of the Clayton Act, 15 U.S.C. § 15 and Del. Code. Ann., Title 6, § 2532 et seq.;

c)    Permanently enjoin Rambus from monopolizing and attempting to monopolize the world and United States markets for high-performance

DRAM interface technology and the world and United States markets for high-performance DRAMs under Section 16 of the Clayton Act, 15 U.S.C. § 16;

d) Award Micron punitive damages as a result of Rambus' fraudulent conduct;

e) Permanently enjoin Rambus from enforcing the Patents in Suit and the Rambus Patents and from collecting any royalties or damages under such Patents in the United States and elsewhere;

f) Award Micron and declare that Micron (including all wholly-owned subsidiaries, foreign and domestic) has a royalty-free license for the Patents in Suit and for the Rambus Patents for all Micron products that incorporate the JEDEC standards;

g) Declare that the Patents in Suit are not infringed, are invalid, and/or are unenforceable;

h) Award Micron its attorneys' fees and costs expended in this action, including as provided by Section 4 of the Clayton Act, 15 U.S.C. § 15 and Del. Code. Ann., Title 6, § 2532 et seq. and as otherwise provided by law; Award such other and further relief as this Court deems just and proper;

i) Permanently enjoin Rambus from continuing its unlawful, harmful and anti-competitive conduct pursuant to Cal. Bus. & Prof. Code § 17203; and

j) Award Micron restitution of all money and property that Rambus has received from Micron as a result of Rambus's wrongful conduct pursuant to Cal. Bus. & Prof. Code § 17203.

52

## JURY DEMAND

Micron demands a trial by jury as to all claims so triable.

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Anne Shea Gaza (#4093)
gaza@rlf.com
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware   19899
(302)651-7700
*Attorneys for Micron Technology, Inc.*

Of Counsel:

OF COUNSEL:
Matthew D. Powers
Jared Bobrow
Weil, Gotshal & Manges LLP
201 Redwood Shores Parkway
Redwood Shores, CA    94065

William C. Price
Jon R. Steiger
Dominic Surprenant
Robert Becher
Diane C. Hutnyan
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA    90017

Dated:   September 5, 2007

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2007, I caused to be served by hand delivery the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Mary B. Graham, Esquire
> Rodger D. Smith, Esquire
> Morris, Nichols, Arsht & Tunnell
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899-1347

I hereby certify that on September 5, 2007, I caused to be sent by Federal Express the foregoing document to the following non-registered participants:

> Charles W. Douglas, Esquire
> Sidley Austin LLP
> One South Dearborn Street
> Chicago, IL 60603

> Gregory P. Stone, Esquire
> Munger Tolles & Olson
> 355 South Grande Avenue
> 35th Floor
> Los Angeles, CA 90071

> Anne Shea Gaza (#4093)
> Gaza@rlf.com
> Richards, Layton & Finger, P.A.
> One Rodney Square
> P.O. Box 551
> Wilmington, Delaware 19899
> (302) 651-7700