IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MICRON TECHNOLOGY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| RAMBUS INC., | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |
| | ) | C.A. No. 00-792 (SLR) |
| RAMBUS INC., | ) | |
| | ) | |
| Counterclaim Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| MICRON TECHNOLOGY, INC., MICRON | ) | |
| ELECTRONICS, INC., and MICRON | ) | |
| SEMICONDUCTOR PRODUCTS, INC., | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |
| ———————————————— | ) | |

## MICRON'S POST-TRIAL BRIEF REGARDING
## RAMBUS'S DUTY TO PRESERVE EVIDENCE

*Of Counsel.*
William C. Price
Robert J. Becher
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000

Jared Bobrow
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065-1175
(650) 802-3000

Frederick L. Cottrell, III (#2555)
Cottrell@rlf.com
Anne Shea Gaza (#4093)
Gaza@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700

Attorneys for Plaintiffs and
Counterclaim Defendants Micron
Technology, Inc. and Micron
Semiconductor Products, Inc.

Dated: February 5, 2008

**TABLE OF CONTENTS**

<div align="right">

**Page**

</div>

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................... 1

BACKGROUND FACTS ........................................................................................ 3

ARGUMENT ........................................................................................................... 8

I.    THE DUTY TO PRESERVE ARISES WHEN LITIGATION BECOMES
      REASONABLY FORESEEABLE ..................................................................... 8

      A.    A Party May Not Destroy Documents When It Knows Or Should
            Know That They Might Be Relevant To Reasonably Foreseeable
            Litigation ................................................................................................ 8

      B.    Litigation Does Not Have To Be "Probable" ........................................ 10

II.   RAMBUS FORESAW LITIGATION NO LATER THAN MARCH 1998 ......... 11

      A.    Mr. Karp Met With Attorneys To Develop A Litigation Plan .............. 11

            1.    Outside counsel's billing statements confirm they were paid
                  to work on litigation .................................................................. 15

      B.    Rambus Presented Its Litigation Strategy To Its Board of Directors
            on March 3, 1998 .................................................................................. 16

III.  THE SELECTIVE RETENTION OF DOCUMENTS AND THE
      RETENTION OF A LITIGATOR SHOWS THAT RAMBUS HAD
      FORESEEN LITIGATION BEFORE THE FIRST SHRED DAY ................... 20

      A.    In May 1998 Rambus Began Saving Helpful Information And
            Destroying The Rest ............................................................................. 20

      B.    The "Document Retention Policy" Was Specifically Intended To
            Destroy Evidence That Would Be Called For In Discovery ................. 21

      C.    In August 1998 Rambus Retained Neil Steinberg To Prepare For
            Litigation .............................................................................................. 24

IV.   AFTER THE FIRST SHRED DAY, RAMBUS CONTINUED TO
      PREPARE FOR LITIGATION ........................................................................ 25

<div align="center">

i

</div>

A.  Rambus "Continued In Stealth Mode" To Prepare for Litigation............25

B.  In Spring 1999 Mr. Karp Instructed Mr. Vincent To Initiate The
    Patent File Purge..................................................................28

C.  Rambus Tried To Cover Its Tracks............................................29

D.  Mr. Karp Admitted That By Summer 1999 There Was a
    Likelihood Of Litigation........................................................30

E.  In Fall 1999, Rambus Stayed The Course And Executed Against
    Its Litigation Strategy According to Plan...................................35

V.  RAMBUS'S ARGUMENTS THAT IT HAD NO DUTY TO PRESERVE
    LACK MERIT.............................................................................37

    A.  The Presence Or Absence Of A Litigation Line Item In Rambus's
        Budgets Does Not Prove Or Disprove That Rambus Foresaw
        Litigation..........................................................................37

    B.  The Date Of "Board Approval" Of Litigation Has Nothing To Do
        With The Date Litigation Was First Foreseen.............................38

    C.  The Date Rambus Could Sue Is Not The Date Litigation Is
        Foreseeable.......................................................................39

CONCLUSION.........................................................................................42

# TABLE OF AUTHORITIES

**Page**

## Cases

Bayoil, S.A. v. Polembros Shipping Ltd.,
196 F.R.D. 479 (S.D. Tex. 2000) ..........................................................................9

Howell v. Maytag,
168 F.R.D. 502 (M.D. Pa. 1996) ...........................................................................8

Kronisch v. United States,
150 F.3d 112 (2d Cir. 1998) .......................................................................9, 10, 30

MOSAID Techs. Inc. v. Samsung Elecs. Co., Ltd.,
348 F. Supp. 2d 332 (D.N.J. 2004) ...................................................................8, 11

M&T Mortgage Corp. v. Miller, No. CV 2002-5410 (NG) (MDG),
2007 WL 2403565 (E.D.N.Y. Aug. 17, 2007) ......................................................10

Rambus, Inc. v. Infineon Techs. AG,
222 F.R.D. 280 (E.D. Va. 2004) ..........................................................................10

Scott v. IBM Corp.,
196 F.R.D. 233 (D.N.J. 2000) ...............................................................................8

Shamis v. Ambassador Factors Corp.,
34 F. Supp. 2d 879 (S.D.N.Y. 1999) .....................................................................8

Silvestri v. Gen. Motors Corp.,
271 F.3d 583 (4th Cir. 2001) ................................................................................8

In re Wechsler,
121 F. Supp. 2d 404 (D. Del. 2000) .......................................................................8

Zubulake v. UBS Warburg LLC,
220 F.R.D. 212 (S.D.N.Y. 2003) .......................................................................8, 9

iii

## INTRODUCTION

The duty to preserve evidence arises when a party knows or should know that such evidence might be relevant to reasonably foreseeable litigation. Rambus does not deny that in 1998 and into the year 2000, it destroyed millions of pages of documents and erased over a thousand backup tapes. Nor does Rambus deny that during the mid- and late-1990's, Rambus sought and secured patents with the specific goal of asserting them against the manufacturers of so-called "non-compatible" or non-RDRAM memory devices (also known as SDRAM and/or DDR SDRAM products). While Rambus does not deny these truths, it claims that it did not foresee litigation until late 1999 or early 2000--immediately before it fired the "shot heard 'round the world" in the form of a lawsuit against the first DRAM target, Hitachi, in January 2000.

The evidence presented to the Court proved that Rambus not only foresaw litigation when it caused these documents and backup tapes to be destroyed, but that by no later than March 1998, Rambus was actually preparing for litigation against the manufacturers of "non-compatible" DRAM. Indeed, Rambus knew litigation against Micron was a certainty: Joel Karp--Rambus's then-Vice President of Intellectual Property-- admitted that he knew Micron would fight "tooth and nail."

In January 1998, Rambus's CEO Geoffrey Tate instructed the newly hired Mr. Karp to prepare a litigation strategy to enforce patents against the DRAM industry and to be ready to present the litigation strategy to the Rambus Board of Directors at the March 1998 meeting. Pursuant to his CEO's directive, Mr. Karp engaged a prominent litigation team from a major Silicon Valley firm to assist him in pulling together a plan.

1

As a result of the meetings with counsel, Mr. Karp knew, among other things, that Rambus would need to litigate to have a court declare its patents valid.

As envisioned by Mr. Tate, Mr. Karp presented the Rambus litigation plan to the Board of Directors at the March 1998 meeting. The presentation included such details as the identification of causes of action and a time line for the litigation. Mr. Karp's presentation set forth a 5% royalty rate on products other than Rambus's RDRAM--a rate more than double the rate for RDRAM. This rate, Mr. Karp and his litigation team understood, would "push" Rambus "into litigation quickly." Of special importance to the proceedings before the Court, Rambus's 1998 litigation strategy included the plan to institute a document destruction protocol in order to make the company "battle ready."

In May 1998, Rambus instituted a three-month retention period for electronic backup tapes but applied the policy selectively. Apparently believing there was a particularly helpful document on one of the backup tapes (having to do with the date of one of its claimed inventions), Rambus tasked company employees with finding that tape. When the document was located, Rambus was careful to preserve the tape on which it resided and went forward with the destruction of some 1,269 others.

In August 1998, Rambus retained Neil Steinberg to perform patent-related legal services that, according to Mr. Steinberg, included "preparing for litigation" involving SDRAM and DDR SDRAM products. In September 1998, consistent with the litigation strategy presented to the Board of Directors in March 1998, Rambus had its first "Shred Day."

By summer 1999--before the second Shred Day in August 1999--Rambus knew that the patents on which it would sue manufacturers of non-compatible DRAM

2

were about to issue because it received notices of allowance from the United States
Patent and Trademark Office. Indeed, one of the patents in suit, the '105 patent, issued in
June 1999. At that time, Mr. Tate instructed Mr. Karp to select the first target for
litigation. Document destruction remained part of Rambus's litigation strategy. A
version of Mr. Karp's IP Goals from late 1999 listed "Organize 1999 shredding party at
Rambus" under the heading "Licensing/Litigation Readiness." At trial, even Mr. Karp
admitted that by this point, there was a likelihood of litigation. By August 1999,
Rambus's litigation plans involved specific patents, identified targets, and preferred
venues.

These are, of course, but a few examples from the body of evidence
presented to the Court. Over more than a two-year period, employees were instructed to
look for--and preserve--documents that would be helpful in litigation, but were instructed
to destroy those that were not. Prior to the instructions to prepare for litigation, Rambus
had never systematically preserved nor purged files. Instead, Rambus initiated its
systematic and selective document destruction as a central part of its plan to get ready for
litigation against Micron and the rest of the DRAM industry.

## BACKGROUND FACTS

**Procedural Posture.** Micron's affirmative defenses of spoliation and
litigation misconduct were tried before the Court on November 8, 9, 13, 14 and 15,

2007.[1]  On November 30, 2007, the Court held a post-trial conference and asked that the
parties initially brief the issue of when Rambus's duty to preserve documents arose.[2]

**JEDEC Standards Setting Meetings.**  In 1991, representatives from
Rambus and other companies began meeting together to set industry wide standards for
the computer industry.  The entity setting standards was JEDEC (Joint Electron Device
Engineering Council), which consisted of interested companies ranging from those that
own technology (such as Rambus); manufactured chips (such as Micron); and bought
chips (such as IBM).[3]  JEDEC strives to set standards that are open;[4] standards that are
patent free and royalty-free.  Under the JEDEC rules, the adoption of standards requiring
the use of patented items "should be considered with great care."[5]  One standard the
participants sought to set was for DRAM--a type of computer memory.[6]  Rambus's
technology was a type of DRAM called RDRAM, and JEDEC was working on
variations, known as SDRAM and DDR SDRAM.[7]

**Rambus Sought To Patent Open Standards.**  While the engineers were
working out the standard at JEDEC meetings, Rambus was secretly working to patent the
very technology that was supposed to be patent free.  Rambus officers have testified that

---

[1]  See D.I. 1058-1062 (Reporter's Transcripts of Proceedings).  The Court also
allowed the parties to submit additional designated deposition testimony as part of the
record.  D.I. 1071.

[2]  Reporter's Transcript of Proceedings on November 30, 2007 (D.I. 1065) at
44:7-13.

[3]  Reporter's Transcript of Proceedings on November 8, 2007 ("11/8/07 RT"--D.I.
1058) at 160:12-15, 160:22-161:4.  (J. Karp testimony).

[4]  Id. at 161:16-21 (J. Karp testimony).

[5]  See MTX 808-0018 (JEDEC Manual of Organization and Procedure, § 9.3,
"Reference to Patented Products in EIA Standards").

[6]  11/8/07 RT at 160:8-10, 16-21, 171:15-18 (J. Karp testimony).

4

representatives of Rambus would take the information they learned at JEDEC committee meetings and pass it along to patent prosecution counsel to either amend pending patent applications or to file new ones to cover the features discussed at JEDEC meetings.[8]  The CEO of Rambus, Geoffrey Tate, conceded at trial that from 1991 to 1995, Rambus was working to extend its patent claims to JEDEC standardization proposals.[9]

As confirmed by e-mail messages, Rambus's plan was to remain silent while JEDEC set a standard that Rambus believed infringed.  Rambus would remain silent while other companies developed production facilities and products that used the JEDEC standard.  When the other companies were substantially invested in what they believed was an open standard, Rambus would surprise them with the demands for royalties and threats of an infringement action.[10]  In this way, Rambus planned to "leverage" others:

---

(. . . continued)
    [7]   See id. at 160:8-10, 16-21, 171:15-18 (J. Karp testimony).

    [8]   RAMTX 069 (collection of JEDEC e-mail messages including "trip reports" from R. Crisp); RAMTX 085 (collection of JEDEC e-mail messages); MTX 040 (May 19, 1992 e-mail message from G. Tate).

    [9]   Reporter's Transcript of Proceedings on November 13, 2007 ("11/13/07 RT"-- D.I. 1060) at 694:10-22 (G. Tate testimony); see also id. at 798:12-799:8, 806:24-807:14 (R. Crisp testimony).

    [10]   See, e.g., MTX 235 (February 10, 1997 e-mail message from G. Tate: "do *NOT* tell customers/partners that we feel DDR may infringe – our leverage is better to wait"); MTX 183 (February 15, 1996 e-mail message from G. Tate: "several papers were presented on SDRAMs that look more and more rambus-like [. . .] prepare the [patent] minefield."); MTX 248 (July 11, 1997 e-mail exchange forwarding memorandum from David Mooring of Rambus: "We have not yet told Siemens that we think SLDRAM and SDRAM-DDR infringe our patents."); MTX 253 (August 4, 1997 e-mail message from G. Tate: "dave believes we should meet with intel [. . .] to get them aware that IF they were to consider a DDR chipset that there is a minefield of 60+ rambus patents that would have to be avoided").

5

> Do *NOT* tell our customers/partners that we feel
> DDR may infringe--our leverage is better to wait.[11]

**Rambus Knew It Would Have To Sue To Obtain Royalties.**   In 1997,
Rambus hired a Vice President of Intellectual Property--Joel Karp--who was charged
with asserting Rambus's patents against alleged infringers who were making non-
compatible products-- DRAMs other than Rambus's RDRAM.   The hiring of Mr. Karp
occurred around the time that the CEO of Rambus, Geoffrey Tate, announced in a
document entitled "Top Level Key Results for 1998," that Rambus's goal was to license
or sue:

> Get all infringers to license our IP with royalties > [greater
> than] RDRAM OR sue.[12]

Mr. Karp was well-suited to carry out Rambus's litigation plan.   Prior to
joining Rambus, Mr. Karp had worked for several years at Samsung, where he
participated in patent license negotiations and other licensing activities.[13]   Prior to being
hired, Mr. Karp also worked at a law office, consulting on patent infringement matters.[14]
As pertinent here, Mr. Karp testified that he knew at the time he joined Rambus that
Rambus would have to litigate against Micron.   He testified that Micron would not
voluntarily agree to pay a royalty but would fight "tooth and nail" and "never settle":

> Q.      So, the example used is that companies like
> Micron will fight us tooth and nail and will never settle,
> that's what you wrote?

---

[11]   MTX 235 (emphasis in original).

[12]   MTX 279 ¶ 18(c) (emphasis added), see also 11/13/07 RT at 710:14-711:14,
751:3-13 (G. Tate testimony discussing MTX 279).

[13]   Reporter's Transcript of Proceedings on November 9, 2007 ("11/9/07 RT" --
D.I. 1059) 11/9/07 RT at 405:5-12 (J. Karp testimony).

[14]   Id. at 159:7-160:2 (J. Karp testimony).

6

A.    That's right.

Q     Okay. And that was consistent with your--
with--with your opinion we talked about. We had talked
about you had even while you were at Samsung, that
Micron specifically--

A.    No. I had that opinion long before
Samsung.

Q.    Okay. So even long before Samsung, you
had the opinion that Micron particularly was the type of
company that would fight you tooth and nail--

A     Right.

Q.    --and not settle; correct?

A.    Right.[15]

When Mr. Tate hired Mr. Karp, Mr. Tate told him

> if a chip co[mpany] wants to license all of our present and
> future patents for use for any infringing dram, then the only
> acceptable deal is the royalty on infringing drams must be
> greater than the royalty on rambus drams.[16]

Mr. Tate wrote to other Rambus officers and management when Mr. Karp

accepted the offer, telling them to have their "spin control ready" to "downplay the whole

infringement/IP issue" for companies who would view Mr. Karp's hiring as a signal that

Rambus intended to confront alleged infringers.[17]

---

[15]    11/8/07 RT at 229:20-230:13. See also 11/8/07 RT at 228:7-15 (J. Karp
testimony: "I didn't believe Micron would pay any royalties to us. So it really wasn't any
-- specifically any number. It was just from my previous experience with Micron."). At
the time Mr. Karp testified at trial, he was a Rambus-retained consultant making $600 per
hour. Id. at 153:22-24, 156:13-16.

[16]    MTX 263 (October 1, 1997 e-mail message from G. Tate).

[17]    MTX 263 (October 1, 1997 e-mail message from G. Tate stating Rambus
should have its "spin control" ready when Mr. Karp starts), RAMTX 006 (October 21,
1997 e-mail message from G. Tate stating that Rambus's strategy is to "downplay the
whole infringement/IP issue" and that Rambus employees are to answer questions about
(continued . . .)

**ARGUMENT**

## I.   THE DUTY TO PRESERVE ARISES WHEN LITIGATION BECOMES REASONABLY FORESEEABLE

### A.   A Party May Not Destroy Documents When It Knows Or Should Know That They Might Be Relevant To Reasonably Foreseeable Litigation

The duty to preserve evidence arises when a party knows or reasonably should know that such evidence might be relevant to reasonably foreseeable litigation. See, e.g., MOSAID Techs. Inc. v. Samsung Elecs. Co., Ltd., 348 F. Supp. 2d 332, 336 (D.N.J. 2004) ("The duty to preserve exists as of the time the party knows or reasonably should know litigation is foreseeable."); In re Wechsler, 121 F. Supp. 2d 404, 415 (D. Del. 2000) (citing Shamis v. Ambassador Factors Corp., 34 F. Supp. 2d 879, 888-89 (S.D.N.Y. 1999), asking whether the party "knew or should have known that the destroyed evidence was relevant to pending, imminent, or reasonably foreseeable litigation"); Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001) ("Spoliation refers to the destruction or material alteration of evidence [. . .] in pending or reasonably foreseeable litigation."); Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (same).

To give rise to the duty to preserve evidence, litigation does not need to be certain or imminent. See, e.g., Scott v. IBM Corp., 196 F.R.D. 233, 249 (D.N.J. 2000) (finding spoliation when "while litigation was not guaranteed, it could be viewed as reasonably foreseeable"); In re Wechsler, 121 F. Supp. 2d at 415 (finding spoliation

_____

(. . . continued)

Mr. Karp's hiring by saying "ONLY" that "'he's going to help us on contract negotiations'").

where there is "pending, imminent, or reasonably foreseeable litigation"); Howell v. Maytag, 168 F.R.D. 502, 507 (M.D. Pa. 1996) ("[T]he knowledge of a potential subrogation claim is deemed sufficient to impose a duty to preserve evidence.") (emphasis in original); Kronisch v. United States, 150 F.3d 112, 126-27 (2d Cir. 1998) (affirming the district court's holding that there was a duty to preserve evidence, even absent imminent litigation); Zubulake, 220 F.R.D. at 216 (finding a duty to preserve evidence when "the relevant people at UBS [the defendant]" "recognized the possibility that she [the plaintiff] might sue"). "Notice [sufficient to give rise to the duty to preserve evidence] does not have to be of actual litigation, but can concern 'potential' litigation. Otherwise, any person could shred documents to their heart's content before suit is brought without fear of sanction." Bayoil, S.A. v. Polembros Shipping Ltd., 196 F.R.D. 479, 482 (S.D. Tex. 2000).

For example, in Kronisch, the Second Circuit held that defendants' duty to preserve evidence arose ten years before plaintiff's lawsuit was filed, when no litigation was imminent. See Kronisch, 150 F.3d at 127. Defendants argued that there was no spoliation because the documents were destroyed at a time no litigation had commenced, and that defendants' reasons for destroying documents had nothing to do with a fear of future litigation. See id. Defendants claimed that the documents were destroyed to preserve confidential identities, to prevent incomplete documents from being misunderstood, and to prevent paper overflow. See id. The district court rejected these arguments, and the Second Circuit affirmed. See id. The district court observed that defendants' fear that incomplete documents could be "misunderstood" could be

9

interpreted as a fear that the documents could become the subject of future litigation. <u>See</u> <u>id.</u>

In addition, litigation does not need to be foreseen with the specific party alleging spoliation in order to give rise to the duty to preserve evidence. <u>See, e.g.,</u> <u>Rambus, Inc. v. Infineon Techs. AG</u>, 222 F.R.D. 280, 295 n.31 (E.D. Va. 2004) (stating that there is no decisional support for the proposition that "before a court can find spoliation, it must find that the alleged spoliator reasonably anticipated litigation with the specific party who later alleges the spoliation"); <u>M&T Mortgage Corp. v. Miller</u>, No. CV 2002-5410 (NG) (MDG), 2007 WL 2403565, at *6 (E.D.N.Y. Aug. 17, 2007).

For example, in <u>M&T Mortgage Corp.</u>, the court held that defendants' duty to preserve evidence arose three years before plaintiff's lawsuit was filed, when defendants were sued by a different plaintiff in an earlier action. <u>See M&T Mortgage Corp.</u>, 2007 WL 2403565, at *6. Given the overlap in the claims and allegations between the two litigations, the documents that defendants had a duty to preserve in the first litigation were not very different from the documents that plaintiffs sought in the second litigation. <u>See id.</u> In addition, defendants should have reasonably foreseen that separate litigations (subsequent to the first litigation) could be brought. <u>See id.</u> Accordingly, the court concluded that defendants had a continuing duty to preserve evidence from the start of the first litigation. <u>See id.</u>

### B.   <u>Litigation Does Not Have To Be "Probable"</u>

Rambus has contended that no duty to preserve documents arises until litigation is "probable."[18] "Probable" is not the standard. In the Third Circuit, litigation

---

[18]   <u>See</u> 11/8/07 RT at 73:10-13, 136:4-16 (Rambus Opening Statement).

RLF1-3250714-1


meeting.[21]   Consistent with Mr. Tate's directive, Mr. Karp called Diane Savage, a

transactional attorney at the Cooley Godward law firm, asking for a referral to a litigator:

> Q.   When Mr. Karp first contacted you with respect to
> providing legal services for Rambus, what did he
> say to you, and what did you say to him?
>
> A.   He told me he was working at Rambus, and that he
> was looking for some litigation -- somebody to
> provide him with litigation assistance.[22]

She then contacted Dan Johnson, a litigation partner at Cooley Godward, and arranged a

meeting.[23]

Mr. Karp then had multiple meetings with outside counsel in January and

February 1998.   On January 13, 1998, he and Mr. Tate met with Cooley Godward

attorney Peter Leal.[24]   Mr. Leal's notes of that meeting explicitly state that Rambus

"want[ed] [a] litigation strategy by [the] March board meeting"[25]--which is exactly what

Mr. Karp noted in his January 7 meeting with the CEO.   Further, the notes capture the

following points made by Messrs. Tate and Karp:

> No negotiations w/out full strategy and prep stated by
> Geoff [Tate] underscored by Joel [Karp]
>
> [. . . .]
>
> Go in and quickly proceed to either a license or litigation

---

[21]   11/8/07 RT at 185:4-14.   But Mr. Tate did not own up to his instruction.
Instead, when shown Mr. Karp's notes, he testified that they did not refresh his
recollection regarding what he told Mr. Karp to do.  11/13/07 RT at 714:12-19.  The page
Mr. Tate was shown is identical to page 26 of MTX 385 which was used with Mr. Karp.
Compare MTX 270-0006 with MTX 385-0022.

[22]   11/9/07 RT at 598:8-15.  (D. Savage testimony).

[23]   11/9/07 RT at 599:1-7 (D. Savage testimony).

[24]   11/8/07 RT at 187:18-188:2; see also MTX 285 (P. Leal notes of conference).

[25]   MTX 285-0001; 11/9/07 RT at 615:9-616:5, 616:22-618:15, 622:12-623:20,
624:9-625:9, 628:24-629:15 (P. Leal testimony).

Try win-win first; do not prejudice [good faith] for
litigation

[. . . .]

Looking for royalty rate that tells them it costs to infringe

[. . . .]

Go to first meeting but be ready to (in advance) to go to
litigation.[26]

Two days later, Mr. Karp met Mr. Leal again and in this meeting
discussed patents that Rambus believed were infringed.[27]  Prior to this second meeting,
Mr. Karp had prepared a "claim chart,"[28] listing a patent claim on one side and the
evidence of the alleged infringement on the other.[29]

On February 12, 1998, Mr. Karp met a third time with Cooley Godward
attorneys, including Dan Johnson, a litigator.[30]  They discussed, among other topics, the
cost of preparing trial graphics; the cost of preparing claims; and the retention of
experts.[31]  And, as Mr. Karp explained at trial, those subjects pertained to Rambus's
assertion of patent infringement claims.[32]

---

[26]   MTX 285; 11/9/07 RT at 615:9-616:5, 616:22-618:15, 622:12-623:20, 624:9-625:9, 628:24-629:15 (P. Leal testimony).

[27]   MTX 287 (P. Leal notes of conference); see also 11/8/07 RT at 191:2-192:3 (J. Karp testimony).

[28]   MTX 287-0003 (P. Leal notes of conference: "Joel has drafted claim charts [. . .] we will review"); 11/8/07 RT at 175:12-18, 178:5-179:12 (J. Karp testimony).

[29]   11/13/07 RT at 1017:22–1018:9 (Sean Cunningham testimony explaining the elements of a claim chart).

[30]   MTX 290 (J. Karp notes of meeting); see also MTX 506 (J. Karp agenda for meeting); MTX 304-0001 (Cooley Godward time entries for February 12, 1998); 11/8/07 RT at 196:24-197:6, 199:23-200:16 (J. Karp testimony).

[31]   MTX 506; MTX 290; 11/8/07 RT at 197:7-198:18 (J. Karp testimony).

[32]   11/8/07 RT at 198:24-199:16.  Sometime after February 1998, Mr. Johnson left Cooley Godward to join the Fenwick & West firm.  11/8/07 RT at 236:6-14 (J. Karp (continued . . .)

Mr. Karp's notes of the February 12 meeting with Cooley Godward show that Rambus recognized that royalty rate would mean that Rambus would "need to litigate":

> Royalty rates will probably push us into litigation quickly.
>
> [. . .]
>
> Need to litigate against someone [...] and have court declare patent valid.[33]

Mr. Karp's notes also state that Rambus needed to "[m]ake ourselves battle ready," and needed a "company policy on document retention."[34]  The phrase "battle ready" came from Mr. Karp, not his counsel.[35]  At his deposition, Mr. Karp acknowledged that becoming "battle ready" meant preparing "for the war of litigation":

---

(. . . continued)
testimony).  Mr. Karp continued working with Mr. Johnson--the litigator--on Rambus's licensing/litigation strategy after his move to Fenwick & West, but did not continue working with Messrs. Leal and Girvin, who had expertise in patent licensing.  Id. at 236:22-237:15 (J. Karp testimony).

[33]  MTX 290; see also 11/8/07 RT at 202:2-19, 212:18-213:15 (J. Karp testimony).

[34]  MTX 290; 11/8/07 RT at 207:19-208:6 (J. Karp testimony).

[35]  At trial, Dan Johnson, Rambus's litigation counsel, testified that the phrase "battle ready" was not a phrase he used:

> Q.   Look if you would at the very next bullet point, which says make ourselves battle ready.  Do you recall that phrase or something to that effect being said at this meeting?
>
> A.   I recall the substance.  I don't normally talk about making somebody battle ready.  I talk about making sure that they have systems in place, so if they ever got involved in litigation, they're not going to be spending a fortune looking at documents or looking for documents that aren't relevant.

Transcript of Proceedings on November 15, 2007 ("11/15/07 RT"--D.I. 1062) at 1493:19-1494:5.

14

RLF1-3250714-1

Case 1:00-cv-00792-SLR   Document 1074   Filed 02/06/08   Page 19 of 47 PageID #: 8663

> Q.     So let me ask you this, you said you
> understood this as sort of getting ready to prepare for a war;
> correct?
>
> A.     Yes. Yeah.
>
> Q.     And your understanding in this context, that
> battle ready is preparing to the war included--at least a
> portion of it was included be ready for the war of litigation?
>
> A.     I think it's well understood that litigation is
> something that can be an outcome from licensing
> discussions. We all knew that.
>
> Q.     And you knew that was encompassed in his
> concept here, we've got to make ourselves ready for that,
> battle ready; correct?
>
> A.     Right.[36]

By the time of trial, Mr. Karp apparently recognized that his testimony undercut

Rambus's assertion that it had no idea that it would need to bring litigation. Thus when

asked the same question at trial, Mr. Karp took a different spin:

> Q.     And your understanding in this context, sir,
> that battle ready is preparing for the war, that included, at
> least a portion of it included be ready for the war of
> litigation; correct?
>
> A.     I just saw that. I don't think that's what I
> saw there. I think we're talking about a licensing
> program.[37]

1.     Outside counsel's billing statements confirm they were paid to
       work on litigation

Contemporaneous billing statements from Cooley Godward also show that

Rambus was preparing for litigation. The statement for February 1998, for example,

---

[36]   11/8/07 RT at 212:1-15 (emphasis added).

[37]   11/8/07 RT at 211:13-20 (emphasis added).

RLF1-3250714-1

contains charges for preparation of "litigation strategy memorandum."[38]   The memorandum is entitled "Proposed Litigation Strategy for Rambus."[39]  It sets forth a "tiered litigation strategy" for Rambus.[40]  It points out that by choosing the "rocket docket" of the Eastern District of Virginia "Rambus may be able to obtain an advantage over its competitors."[41]  As the memorandum explains "[b]ecause these courts proceed at an accelerated schedule, <u>early preparation will benefit Rambus</u>."[42]

Similarly, billing records from Fenwick & West reflect work performed for Rambus on potential litigation.[43]  For example, the May 1998 records show that Mr. Karp also had Mr. Johnson and others at Fenwick & West consider potential targets, including Micron, to determine where those targets fell within the litigation strategy Mr. Karp had presented to Rambus's board in March 1998.[44]

**B.** **Rambus Presented Its Litigation Strategy To Its Board of Directors on March 3, 1998**

At the March 1998 board meeting, Mr. Karp presented the litigation strategy he had formulated in the two preceding months with Rambus's outside counsel.[45]  He proposed that Rambus seek an up-front payment and a 5% running royalty for a

---

[38]   MTX 304-0002.

[39]   MTX 293-0001.

[40]   MTX 293-0002.

[41]   MTX 293-0003.

[42]   <u>Id.</u> (emphasis added).

[43]   MTX 345-0005-0007 (Fenwick & West Invoice).

[44]   11/8/07 RT at 255:13-256:13, 257:9-19 (J. Karp testimony); <u>see also</u> MTX 345-0005 (Fenwick & West time entry for May 19, 1998: "Draft memo regarding review of Micron, Hyundai and SLDRAM license agreements"), MTX 345-0006 (Fenwick & West time entries for May 21 and 22, 1998:  "Research case law and prepare memo re: taking action against licensees of Rambus," "Research and preparation of memo regarding urgency in filing claims against licensees of Rambus").

16

license pertaining to non-compatible products.[46]   Importantly, the royalty rate Rambus had charged for RDRAM was in the range of 1-2%.[47]   Thus, by industry standards for this technology, Rambus was seeking to impose an exorbitant 5% royalty, and one which Rambus knew would bring litigation.   At the time Mr. Karp made his March 1998 presentation to the Board, he knew that the DRAM manufacturers (including Micron) would "fiercely resist" high running royalty rates like the 5% set forth in his presentation slides.[48]   Mr. Tate also reluctantly conceded at trial that potential licensees would reject that royalty rate:

> Q.    Okay.  Assuming he did, and knowing what you do about the licensing experience that Rambus had, it's true, isn't it, that those terms would be highly unacceptable to major DRAM manufacturers?
>
> A.    They would be challenging, yes, to achieve.
>
> Q.    These would be the type of terms that would lead someone to say pound sound [sic], correct?
>
> A.    Possibly.
>
> Q.    And by pounds sand, we mean we're not going to do a deal, right?
>
> A.    I assume that's what you meant.[49]

---

(. . . continued)

[45]   MTX 295; 11/8/07 RT at 214:2-19 (J. Karp testimony).

[46]   MTX 295-0001 (March 3, 1998 slide presentation); 11/8/07 RT at 214:2-19 (J. Karp testimony).

[47]   Transcript of the Deposition of Gary Harmon taken July 28, 2006 ("7/28/06 Harmon Tr."--submitted as part of Micron's additional two hours of deposition designations--D.I. 1071) at 216:15-18, 216:24-217:2.

[48]   11/8/07 RT at 244:3-11, 254:4-11 (J. Karp testimony).

[49]   11/13/07 RT at 717:14-718:3.

Mr. Karp's board presentation also included a summary of the various causes of action Rambus could bring, and a time line showing how long it would take to prosecute a lawsuit.[50]   He presented a detailed, litigation strategy--consistent with someone who foresees litigation.

Importantly, at the meeting, Mr. Karp informed the Board that a "near term" action Rambus could take was <u>implementing a document retention policy</u>; indeed he told the Board such a policy was <u>necessary</u> to prepare for the upcoming battle.[51]   As Mr. Karp conceded, this was the first time a document retention policy had been discussed internally at Rambus:

> Q.   But in the presentation you made to the Board of Directors in March of '98, you discussed the need to create document retention policy in the context of being prepared for this battle, this war that was going to take place; correct?
>
> A.   Yeah, in the context of that--of that overall battle. That's correct.
>
> Q.   And you're not aware of a document retention policy being discussed at Rambus prior to March of '98 in any other context; correct?
>
> A.   Right.[52]

As another key part of his litigation strategy, he told the Board that Rambus needed to have its patent prosecution attorneys "organize" their files concerning issued patents.[53]

Neither Mr. Tate nor the members of the Board voiced any opposition or disapproval of Mr. Karp's strategy.[54]   Quite the contrary, Mr. Tate repeatedly endorsed

---

[50]   MTX 295-0004, 0007; 11/8/07 RT at 246:5-18 (J. Karp testimony).

[51]   11/8/07 RT at 241:2-10 (J. Karp testimony).

[52]   11/8/07 RT at 242:13-243:12.

and affirmed it.  Mr. Karp's goals--drafted with Mr. Tate's input[55]--make clear that the document retention policy was part and parcel of Rambus's litigation strategy.   His "IP Top Level Goals Q2 '98 Final-Confidential" includes as a completed action item "Propose policy for document retention" under the heading "IP Litigation Activity."[56] Mr. Karp's next set of goals included implementation of the proposed policy.   His "IP-Key Goals for Q3 '98" list "Implement document retention action plan" and "Co-manage (with HR) summer housecleaning" under the heading "IP Litigation Activity."[57]

Within two weeks of the March 1998 board meeting, Allen Roberts, Rambus's Vice President of Engineering and head of Rambus's Information Technology department, instructed his subordinates to start working on proposals for a retention policy for electronic backup tapes.[58]  Mr. Roberts explained that this action was taken because of a "growing worry" that the e-mail backups are "discoverable information."[59]

---

(. . . continued)

[53]   MTX 295-0008; 11/8/07 RT at 260:14-261:14 (J. Karp testimony).

[54]   11/8/07 RT at 259:23-260:13 (J. Karp testimony); Reporter's Transcript of Proceedings on November 14, 2007 ("11/14/07 RT"--D.I. 1061) at 1269:24-1271:11 (Mark Horowitz testimony); 7/28/06 Harmon Tr. at 457:6-18, 21-22, 457:24-458:1, 458:4.

[55]   11/8/07 RT at 251:10-24.

[56]   MTX 276.

[57]   MTX 278.

[58]   MTX 299 (March 16, 1998 e-mail message from A. Roberts); see also 11/14/07 RT at 1076:19-1078:23 (A. Roberts testimony).

[59]   MTX 299.

19

III.   **THE SELECTIVE RETENTION OF DOCUMENTS AND THE RETENTION OF A LITIGATOR SHOWS THAT RAMBUS HAD FORESEEN LITIGATION BEFORE THE FIRST SHRED DAY**

Rambus's conduct after the March 1998 board meeting and before the first Shred Day demonstrates that litigation continued to be reasonably foreseeable prior to the first Shred Day.

A.   **In May 1998 Rambus Began Saving Helpful Information And Destroying The Rest**

By e-mail message dated May 14, 1998, Mr. Karp announced that electronic backup tapes would be saved for only three months.[60] Mr. Karp instructed employees to discuss questions about his instructions face-to-face only.[61]   However, Mr. Karp did not implement a content-neutral plan to destroy backup tapes.  Rather, Mr. Karp admitted that there was at least one instance where information Rambus believed to be helpful in anticipated litigation was preserved before the remainder was destroyed.

At trial, Mr. Karp also admitted that an engineer at Rambus showed Mr. Karp a document on his computer that would help prove a favorable conception date for a Rambus invention that Rambus was patenting.[62]  But the act of pulling up and displaying the document on the employee's computer automatically changed the date of the document to the date it was pulled up, which rendered the document useless for

---

[60]   MTX 314; 11/8/07 RT at 249:12-250:4 (J. Karp testimony).  In his May 14, 1998 e-mail message, Mr. Karp called out Mr. Johnson as "Rambus's litigation counsel." MTX 314.

[61]   MTX 314; 11/8/07 RT at 250:16-19 (J. Karp testimony).

[62]   11/8/07 RT at 263:23-264:10 (J. Karp testimony).

proving that the invention had occurred much earlier.[63]   Accordingly, Mr. Karp had

Rambus employees search 1,270 electronic backup tapes to find the one tape that

contained a copy of the document with its original date, which he believed Rambus

would need for litigation.[64]   The employees did in fact find the document; preserved the

backup tape on which the document resided; and had the remaining 1,269 backup tapes

erased in July 1998.[65]

      The obligation to preserve documents is a two-way street.   When a

company sees the advantage of preserving documents for anticipated litigation--and does

so--it cannot in fairness only preserve the ones that help its case.

**B.**    **The "Document Retention Policy" Was Specifically Intended To Destroy Evidence That Would Be Called For In Discovery**

      Mr. Karp next turned his attention to implementing Rambus's destruction

policy for documents other than backup tapes.   He presented the policy to management

and rank-and-file employees in July 1998.[66]   The slides used during those presentations

set forth "horror stories" of e-mail messages discovered during litigation and used as

damaging admissions.[67]   Mr. Karp instructed Rambus employees to "look for things to

keep."[68]   Mr. Karp admitted at trial that "things to keep" included documents that would

help Rambus in its patent litigation:

---

   [63]  Id.

   [64]  Id. at 264:11-17 (J. Karp testimony).

   [65]  Id. at 264:18-23 (J. Karp testimony); see also MTX 326 (July 14, 1998 Rambus Purchase Requisition Order signed by A. Roberts for the degaussing of 1,269 backup tapes).

   [66]  11/8/07 RT at 271:3-23 (J. Karp testimony).

   [67]  MTX 333-0006; 11/8/07 RT at 274:23-275:7 (J. Karp testimony).

   [68]  MTX 343-0001; 11/8/07 RT at 267:17-23 (J. Karp testimony).

> Q.     And you actually went and talked to the divisions and gave presentations about this policy, right?
>
> A.     Yes.
>
> Q.     And you talked to engineers; correct?
>
> A.     Yes.
>
> Q.     And you told them, you know, I want you to look for things to keep that will help establish conception and prove that we have IP; correct?
>
> A.     That's correct.[69]

Craig Hampel, a Rambus engineer, explained what Mr. Karp told Rambus personnel they should <u>not</u> keep: <u>e.g.</u>, evidence that would disprove Rambus's claims:

> Q.     Was anything said about the reasons for instituting this new policy?
>
> A.     A couple of examples of why it's a good idea no--not to keep stuff around were cited, yea.
>
> Q.     What were those examples?
>
> A.     Things like apparently discussion on patentability of a - of a concept. If for some reason you had a third party in the company that said that this idea isn't patented--maybe they were wrong even, but they said it's not patentable for some reason, <u>having that email around could be used in the prosecution of the patent, or at some later date</u>. So it was examples like that given, where it's not a good idea to have the discussion on the idea, the formulation of the idea, and its patentability prior to applying for a patent.[70]

Mr. Roberts similarly testified that one rationale for the document destruction policy was getting rid of documents that would be turned over during pre-trial discovery. After testifying as to the time frame in which he met with Joel Karp to discuss

---

[69]   11/8/07 RT at 267:5-16 (J. Karp testimony).

[70]   11/14/07 RT at 1303:21-1304:14 (emphasis added).

22

purging files, Mr. Roberts admitted that the reason for destroying documents was that

they would otherwise be discoverable in litigation:

> QUESTION:  And he told you one of the reasons
> for doing that was because such materials are discoverable
> in subsequent litigation; right?
>
> ANSWER: Yes.[71]

Anthony Diepenbrock, Rambus's in-house counsel, also testified that the

stated reason for not keeping e-mail messages was that they would otherwise be

"discoverable" in litigation:

> Q      What did they tell you about the benefits of
> not keeping e-mails and other documents around?
>
> A      Well, from the standpoint of Rambus, it
> would obviously--you know, some of that stuff is
> discoverable.  And they listed several reasons to make sure
> things are, you know, on a periodic basis, you know,
> trimmed, you know, to--I mean like--it's a standard policy
> to keep e-mails around for three months or something.
>
> Other companies have that, and it was in
> accord with those kinds of benefits that other companies
> derive from it too.
>
> Q      And when you say you were told Rambus
> didn't want to keep these documents around because they
> were discoverable, when you say, "discoverable," you are
> talking about in a subsequent litigation like we are in right
> here; right?
>
> [Objection.]
>
> THE WITNESS:  Just generally.
>
> BY MR. DESMARAIS:
>
> Q      But that's what "discoverable" means in your
> view; right?

---

[71]   11/14/07 RT at 1181:19-1182:8.

23

A       Discoverable in a lawsuit, yeah.[72]

**C.      In August 1998 Rambus Retained Neil Steinberg To Prepare For Litigation**

In August 1998, Rambus retained Neil Steinberg for the specific purpose of preparing for litigation. Mr. Steinberg--who first served as Rambus's outside counsel but then went "in-house"--testified at deposition that he was retained in August or September 1998 for services that included preparing for litigation:

> Q.      Were your duties and responsibilities for Rambus, as outside counsel, related exclusively to patent prosecution when you were working as Neil A. Steinberg?
>
> A.      No.
>
> Q.      What other types of work did you do for Rambus at that time?
>
> A.      The type of work was licensing and preparation for litigation, and, of course, prosecution.
>
> Q,      Licensing and preparation for litigation in the RDRAM context, or in the SDRAM DDR context?
>
> A.      It related to Rambus technology and Rambus patents.
>
> Q.      Did it relate to Rambus technology and Rambus patents relating to third parties using RDRAMs, or relating to third parties using SDRAMs and DDR SDRAMs?
>
> A.      I'm sorry, you said DDR and?
>
> Q.      SDRAMs and DDR SDRAMs.
>
> A.      Both.

---

[72]      Transcript of the Deposition of Anthony Diepenbrock taken April 11, 2007 (submitted as part of Micron's additional two hours of deposition designations-- D.I. 1071) at 207:12-208:13, 208:16-20.

Q.    When you said both, what were you referring to?

A.    Both categories, Rambus DRAM and SDRMS AND DDR SDRAMS.[73]

Despite having retained counsel to prepare for litigation, Rambus nevertheless did not suspend its document destruction. On September 3, 1998, Rambus employees participated in the company's first company-wide document destruction event.[74] Rambus personnel dubbed the event "Shred Day."[75] David Rhoads--Vice President of the company Rambus hired to shred the documents--estimated the volume of documents destroyed was approximately 400 bankers' boxes.[76]

## IV.    AFTER THE FIRST SHRED DAY, RAMBUS CONTINUED TO PREPARE FOR LITIGATION

### A.    Rambus "Continued In Stealth Mode" To Prepare for Litigation

In October 1998, Mr. Karp made another litigation strategy presentation to Rambus's executive group [77] During that presentation, Mr. Karp recommended that Rambus assert its patents against companies that manufacture both Rambus's RDRAM and non-compatible products like SDRAM and DDR SDRAM only after those target companies had reached the "point of no return" in preparing to manufacture RDRAM.[78] During trial, he explained that the idea was to wait until companies had invested so much

---

[73]  11/13/07 RT at 835:4-836:15.

[74]  See MTX 368 (September 3, 1998 e-mail message from J. Karp: "Shred Day: Status Report"); 11/8/07 RT at 287:12-289:2 (J. Karp testimony).

[75]  11/8/07 RT at 283:14-24 (J. Karp testimony).

[76]  11/15/07 RT at 1469:2-13; see also MTX 398-0027 (ProShred invoice stating that 185 bags and 60 boxes of documents were shredded); MTX 398-0028 (ProShred Certificate of Destruction stating that approximately 200 bags of documents were destroyed).

[77]  MTX 375 (presentation slides); 11/8/07 RT at 294:1-4 (J. Karp testimony).

money and capital "ramping up" that they could not "back off" of their plans to manufacture RDRAM.[79]  At the time of the October 1998 presentation, RDRAM had not yet reached the mass production stage; Rambus was working with its partners to prepare RDRAM's "launch."[80]

During that same presentation, Mr. Karp told the Board that the point of no return for Rambus's targets would come in the first quarter of 2000.[81]  Accordingly, he recommended Rambus "continue in Stealth Mode" during 1999, and wait to assert its patents against non-compatible products such as SDRAM and DDR SDRAM until the first quarter of 2000.[82]  Mr. Karp's presentation slides conclusively show the question was not *if* Rambus should assert its patents, but *when*:

> We should not assert patents against direct partners
> until ramp reaches a point of no return.  (TBD)

> Probably not until Q1 '00.[83]

Waiting another year meant more patents would issue.  Waiting another year meant minimizing the risk that companies would not manufacture RDRAM.  Also, waiting another year meant more documents destroyed.

---

(. . . continued)

[78]   MTX 375-0003; 11/8/07 RT at 294:22-295:2 (J. Karp testimony).

[79]   11/8/07 RT at 296:22-298:2, 299:10-20.

[80]   11/14/07 RT at 1102:6-11 (A. Roberts testimony).

[81]   MTX 375-0003; 11/8/07 RT at 298:3-7 (J. Karp testimony).  The first quarter of 2000 was the very time frame in which Rambus filed its first lawsuit, against Hitachi. 11/8/07 RT at 298:8-10 (J. Karp testimony).

[82]   MTX 375-0002, 0003; 11/8/07 RT at 298:11-20, 299:21-300:1 (J. Karp testimony).

[83]   MTX 375-0003 (emphasis added).

In further preparation for launching its Q1 '00 litigation, Mr. Karp laid out his "Nuclear Winter Scenario" in a document circulated on or after November 30, 1998.[84] Mr. Karp analyzed how Rambus should proceed if RDRAM was rejected by the market and Intel decided to "cancel ramp and move away from Rambus."[85]  In the memorandum, he wrote that Rambus already had claim charts showing the infringement of Rambus patents by a Micron product.[86]  He also identified potential targets, potential causes of action and potential forums in which to file suit.[87]  The memorandum also confirms that the 5% royalty rate Rambus would demand would require litigation. Mr. Karp wrote that Rambus "could ask for royalties in the 5-10% range, in cases where we are not interested in settling."[88]

In November 1998, Rambus held an off-site meeting at the Chaminade resort in the Santa Cruz mountains.[89]  At that meeting, Mr. Tate told Rambus personnel that by 2002, after Rambus sprung its patent trap for SDRAM and DDR SDRAM, it

---

[84]    MTX 763; 11/8/07 RT at 193:3-6, 196:20-22 (J. Karp testimony).

[85]    See id.

[86]    MTX 763-0003; see also MTX 802 (IP Q3'98 Goals:  "2.  Infringement Activity [. . .] E. Prepare claim chart for Micron SDRAM-Done").

[87]    MTX 763-0004-0006; 11/8/07 RT at 303:12-22 (J. Karp testimony).

[88]    MTX 763-0004 (emphasis added).  Again, as with his announcement that he was working on a document retention policy (MTX 314), Mr. Karp took a cloak-and-dagger approach with respect to the Nuclear Winter Scenario memorandum.  He asked those who received it not to make copies and to "return all copies to [him] after our discussion."  MTX 763-0001.

[89]    See Transcript of the Deposition of Julie Cates taken September 1, 2006 (submitted as part of Micron's additional two hours of deposition designations--D.I. 1071) at 69:6-10, 13-14, 70:14-16, 70:18-71:6; see also MTX 946-0001 (J. Cates handwritten notes); Transcript of the Deposition of David Mooring taken October 14, 2004 ("10/14/04 Mooring Tr."--submitted as part of Micron's additional two hours of deposition designations--D.I. 1071) at 95:24-25, 96:3-5; MTX 947-0001 (November 25, 1998 e-mail message summarizing Mr. Tate's presentation at Chaminade and listing "$375 M/yr" as the "Infringing Royalties" projected by Mr. Tate for 2002).

could enjoy a revenue stream of $375 million consisting of royalties paid on "infringing DRAM."[90]

**B.** **In Spring 1999 Mr. Karp Instructed Mr. Vincent To Initiate The Patent File Purge**

In April 1999, Mr. Karp instructed Mr. Vincent to remove and discard documents from Rambus patent files.[91] That instruction was the same one that Mr. Karp recommended at the March 1998 board meeting.[92] During trial, Mr. Vincent admitted that prior to Mr. Karp's April 1999 instruction, he had never before instructed his assistant to systematically review Rambus's files for cleaning.[93] The categories of documents discarded included electronic and "hard" copies of: draft patent claims and amendments, handwritten notes, and correspondence between the Blakely Sokoloff firm and Rambus regarding patent prosecution.[94] Those types of documents are ones one would expect to be turned over during pre-trial discovery.[95]

---

[90] MTX 946-0003; MTX 947-0001; 10/14/04 Mooring Tr. at 97:18-19, 98:21-25, 99:2.

[91] MTX 420-0004 (L. Vincent notes of April 5, 1999 conference with J. Karp listing as an action item "Clean out all the Rambus files that have issued") (emphasis in original); MTX 934 (L. Vincent April 28, 1999 notes to file: "File clearance re document retention policy: – 11 of 49 issued patent files for BSTZ have been cleared – Another 5 are awaiting my review – Doing 2 a day"); MTX 601 (Chart: "Rambus (073305) Issued Patent File Clean-Up"); MTX 412-0001-0012 (Blakely Sokoloff time entries regarding implementation of Rambus document retention policy); MTX 427 (same); see also MTX 420-0001 (L. Vincent May 5, 1999 notes: "20 files cleared") 11/8/07 RT at 304:4-11 (J. Karp testimony); 11/14/07 RT at 1320:23-1321:8, 1322:6-13 (L. Vincent testimony); Transcript of the Deposition of Christopher Marshall taken July 25, 2006 ("7/25/06 Marshall Tr."--submitted as part of Micron's additional two hours of deposition designations--D.I. 1071) at 39:2-10, 40:14-24, 41:3-8, 11-13 (discussing MTX 601).

[92] MTX 295-0008.

[93] 11/15/07 RT at 1406:22-1407:4. Mr. Vincent's assistant testified to similar effect. 7/25/06 Marshall Tr. at 70:12-72:18.

[94] 11/14/07 RT at 1323:6-1325:11, 1347:17-1348:1 (L. Vincent testimony).

[95] See 11/14/07 RT at 1071:14-1072:13 (S. Cunningham testimony).

28

C.    **Rambus Tried To Cover Its Tracks**

On or about June 27, 1999, Messrs. Karp and Steinberg prepared

Mr. Karp's goals for the upcoming third quarter--i.e., the "IP Q3 '99 Goals."[96]  Two

versions of those goals include preparing a litigation strategy with respect to a SDRAM

manufacturer and being ready for litigation with 30 days' notice.[97]  In the original

version, however, Mr. Karp included under the heading "Licensing/Litigation Readiness"

an action item denoted as "Organize 1999 shredding party at Rambus."[98]  In a later

version of the document, however, Mr. Karp moved the shredding party under the

heading "Database Maintenance," and changed it to read "Organize document retention

management event."[99]  Mr. Karp testified that he changed the location and description of

the shredding party at the request of Mr. Steinberg, Rambus's in-house counsel:

> Q.    So your testimony now is that you are
> certain that after showing that to Mr. Tate, saying my goal,
> what I hope to accomplish as an employee is to identify a
> company for litigation and actually sue them that it was
> after that that you went and altered your [IPQ3 '99 Goals]
> as reflected in [MTX] 436 to move the shredding party, the
> litigation readiness to another category?
>
> That's what happened, according to you;
> right?
>
> A.    Well, can I explain why I have a clear
> memory of this one?
>
> Q.    Well, is the answer to my question yes?

---

[96]    See 11/8/07 RT at 305:15-306:24, 308:22-309:18 (J. Karp testimony); see also
MTX 436; MTX 438.

[97]    MTX 436-0001 ("3. Licensing/Litigation Readiness [. . .] G. Prepare litigation
strategy against 1 of the 3 manufacturers (re:3D); H. Ready for litigation with 30
days'notice."); MTX 438-0001 (same).

[98]    MTX 436-0001, 0002 § 3(I).

[99]    MTX 438-0002 § 5(D).

A.      You know, what actually happened was I- I created [MTX 436] that had the "I" on it.  And then I showed it to Neil, who was--at that time had become a Rambus employee, but only spending part time there.  As most of our communication was he was in Washington at least three-quarters of the time.  And I recognized the second one [MTX 438] as being the one that was incorporating Neil Steinberg's input.

Q.      Incorporating what?

A.      Incorporating Neil Steinberg's inputs.

[* * * *]

Q.      You would not have changed your final goals for the third quarter of '99, which had organizing a shredding party under your litigation licensing readiness concept?  You would not have changed that, but for your communication with Mr. Steinberg; correct?

A.      That's probably correct.  Yes.[100]

Mr. Karp's testimony demonstrates that Mr. Steinberg and others at Rambus were anticipating litigation and were therefore re-writing documents that one day might be turned over during discovery to make Rambus's document destruction appear innocuous and unrelated to litigation.  To fear how documents would be used in litigation is to foresee they would be used in litigation.  See Kronisch, 150 F.3d at 127.

## D.      Mr. Karp Admitted That By Summer 1999 There Was a Likelihood Of Litigation

The same IP Q3 '99 Goals that Mr. Karp modified at Mr. Steinberg's direction -- MTX 436 and MTX 438 -- include other indicia of anticipation of litigation.  Common to both versions of the document are the following litigation-related items:

2.      Infringing Devices

---

[100]   11/9/07 RT at 468:18-469:19, 472:12-18.

A.    Initiate reverse engineering of infringing devices as required for litigation prep

B.    Monitor industry for potential infringing activity - all semiconductors

3.    Licensing/Litigation Readiness

A.    Develop complete licensing strategy

[. . . .]

F.    Prepare licensing positions against 3 manufacturers

G.    Prepare litigation strategy against 1 of the 3 manufacturers (re: 3D)

H.    Ready for litigation with 30 days notice[101]

In a separate document created in June 1999, Mr. Karp detailed his progress fulfilling his key results for 1999.[102]    Among the goals for 1999 was "[c]hoos[ing] one company to litigate with during Q1/00."[103] At trial he admitted that his written goal was to litigate, and that a likelihood of litigation existed:

> Q.    Well, then, let's move forward in June of '99 when you did your Exhibit 807 [the key results for 1999]. [. . . .]
>
> [* * * *]
>
> At this time in June where you're writing you need to choose one company to litigate with and commence litigation in February, at that time, is it your testimony at that time you didn't think it was likely that Rambus was going to commence litigation against the DRAM manufacturer?
>
> A.    As of June '99, I think the situation was a lot different than it was back in February or March of '98.

---

[101]    MTX 436-0001; MTX 438-0001.

[102]    MTX 807-0014; 11/8/07 RT at 311:21-313:2 (J. Karp testimony).

[103]    MTX 807-0014; 11/8/07 RT at 313:3-12 (J. Karp testimony).

Q.    Well, so perhaps you can answer my question. As of that time in June of '99, was it your belief that it was likely that Rambus was going to be suing a DRAM manufacturer?

A.    Well, it was--it was a written goal, but it still doesn't--it still was not my plan to litigate.

I wanted to get--I wanted to get some negotiated settlements. I thought I had the patents, and that's--I thought the people that understood and respected IP would--would go--would listen to that story.

[* * * *]

Q.    Now, I want to ask you about what you thought was likely. When you wrote your goals that you needed to choose a company to litigate with and commence litigation, at that time, did you think it was likely more probable than not that you were going to have to sue to establish those rates?

A.    I would say that there was maybe a likelihood, but I don't know that I would say it was more likely than not.[104]

Mr. Tate also believed that litigation was likely. On June 24, 1999, Mr. Tate instructed Mr. Karp to identify the "first target" and give the rationale therefor: "what is our strategy for the battle with the first target that we will launch in October - who is the first target and why."[105]

To prepare a response to Mr. Tate's questions, Mr. Karp asked Mr. Johnson for a time line comparing the duration and progress of patent litigation lawsuits brought in different U.S. District Courts.[106] Mr. Johnson's associate, Emily Lau,

---

[104]   11/9/07 RT at 348:17-349:22, 350:12-21.

[105]   MTX 429-0003 (June 24, 1999 e-mail message from G. Tate).

[106]   11/8/07 RT at 317:13-318:2, 318:23-319:19 (J. Karp testimony). Mr. Karp did <u>not</u>, however, disclose to Mr. Johnson the fact that Mr. Karp's goal was to choose one
(continued . . .)

sent Mr. Karp the requested time line on July 8, 1999.[107]  Consistent with Mr. Tate's

October time frame for launching the "first battle," the time line Mr. Karp received used

October 1, 1999 as the date to file a complaint.[108]  The time line shows the advantage to

Rambus of filing in the Eastern District of Virginia with its "rocket docket."  According

to the time line, trial in the Eastern District of Virginia could convene as early as

September 2000.[109]  By comparison, September 2000 was the earliest a motion for

summary judgment could be heard in the Northern District of California, and

October 2001 was the earliest trial date.[110]

Despite the efforts to prepare for a very specific type of litigation against

identified targets and products, on August 26, 1999, Rambus employees participated in

the company's second Shred Day.  Mr. Rhoads estimated that 300 boxes of documents

were destroyed.[111]  Importantly, Mr. Karp testified that <u>Rambus knew prior to that second

Shred Day in August 1999 that at least three patents--the '105, the '263 and the '804

patents--would issue</u>:

---

(. . . continued)
company to litigate against, and to commence litigation by the second quarter of 2000.
11/15/07 RT at 1582:19-1584:3 (D. Johnson testimony).

[107]  MTX 441; <u>see also</u> Transcript of the Deposition of Emily Ward (née Lau)
taken July 28, 2006 (submitted as part of Micron's additional two hours of deposition
designations--D.I. 1071) at 68:1-9, 17-22, 69:1-9 (discussing MTX 441).  This was not
the first litigation time line Mr. Johnson provided Mr. Karp.  On June 24, 1999,
Mr. Johnson sent a litigation time line for prosecuting a patent infringement case in the
Northern District of California.  MTX 430.

[108]  MTX 441-0002.

[109]  <u>Id.</u>

[110]  MTX 441-0002, 0008.

[111]  11/15/07 RT at 1470:13-1471:4; <u>see also</u> MTX 398-0034 (ProShred invoice
stating that 150 bags of documents were shredded); MTX 398-0035 (ProShred Certificate
of Destruction stating that 150 bags of documents were destroyed).

Q.      This is the letter [MTX 473-0001] you signed and sent to Hitachi to set up that first meeting; correct?

A.      Yes.

Q.      And it talked--actually lists patents, the '105 patent, the '263 patent, the '804 and also six related U.S. applications that have been allowed and will issue shortly. Do you see that?

A.      Yes.

Q,      What's the importance of a patent that you've received a notice of allowance for?  Why would that be a negotiating point?

A.      Well, we had received notices of allowance, and we knew that we were going to have certain claims.  So our plan at that point was to actually show some of those claims to Hitachi.

[* * * *]

Q.      Okay.  So your best recollection, then, is that you would have gotten notice of allowance in these three patents that were issued at least three months before this letter, correct?

A.      That's correct.  Yes.

Q.      So that means that you would have known you had these claims prior to that second shred day?

A.      And the date of the second shred day?

Q.      The day of that second shred day is September--August 25, 1999.

A.      Okay.  I've testified before that I have no memory of that second shred day.  I'm aware that it happened, because I've seen invoices and so forth.

34

But the answer to your question as to whether we had these patents before that shred day, I believe that's true.[112]

Mr. Tate's testimony was to the same effect:

Q.    Let me show you a transcript of your sworn testimony before the Federal Trade Commission.   [. . . .]   Do you see that?

[* * * *]

A.    Well, unless I'm missing something, this email I authored and sent on the 24th of June 1999.  So without seeing the Email, I--I guess this time frame refers to June '99.  And I said here that somewhere in this time frame, I believe we had issued patents of claims that we believed were clearly infringed by SDRAM and by DDR.[113]

Indeed, one of those patents, the '105 patent, issued in June 1999.[114]  Within two months of the August 26 Shred Day, <u>Rambus asserted the '105, '263 and '804 patents against Hitachi</u> in Mr. Karp's October 22, 1999 demand letter.[115]  Rambus asserted those same patents in this action against Micron.[116]

### E.    In Fall 1999, Rambus Stayed The Course And Executed Against Its Litigation Strategy According to Plan

As the Court will recall, one message Mr. Karp took away from his meeting with Cooley Godward attorneys in February 1998 was that Rambus would have

---

[112]    11/9/07 RT at 363:24-366:11.

[113]    11/13/07 RT at 756:21-757:24.

[114]    MTX 428 (United States Patent Number 5,915,105).

[115]    MTX 473-0001.   Mr. Tate testified that by June 1999, he too believed Rambus had issued patents that SDRAM and DDR "clearly infringed."  11/13/07 RT at 756:21-757:24.

[116]    Proposed Pre-Trial Order (D.I. 912) § III, ¶ 3.

to litigate and have a court declare its patents valid.[117]   <u>That is the same message</u>

<u>Mr. Karp relayed to others at Rambus.</u>   In September 1999, Messrs. Karp and Steinberg

prepared yet another presentation for Rambus executives and management.[118]   In their

September 24, 1999 presentation titled "Is There Life at Rambus After Intel?", they

explained that "[e]ven if [Rambus] gain[s] some initial settlements, [Rambus] will have

to ultimately pursue remedies in court."[119]

Their presentation slides also stated, in no uncertain terms, "Companies

like Micron will fight us tooth and nail and will never settle."[120]   That, of course, was the

same understanding Mr. Karp had when he joined Rambus in October 1997.[121]

Mr. Karp's presentation apparently left an impression on its audience.

Mr. Tate sent an e-mail message the evening after the presentation.   Mr. Tate's message

states:

> CONSENSUS achieved on 2 items (at least for those
> present - anyone not at the meeting please email if you
> have inputs/disagreements)
>
> 1.                    ip                    strategy
> - wait till 820/840 launch till ~300K pc's have shipped (but
> no              later              than              2/00)
> - terms for licensing our IP for sdram/ddr/etc: royalty rate >
> rambus                    royalty                    rate
> - need to sue a dram company to set an example: visit them
> a few weeks in advance at exec level to explain our IP,
> position,              offer              terms
> - publicize: patents and suit; put all dram/controller
> companies       that       use       sdram/ddr/...       on       notice

---

[117]   <u>See</u> MTX 290 (J. Karp notes of February 12 meeting).

[118]   MTX 801; 11/8/07 RT at 326:7-14 (J. Karp testimony).

[119]   MTX 801-0004.

[120]   MTX 801-0004.

[121]   <u>See</u> 11/8/07 RT at 229:20-230:13 (J. Karp testimony).

36

- expectation is that no one will settle with us until after initial suit is resolved: 1-2.5 years if jury trial; if pre-trial settlement 0.5-1 years[122]

Mr. Karp made yet another presentation in October 1999 to Rambus's Board. This time, he assessed in greater detail the potential target companies including Micron.[123] According to the analysis, Hitachi had the highest final point total and thus was the most desirable target.[124] Mr. Karp proposed a time line for approaching Hitachi and filing suit in Delaware.[125] Rambus ultimately filed suit against Hitachi on January 18, 2000.[126] That is within the very same "Q1'00" time frame Mr. Karp had predicted as part of his October 1998 Stealth Mode Presentation.[127]

Rambus settled with Hitachi on June 22, 2000.[128] Micron filed its declaratory relief action on August 28, 2000.[129]

## V.   RAMBUS'S ARGUMENTS THAT IT HAD NO DUTY TO PRESERVE LACK MERIT

### A.   The Presence Or Absence Of A Litigation Line Item In Rambus's Budgets Does Not Prove Or Disprove That Rambus Foresaw Litigation

Rambus has suggested that it had no duty to preserve documents because there was no litigation line item in its budget before it sued Hitachi in January 2000.[130]

---

[122]   MTX 464-0001, 0002.

[123]   MTX 468; 11/9/07 RT at 359:14-19, 360:13-361:22 (J. Karp testimony).

[124]   MTX 468-0002, 0003, 0006.

[125]   MTX 468-0008.

[126]   See MTX 493 (January 18, 2000 IP Presentation stating that Rambus would file its complaint that day).

[127]   MTX 375-0004.

[128]   MTX 533 (Rambus press release regarding Hitachi settlement).

[129]   Proposed Pre-Trial Order (D.I. 912). at 4, ¶ 3

[130]   11/8/07 RT at 141:9-18 (Rambus Opening statement).

But this argument is a red herring. Rambus introduced <u>no</u> evidence at trial that budgeting was an essential or even relevant step in its litigation preparation. To the contrary, Rambus never had a budget line item for the Hitachi litigation at any time before or during the Hitachi litigation.[131]

### B.    The Date Of "Board Approval" Of Litigation Has Nothing To Do With The Date Litigation Was First Foreseen

Rambus argues it had no duty to preserve documents until Rambus's Board had approved the filing of a lawsuit. The evidence is clear that Mr. Tate did <u>not</u> need board approval before bringing suit. Mr. Tate testified that no technical requirement existed for such approval.[132] Mr. Roberts testified to the same effect at trial. In fact, according to William Davidow, another member of Rambus's Board, the Board never did vote on whether to file suit against Hitachi.[133]

Finally, Mr. Farmwald admitted that Mr. Tate could and did prepare for litigation without board approval:

> Q.    And so, for example, Mr. Tate can say to his employee, you know, I believe we're going to be suing someone, and so I want you to be prepared and to do that and take steps to do that?
>
> A.    Yes, he can do that.
>
> Q.    Okay. So Mr. Tate can take steps in anticipation of litigation without the board's approval?
>
> A.    If I understand your question correctly, I think the answer is yes.

---

[131]    7/28/06 Harmon Tr. at 342:7-9, 12-13, 323:15-20, 323:22-324:2, 324:21-23, 325:1-4, 6-7, 9-12, 333:17-20, 23-24; see also MTX 823-0002 ("Rambus Inc. Budget v. Actual-Operating Expenses for the Month Ending June 30, 2000").

[132]    11/9/07 RT at 668:1-4; 11/13/07 RT at 705:16-706:24, 770:2-16.

[133]    11/15/07 RT at 1646:7-18.

Q.    And, in fact, you've come to learn that Mr. Tate did that before there was any board presentation in late '99, correct?

A.    Yes.[134]

## C.    The Date Rambus Could Sue Is Not The Date Litigation Is Foreseeable

Rambus asserts that it had no duty to preserve documents prior to the date its patents issued. Rambus reasons that without the patents, it could not sue. But the duty to preserve documents does not begin when the requirements to file suit are fulfilled, but when litigation is "foreseeable." Rambus had a plan to demand substantially higher royalties from its targets. That plan required litigation. Of course it also required patents because without patents it had no basis for demanding royalties. But Rambus anticipated the issuance of the patents on which it would later sue. Indeed, it had applications pending and patent counsel prosecuting them.[135] In fact, one of the reasons Mr. Karp recommended that Rambus continue in Stealth Mode during 1999 was because Rambus anticipated patents would issue and was working to obtain additional patents.[136]

Moreover, Rambus's internal e-mail messages demonstrate that Rambus believed non-compatible products infringed its patents long before the patents in this suit issued. As early as 1996 and 1997, Mr. Tate wrote to others at Rambus that SDRAM and DDR infringe issued or to-be-issued Rambus patents.[137] The same holds true during

---

[134]    11/15/07 RT at 1694:12-1695:3.

[135]    11/14/07 RT at 1318:23-1319:15 (L. Vincent testimony); 11/15/07 RT at 1572:1-16 (D. Johnson testimony); 11/13/07 RT at 835:1-23, 836:16-837:6, 837:16-24 (N. Steinberg testimony).

[136]    MTX 375-0002.

[137]    See, e.g., MTX 235 (February 10, 1997 e-mail message from G. Tate: "do *NOT* tell customers/partners that we feel DDR may infringe – our leverage is better to wait"); MTX 183 (February 15, 1996 e-mail message from G. Tate: "several papers were (continued . . .)

39

RLF1-3250714-1

1998.  For example, Mr. Tate wrote a January 10, 1998 e-mail message that states "ddr
infringes our patents" and asks "do we start stating this publicly?"[138]

In the Nuclear Winter Scenario memorandum circulated on or about
November 30, 1998, Mr. Karp suggested that Rambus already had patents infringed by
Micron and Fujitsu:

> We already have claim charts relative to Micron and
> Fujitsu devices for the '580 patent.[139]

In addition, it is undisputed that one of the patents Rambus has asserted in
this case, the '105 patent, issued in June 1999, before the August 1999 Shred Day.[140]
Rambus has also conceded that that it had received notices of allowance for two other
patents it is asserting in this case and that it knew prior to the August 1999 Shred Day
that these patents would issue.[141]

Rambus also argues that litigation was not foreseeable until it had samples
of infringing products and had those products reverse-engineered.  Mr. Karp admitted at
trial, however, that Rambus did not rely on reverse engineering reports in deciding to
sue.[142]  He confirmed that the claim charts used to analyze infringement of the Hitachi

---

(. . . continued)
presented on SDRAMs that look more and more rambus-like [. . .] prepare the [patent]
minefield."); MTX 248 (July 11, 1997 e-mail exchange forwarding memorandum from
David Mooring of Rambus:  "We have not yet told Siemens that we think SLDRAM and
SDRAM-DDR infringe our patents."); MTX 253 (August 4, 1997 e-mail message from
G. Tate:  "dave believes we should meet with intel [. . .] to get them aware that IF they
were to consider a DDR chipset that there is a minefield of 60+ rambus patents that
would have to be avoided").

[138]   MTX 282-0001.

[139]   MTX 763-0003.

[140]   MTX 428 (United States Patent Number 5,915,105).

[141]   11/9/07 RT at 363:24-366:11 (J. Karp testimony).

[142]   11/9/07 RT at 481:24-482:11.

device were based on data sheets and information obtained from the Internet.[143] Similarly, Mr. Steinberg testified that Rambus did <u>not</u> conduct any reverse engineering before suing Infineon.[144]

In any event, even if reverse engineering were also a condition to suit, Rambus never acted as though it believed that was insurmountable.  There are many steps that must occur prior to suit.  The duty to preserve does not first arise when the last step is completed.  Rather, the duty arises when a party "foresees" the suit.  That a party is taking the steps--or waiting for conditions to be right--is evidence that litigation is in fact foreseen.

---

[143]   <u>Id.</u>

[144]   11/13/07 RT at 879:5-880:13.

41

## **CONCLUSION**

For the foregoing reasons, the Court must find that Rambus's duty to

preserve arose no later than March 1998.


*Of Counsel:*
William C. Price
Robert J. Becher
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017-2543
(213) 443-3000

Jared Bobrow
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065-1175
(650) 802-3000


Dated:  February 5, 2008

*Anne Shea Gaza*
Frederick L. Cottrell, III (#2555)
Anne Shea Gaza (#4093)
One Rodney Square
P.O. Box 551
Wilmington, DE  19801
(302) 651-7700
Cottrell@RLF.com
Gaza@RLF.com

*Attorneys for Plaintiffs and Counterclaim*
*Defendants Micron Technology, Inc. and*
*Micron Semiconductor Products, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2008, I electronically filed the foregoing with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following and which has also been served as noted:

### BY HAND

Mary B. Graham, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P. O. Box 1347
Wilmington, DE  19899-1347

I hereby certify that on February 5, 2008, the foregoing document was sent to the following non-registered participants in the manner indicated:

### VIA E-MAIL

Gregory P. Stone, Esquire
Munger Tolles & Olson LLP
355 South Grande Avenue, 35th Floor
Los Angeles, CA  90071

Anne Shea Gaza (#4093)
gaza@rlf.com