IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICRON TECHNOLOGY, INC., | ) |
| Plaintiff, | ) |
| v. | ) |
| RAMBUS, INC., | ) |
| Defendant. | ) |
| | ) |
| RAMBUS, INC., | ) C.A. No. 00-792 (SLR) |
| Counterclaim Plaintiff, | ) |
| v. | ) |
| MICRON TECHNOLOGY, INC., MICRON ELECTRONICS, INC., and MICRON SEMICONDUCTOR PRODUCTS, INC., | ) |
| Counterclaim Defendants. | ) |

## MICRON'S REPLY POST-TRIAL BRIEF REGARDING RAMBUS'S LITIGATION MISCONDUCT AND THE PROPER SANCTION FOR RAMBUS'S SPOLIATION

*Of Counsel:*
William C. Price
Robert J. Becher
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000

Jared Bobrow
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065-1175
(650) 802-3000

Dated:  August 4, 2008

Frederick L. Cottrell, III (#2555)
Cottrell@rlf.com
Anne Shea Gaza (#4093)
Gaza@rlf.com
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
(302) 651-7700

*Attorneys for Plaintiffs and Counterclaim Defendants Micron Technology, Inc. and Micron Semiconductor Products, Inc.*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ............................................................................................................................ 2

I.  RAMBUS IS AT FAULT FOR ITS DOCUMENT DESTRUCTION AND ITS
    DOCUMENT RETENTION POLICY WAS NOT ADOPTED IN GOOD FAITH ............... 2

    A.  Rambus's Brief Ignores Much of the Evidence of Its Fault and Bad Faith .................. 2

    B.  Dan Johnson Provides No Safe Harbor to Rambus ...................................................... 3

    C.  Rambus Did Not Seek Advice From Outside Lawyers Regarding Its Shred
        Days ............................................................................................................................ 4

    D.  Rambus's Discussions With A Security Consultant Provides No Excuse ................... 5

    E.  Karp's Instruction to Vincent to Purge Files Was Done In Bad Faith ........................ 5

    F.  Rambus's Policy Was Hardly "Content Neutral" ........................................................ 6

II. RAMBUS'S CITATION TO CASES APPROVING OF DOCUMENT RETENTION
    POLICIES IS IRRELEVANT TO RAMBUS'S BAD FAITH ............................................. 7

III. RAMBUS'S CLAIM THAT SPOLIATION SANCTIONS ARE ONLY
     AVAILABLE IF THE SPOLIATING PARTY ACTED WITH FRAUDULENT
     INTENT IS WRONG ........................................................................................................ 9

IV. RAMBUS DESTROYED NUMEROUS CATEGORIES OF MATERIALS
    RELEVANT TO PATENT LITIGATION ......................................................................... 10

    A.  Documents and Evidence Relating to Rambus's Negotiations, Licenses and
        Contracts with DRAM Manufacturers and Intel Were Destroyed
        (Categories 1 and 9) ................................................................................................. 12

    B.  Rambus Destroyed Correspondence, Electronic and Hard Copy (Category 10) ....... 13

    C.  Rambus Destroyed Macintosh Backup Tapes (Category 11), Electronic
        Media and Other Backup Tapes (Category 12) .......................................................... 13

    D.  Rambus Destroyed Documents from Vincent's Patent Files (Rambus
        Category 3) ............................................................................................................... 14

    E.  Rambus Destroyed Documents Regarding Prior Art (Category 4) ............................. 15

F.      Rambus Purged Documents Related To Its Participation In JEDEC (Item 5)........... 16

G.      Rambus Destroyed Financial Documents (Rambus Category 2) ................................ 17

H.      Rambus Shredded Documents Concerning Board of Directors Activities
        (Item 6) ................................................................................................................... 17

I.      Rambus Destroyed Files from Dr. Horowitz's Office (Item 7) And
        Documents Concerning the Invention of Rambus's Technology (Item 8) ................. 18

V.      THE RAW NUMBER OF DOCUMENTS PRODUCED AND COUNSEL'S
        STATEMENTS IN TRIAL PROVIDE NO INDICATION OF WHAT RAMBUS
        DESTROYED ..................................................................................................................... 19

VI.     THE DESTROYED DOCUMENTS RELATE TO MICRON'S DEFENSES,
        INFRINGEMENT AND DAMAGES ................................................................................ 20

VII.    THROUGH ITS LIST OF SPECIFIC DOCUMENTS ALLEGEDLY CLAIMED BY
        MICRON TO HAVE BEEN DESTROYED, RAMBUS ATTEMPTS TO
        MISDIRECT THE COURT ................................................................................................ 22

VIII.   RAMBUS MISSTATES THE APPLICABLE LEGAL STANDARD REGARDING
        PREJUDICE AND UNCLEAN HANDS ......................................................................... 26

        A.      Rambus Seeks To Further Gain From Its Destruction With The Meritless
                Argument That Micron Must Specifically Identify The Documents That
                Rambus Destroyed And The Content Thereof ......................................................... 26

        B.      Rambus's Statement Of The Law Regarding Unclean Hands Is Wrong ................. 28

IX.     THE SANCTION OF HOLDING RAMBUS'S PATENTS UNENFORCEABLE
        AND DISMISSING ITS CASE IS APPROPRIATE ......................................................... 30

X.      MICRON IS NOT ESTOPPED FROM SEEKING OTHER RELIEF AND IT HAS
        DEMONSTRATED ITS ENTITLEMENT TO AN ADVERSE INFERENCE ..................... 31

XI.     RAMBUS'S ARGUMENTS REGARDING LITIGATION MISCONDUCT
        IGNORE THE KEY EVIDENCE ....................................................................................... 33

CONCLUSION ............................................................................................................................. 35

RLF1-3309000-1

# TABLE OF AUTHORITIES

**Page**

## Cases

*Albert L. de Graffenried v. U.S.,*
   25 Cl. Ct. 209 (Cl. Ct. 1992) ........................................................................................21

*Anderson v. Cryovac, Inc.,*
   862 F.2d 910 (1st Cir. 1988) ...................................................................................26, 27

*Applied Telematics, Inc. v. Sprint Commc'ns. Co.,*
   1996 WL 33405972 (E.D. Pa. Sept. 17, 1996) ...............................................................9

*Arthur Andersen LLP v. United States,*
   544 U.S. 696 (2005) ........................................................................................................3

*Bio-Technology Gen'l Corp v. Genetech, Inc.,*
   80 F.3d 1553 (Fed. Cir. 1996) .....................................................................................35

*Bowman v. Am. Med. Sys., Inc.,*
   1998 WL 721079 (E.D. Pa. Oct. 9, 1998) .....................................................................9

*Brewer v. Quaker State Oil Refining Corp.,*
   72 F.3d 326 (3d Cir. 1995) .............................................................................9, 10, 32, 33

*Carlucci v. Piper Aircraft Corp.,*
   102 F.R.D. 472 (S.D. Fla. 1984) ....................................................................................8

*Citizens Financial Group, Inc. v. Citizens National Bank of Evans City,*
   383 F.3d 110 (3d Cir. 2004) ....................................................................................29, 30

*In re Daimler Chrysler AG Securities Litigation,*
   2003 WL 22951696 (D. Del. Nov. 25, 2003) ...............................................................10

*Design Strategies, Inc. v. Davis,*
   367 F. Supp. 2d 630 (S.D.N.Y. 2005) ..........................................................................32

*Dippin' Dots, Inc. v. Mosey,*
   476 F.3d 1337 (Fed. Cir. 2007), *cert. denied*, 128 S.Ct. 375 (2007) ...........................20

*Emerson v. Wetherill,*
   1994 WL 249769 (E.D. Pa. June 1, 1994) ...............................................................27, 28

*Estate of Leon Spear v. Commiss. of Internal Revenue Serv.,*
   41 F.3d 103 (3d Cir. 1994) ...........................................................................................26

*Flowers v. City of Minneapolis,*
   2007 WL 2893349 (D. Minn. Sept. 28, 2007) .............................................................28

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.,*
   167 F.R.D. 90 (D. Colo. 1996) .....................................................................................27

*Goldenberg v. Cytogen, Inc.,*
  373 F.3d 1158 (Fed. Cir. 2004) .................................................................................24

*In re Hechinger Inv. Co. of Delaware, Inc.,*
  489 F.3d 568 (3d Cir. 2007) ................................................................................9, 27

*Herman & MacLean v. Huddleston,*
  459 U.S. 375 (1983) ...............................................................................................29

*Hynix Semiconductor Inc. v. Rambus,*
  2006 WL 565893 (N.D. Cal. Jan. 5, 2006) ..........................................................8, 27

*Intel Corp. v. Commonwealth Scientific,*
  455 F.3d 1364 (Fed. Cir. 2006) ..............................................................................20

*Johnson v. Ready Mixed Concrete Co.,*
  424 F.3d 806 (8th Cir. 2005) ..................................................................................28

*Keystone Driller Co. v. Gen. Excavator Co.,*
  290 U.S. 240 (1933) ...............................................................................................35

*MDO Dev. Corp. v. Kelly,*
  735 F. Supp. 591 (S.D.N.Y. 1990) ..........................................................................30

*Martinez v. Bally's Louisiana, Inc.,*
  244 F.3d 474 (5th Cir. 2001) ..................................................................................32

*Merisant Co. v. McNeil Nutritionals, LLC,*
  515 F. Supp. 2d 509 (E.D. Pa. 2007) ................................................................29, 30

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
  357 F.3d 1340 (Fed. Cir. 2004), *cert. denied*, 543 U.S. 821 (2004) ...........................24

*Mosaid Techs. Inc. v. Samsung Elecs. Co.,*
  348 F. Supp. 2d 332 (D. N.J. 2004) ...................................................................10, 32

*Motown Record Co., LP v. DePietro,*
  2007 WL 1725604 (E.D. Pa. June 11, 2007) ...........................................................31

*In re New Valley Corp.,*
  181 F.3d 517 (3d Cir. 1999) ...................................................................................35

*Nobelpharma AB v. Implant Innovations, Inc.,*
  141 F.3d 1059 (Fed. Cir. 1998), *cert. denied*, 525 U.S. 876 (1998) ...........................20

*Positran Manufacturing, Inc. v. Diebold, Inc.,*
  2003 WL 21104954 (D. Del. May 15, 2003) ......................................................10, 31

*Poulis v. State Farm Fire & Cas. Co.,*
  747 F.2d 863 (3d Cir. 1984) ...................................................................................33

*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,*
  324 U.S. 806 (1945) ...............................................................................................28

iv

*Rambus, Inc. v. Infineon Technologies, AG,*
    220 F.R.D. 264 (E.D. Va. 2004) .................................................................... 8, 18, 34

*Rhein-Hawes v. Vanguard Group, Inc.,*
    2005 WL 3441228 (E.D. Pa. Dec. 14, 2005) .................................................. 27

*Riddle v. Liz Claiborne, Inc.,*
    2003 WL 21976403 (S.D.N.Y. Aug. 19, 2003) ............................................... 28

*Sanofi-Aventis v. Advancis Pharmaceutical Corp.,*
    453 F. Supp. 2d 834 (D. Del. 2006) ................................................................ 29

*Schmid v. Milwaukee Electric Tool Corporation,*
    13 F.3d 76 (3d Cir. 1994) ............................................................................ 9, 26, 32

*Scott v. IBM Corp.,*
    196 F.R.D. 233 (D. N.J. 2000) ......................................................................... 32

*Sec. Exch. Comm'n v. Elmas Trading Corp.,*
    683 F. Supp. 743 (D. Nev. 1987) ..................................................................... 30

*Silvestri v. Gen. Motors Corp.,*
    271 F.3d 583 (4th Cir. 2001) ........................................................................ 9, 30

*In re Stone & Webster, Inc.,*
    359 B.R. 102 (Bankr. D. Del. 2007) ................................................................ 10

*Telectron v. Overhead Door Corp.,*
    116 F.R.D. 107 (S.D. Fla. 1987) .................................................................... 27, 30

*Thorn EMI N. Am., Inc. v. Intel Corp.,*
    936 F. Supp. 1186 (D. Del. 1996) .................................................................... 31

*United States v. Local 560 of Int'l Bros. of Teamsters, Chauffeurs, Warehousemen,*
    *& Helpers of Am.,*
    780 F.2d 267 (3d Cir. 1985) ............................................................................ 29

*Walters v. Gen. Motors Corp.,*
    209 F. Supp. 2d 481 (W.D. Pa. 2002) ............................................................... 9

*In re Wechsler,*
    121 F. Supp. 2d 404 (D. Del. 2000) ......................................................... 9, 26, 27, 30

*Wm. T. Thompson v. Gen. Nutrition Corp.,*
    593 F. Supp. 1443 (C.D. Cal. 1984) ................................................................. 27

*Zubulake v. UBS Warburg LLC,*
    220 F.R.D. 212 (S.D.N.Y. 2003) .................................................................... 8, 9

## **Statutes**

35 U.S.C. § 102 ........................................................................................................................... 21

35 U.S.C. § 103 ........................................................................................................................... 21

35 U.S.C. § 112 ........................................................................................................................... 21

*Federal Rules of Civil Procedure* 30(b)(6) ....................................................................... 3, 33

## **Preliminary Statement**

The innocent picture Rambus paints of the origin and nature of its document retention policy bears little, if any, resemblance to reality, or to the irrefutable evidence presented to the Court at trial.  While Rambus cites case law and self-serving testimony regarding the validity of document retention policies in general and under ordinary business circumstances, it ignores the detailed factual record demonstrating that the circumstances under which Rambus instituted its policy were far from ordinary.  As already discussed in Micron's Opening Brief (as well as in the briefing relating to when the duty to preserve arose), Rambus, through Joel Karp and at the direction of Geoff Tate, began the regular, periodic, and massive destruction of documents for the specific and singular purpose of eliminating discoverable information and preparing Rambus for litigation against the DRAM industry.  Because Rambus instituted its policy at a time when it had a duty to preserve information that might be relevant to patent litigation and Micron was denied the chance to inspect the destroyed documents, Micron need only make plausible suggestions as to what was destroyed.  The burden then falls on Rambus to prove that no relevant materials fell victim to its sweeping policy.  Rambus attempts not only to shift this burden to Micron, but to increase it, such that Micron must identify the content of specific documents that Rambus destroyed.  Rambus's position defies both the law and common sense.

Irrespective of where the burden falls, however, the trial record is clear that relevant documents were in fact destroyed.  Moreover, given the purpose and all-encompassing nature of Rambus's destruction program, a very strong inference can readily be drawn that relevant materials must have been destroyed over the course of the three or more years that the program was in effect.

As to litigation misconduct, Rambus glosses over, at best, Micron's allegations and the evidence presented at trial.  Rambus attempts to portray the false testimony of its executives as innocent errors by inarticulate engineers or the like, who were deposed too many times and "don't

1

understand the nuances of language." But, as any school child knows, and as Rambus does as well, the truth is the truth whether one is questioned once or a dozen times. The Rambus witnesses testified as they did to conceal the truth on pivotal substantive issues, such as their secret plot against the DRAM industry and JEDEC standard parts, and their destruction of evidence in preparing to launch their attack.

This Court has the authority to impose whatever sanction it deems appropriate against Rambus, as Micron has stated in its post-trial briefing and in its Pre-Trial Statement. Rambus's destruction of evidence and its conduct in this and other related actions was extraordinary and warrants the most serious of consequences. In light of Rambus's destruction of relevant evidence and litigation misconduct, the Court should hold Rambus's patents unenforceable against Micron and dismiss Rambus's Complaint.

## **ARGUMENT**

I. **RAMBUS IS AT FAULT FOR ITS DOCUMENT DESTRUCTION AND ITS DOCUMENT RETENTION POLICY WAS NOT ADOPTED IN GOOD FAITH**

A. **Rambus's Brief Ignores Much of the Evidence of Its Fault and Bad Faith**

In an attempt to paint its destruction of documents as run-of-the-mill, Rambus glosses over the substantial evidence demonstrating its bad faith and improper intent. As the Court knows well by now, Rambus consistently and exclusively linked its document destruction policy to its litigation plans and strategy. *See* Micron's Post-Trial Brief, dated June 30, 2008 ("MB" or "Micron's Opening Brief"), at 6-7. As detailed in Micron's Opening Brief, Joel Karp testified that implementing the document retention policy was the first step Rambus took to make itself battle ready.[1] Rambus's quarterly goals repeatedly tie document destruction directly to litigation.[2]

Moreover, the contemporaneous and irrefutable evidence demonstrates that the document

---

[1]   Karp, 231:19-22. Unless otherwise indicated, all citations are to the trial record.

retention policy was expressly instituted to eliminate discoverable information and give Rambus an advantage over its litigation opponents. *See* MB, at 6-12. Numerous employees, including Allen Roberts and in-house counsel Anthony Diepenbrock, testified that Karp told them that the document retention policy was being instituted to get rid of documents that would be discoverable.[3] While *Arthur Andersen LLP v. United States*, 544 U.S. 696, 704 (2005), cited by Rambus (Rambus's Post-Trial Brief, dated June 30, 2008 ("RB"), at 34 n.10), observed that document retention policies are created in part to keep information from others, the Supreme Court did not hold--nor has any other court for that matter-- that this would be a proper objective when one anticipates litigation.

Rambus's bad faith is further evidenced by its attempts to conceal its shredding from its adversaries. As discussed in Micron's Opening Brief, Rambus's 30(b)(6) witnesses repeatedly testified that there had only been one shred day; Rambus did not produce key documents about its spoliation until years after they were first requested; and Rambus made misleading statements to courts about its destruction. This clearly evidences a consciousness of wrongdoing.

### B.   Dan Johnson Provides No Safe Harbor to Rambus

Rambus claims that "outside counsel with knowledge of all pertinent facts" recommended the retention policy. RB, at 31. This is plain wrong. Dan Johnson, the only outside attorney who raised the issue of document retention, testified that he mentioned a document retention policy to Rambus as part of his standard pitch to new clients.[4] But Rambus did not inform Dan Johnson of critical facts regarding its intent to litigate, and Rambus did not seek his advice on whether instituting a document retention policy was acceptable in light of its litigation plans.[5] Rambus did

---

[2]   MTX 276, MTX 278.

[3]   Roberts, 1181:19-1182:8; 2 Hr. Designations, Diepenbrock, 101:6-102:6.

[4]   Johnson, 1499:8-24.

[5]   Johnson testified he would not advise a client to destroy documents if he knew it anticipated litigation. Johnson, 1575:6-12, 1580:1-21.

3

not tell Johnson that Geoff Tate, Rambus's CEO, had instructed Joel Karp to create a litigation

strategy for the March 1998 Board meeting, that Tate said he wanted a full strategy and preparation

for litigation before licensing negotiations, or that Tate wanted Rambus to charge a royalty rate that

would show it would cost to infringe.[6]  When counsel asked Johnson if he knew about Tate's

instructions to Karp, Johnson testified:  "Counsel, I have said now three times, I had no knowledge

of Mr. Tate's communications with Mr. Karp, and Mr. Tate never communicated those facts to

me."[7]  Johnson also did not know that Karp thought the royalty rates Rambus intended to charge on

non-compatible products would be a shock to DRAM manufacturers, or that Karp believed Micron

would never agree to the rates Rambus was seeking.[8]

### C. Rambus Did Not Seek Advice From Outside Lawyers Regarding Its Shred Days

Moreover, Rambus does not and can not claim that it sought legal advice regarding any of

its three shred days.  Johnson provided no advice about the September 1998 shred day.  After

July 28, 1998, he just answered random questions from Rambus.[9]  Johnson was rebuffed when he

asked Rambus in July 1998 if it wanted help in executing its document retention policy or advice

about it,[10] and Rambus never sought his advice:

> Q.    So they never came to you to say hey, all these things have happened now,
> we want your advice on whether we should put on litigation hold or whether we
> should continue destroying documents, they never did that after July of 1998?
>
> A.    That's right.[11]

Johnson also did not have any involvement in the August 1999 or December 2000 shred days and

did not keep abreast of Rambus's activities in those time periods.  Johnson testified that, starting in

October 1998, Neil Steinberg was the lawyer who assisted Rambus with licensing, litigation and

---

[6]   Johnson, 1555:18-1556:8, 1558:2-1558:14, 1562:7-1562:16.
[7]   Johnson, 1562:13-16, 1568:14-1569:1.
[8]   Johnson, 1562:21-1563:5.
[9]   Johnson, 1571:13-23.
[10]   Johnson, 1575:16-24.

4

patent prosecution.[12]  Johnson was certainly not updated on Rambus's litigation preparation.  He testified:

> Q. Did you know at that time, this time frame, the June time frame, when this was happening, that one of Mr. Karp's goals, objectives, one of the results he was supposed to obtain by the end of the year was to prepare for litigation and commence litigation against a DRAM manufacturer?
>
> A. I didn't know and I don't believe that.[13]

Johnson did not know that Tate asked Karp in June 1999 to identify Rambus's first target or that there was a consensus in September 1999 that Rambus needed to sue a DRAM manufacturer.  He also did not see the October 1999 board presentation ranking litigation targets.[14]

## D.  Rambus's Discussions With A Security Consultant Provide No Excuse

Rambus also claims it acted in good faith because it spoke with security consultant Alan Brill, who suggested that it consult outside counsel about a document retention policy.  There is no connection between Alan Brill's recommendation and any conduct by Rambus.  Rambus did not retain Brill until March 16, 1998,[15] and Brill did not suggest a policy until an April 24, 1998 presentation.[16]  In contrast, Joel Karp told the Board on March 2, 1998, that Rambus needed to institute a document retention policy as a near term action and, on March 16, 1998, Allen Roberts expressed a "growing worry about email being discoverable" and suggested that Rambus implement a backup tape policy.[17]

## E.  Karp's Instruction to Vincent to Purge Files Was Done In Bad Faith

Rambus boldly claims the record is "devoid of evidence" Karp acted with bad intent when he asked Vincent to purge his files, and that Karp acted on his attorney's advice.  RB, at 35.  Not so.

---

[11]  Johnson, 1576:15-21.
[12]  Johnson, 1572:5-16, 1573:8-16, 1586:18-1587:6.
[13]  Johnson, 1583:19-1584:3.
[14]  Johnson, 1591:11-1592:3, 1592:4-11, 1594:7-18.
[15]  Brill, 1447:14-16.
[16]  Brill, 1440:2-1443:14.

5

Karp waited until April 1999--a year after he received any advice on the subject--to instruct Vincent to clean out issued patent files.[18]   Karp then repeatedly encouraged Vincent to complete the cleaning of the files and sought regular status updates.[19]   This cleaning was not routine or customary at Blakely Sokoloff.  Indeed, the files had never been cleaned before Karp's request.[20]   Moreover, while Vincent was purging files at Karp's direction, Karp's June IP goals included choosing a company to litigate with and commencing litigation.[21]

### F.   Rambus's Policy Was Hardly "Content Neutral"

Rambus incredibly claims that there is no evidence that documents were targeted for destruction because they would be harmful in litigation.  RB, at 37.  This claim is completely at odds with the substantial body of evidence presented to the Court establishing Karp's and Tate's purpose in instituting the document retention program.  MB, at 6-14.  The evidence also showed that with the launch of the program, Rambus employees were told litigation "horror stories" involving harmful email and were instructed to destroy such materials.[22]   As Rambus engineer Craig Hampel testified, he and other employees were instructed that they should not keep emails that, for example, questioned the patentability of a Rambus invention.  In a footnote, Rambus mischaracterizes Hampel's testimony by claiming Hampel testified that employees were told not to create emails about patentability.  RB, at 37 n.11.  A review of the testimony, which is cited in Micron's Opening Brief, conclusively demonstrates that Hampel was describing instructions employees received about what to destroy.  His testimony was offered in response to a question

---

[17]   MTX 299.
[18]   Vincent, 1320:23-1321:23, 1322:6-13; MTX 420-4; Vincent, 1328:22-1329:4.
[19]   Vincent, 1348:17-1349:11; MTX 934; Vincent, 1329:5-22; *see also* MTX 420, Vincent, 1332:7-13.
[20]   Vincent, 1406:22-1407:4.  *See* 2 Hr. Desigs., Marshall, 207:17-209:24; Karp, 261:6-9.
[21]   MTX 807-0014.
[22]   MTX 333; Karp 274:23-275:7.

6

about what reasons were given for instituting the document retention policy.[23]   Moreover, in a subsequent question, the examiner summarized the witness' testimony by stating:   "One of the things you said, one of the examples given about why it was a bad idea to *keep* copies of early discussions of patentability is that it could be used in the prosecution of the patent."[24]   Neither the witness nor his counsel took issue with this description of the testimony.

Rambus also claims--again in a footnote--that Karp's drastic efforts to retrieve another document from the backup tapes before they were destroyed does not show bad faith.  Rambus tries to justify its selectivity by arguing that the document Karp retrieved was the type of document the retention policy required Rambus to retain. RB, at 37 n.11.  This justification is disingenuous given that Rambus has never claimed it went through the millions of documents on the backup tapes to sort them according to the criteria set forth in the retention policy.  Rambus itself concedes it is improper to gather good documents and destroy the rest, and this is what Karp did.

Micron's Opening Brief also set forth various other reasons why the policy was not neutral, which are not addressed by Rambus.  For example, the language of the document retention policy adopted by Rambus calls for the retention of helpful documents.[25]  Moreover, when Karp presented the policy to management and rank-and-file employees in July 1998, he instructed them to keep documents that would help Rambus in its patent litigation.[26]

Micron has presented compelling evidence of Rambus's bad faith.

## II.   RAMBUS'S CITATION TO CASES APPROVING OF DOCUMENT RETENTION POLICIES IS IRRELEVANT TO RAMBUS'S BAD FAITH

Rambus devotes pages of its brief to cases and testimony that document retention policies and shred days are acceptable as a general matter.   This point is irrelevant as Micron is not

---

[23]   Hampel, 1303:21-1304:14; *see also* 1306:13-17.
[24]   Hampel, 1305:24-1306:4 (emphasis added).
[25]   MTX 337-002 (emphasis added).

RLF1-3309000-1

challenging shred days in the abstract.

Rambus also misstates the scope of Micron's allegations by suggesting that Micron is only claiming that Rambus failed to implement a litigation hold. There is more to Micron's claim. Micron asserts that Rambus adopted and implemented its document retention policy and shred days as part of its litigation strategy. In *Rambus, Inc. v Infineon Technologies, AG*, 220 F.R.D. 264, 281 (E.D. Va. 2004), Judge Payne held, "[T]here is a duty not to initiate a document destruction regime if the party reasonably anticipates litigation." Even *Hynix Semiconductor Inc. v. Rambus*, 2006 WL 565893, at *20 (N.D. Cal. Jan. 5, 2006), cited by Rambus, acknowledges that a "document retention policy adopted or utilized to justify the destruction of relevant evidence is not a valid document retention policy." *Id.* at 20 *(citing Carlucci v. Piper Aircraft Corp.*, 102 F.R.D. 472, 486 (S.D. Fla. 1984)).

Rambus cites to its expert, Mr. Montaña, and *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003), to claim that a document retention policy can be implemented even while litigation is anticipated or ongoing. RB, at 22. Mr. Montaña's view is at odds with the case law discussed above. Nonetheless, even he concedes that relevant documents need to be preserved when litigation is anticipated.[27] Montaña also was an advocate for Rambus. One telling example of his bias took place when Micron's counsel showed Montaña an email from Tate that said "need to sue a DRAM company to set an example" and asked him if a litigation hold would be required at that time. Instead of providing an earnest response, Montaña asked counsel for the date of the document before answering so he could assure himself the answer did not harm Rambus.[28]

*Zubulake*, a discrimination case, does not deal with when a document retention policy may

---

[26]   Karp, 267:5-16; 287:6-11.
[27]   Montaña, 560:4-11.
[28]   Montaña, 574:12-577:5; MTX 464.

be instituted. While it observed that a company need not retain all backup tapes when litigation is anticipated, it held that the there is a duty to preserve relevant evidence, including documents from backup tapes related to the anticipated litigation. *Zubulake*, 220 F.R.D. at 217, 218.

## III.  RAMBUS'S CLAIM THAT SPOLIATION SANCTIONS ARE ONLY AVAILABLE IF THE SPOLIATING PARTY ACTED WITH FRAUDULENT INTENT IS WRONG

Rambus argues that sanctions for spoliation are available only when the destruction was undertaken with "fraudulent intent." RB, at 26. Although the evidence of Rambus's fraudulent intent is overwhelming, Rambus is wrong on the law. In *Schmid v Milwaukee Electric Tool Corporation*, 13 F.3d 76 (3d Cir. 1994), the Third Circuit made clear that sanctions for spoliation should be decided based on "a case by case approach keyed to the degree of fault on the part of the party accused of spoliation and the degree of prejudice to the opponent." *Id* at 81. Indeed, as noted in Micron's Opening Brief, numerous cases have imposed spoliation sanctions where a party merely failed to ensure the preservation of relevant evidence despite anticipating litigation. MB, at 6 (citing *Bowman v Am Med. Sys., Inc*, 1998 WL 721079, at *4 (E.D. Pa. Oct. 9, 1998); *Walters v. Gen. Motors Corp*, 209 F. Supp. 2d 481 (W.D. Pa. 2002)). Still other cases have recognized dismissal may be appropriate even for negligent destruction. *See, e.g., Silvestri v. Gen Motors Corp*, 271 F.3d 583 (4th Cir. 2001). Whether evidence was destroyed in bad faith for the purpose of preventing litigation opponents from presenting their case is just one factor a court can consider in assessing fault. *In re Wechsler*, 121 F. Supp. 2d 404, 415 (D. Del. 2000).

None of the cases cited by Rambus require "fraudulent intent" as a prerequisite to spoliation sanctions. Rather, the spoliator's intent is merely one consideration in a court's application of the three *Schmid* factors. *See Applied Telematics, Inc v Sprint Commc'ns Co*, 1996 WL 33405972 (E.D. Pa. Sept. 17, 1996) (weighing *Schmid* factors); *In re Hechinger Inv Co of Delaware, Inc*, 489 F.3d 568 (3d Cir. 2007) (same in context of request for adverse inference). For example, *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir. 1995), which involved a

9

request for an adverse inference instruction, did not require a finding of "fraudulent intent." The court merely reiterated the need for "actual suppression or withholding," which requires only that the destruction be intentional, as opposed to accidental. *Id.* at 334; *see Mosaid Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 337-38 (D. N.J. 2004). Rambus claims that *Positran Manufacturing, Inc. v. Diebold, Inc.*, 2003 WL 21104954 (D. Del. May 15, 2003), states that dismissal is "only" proper if the destruction is intended to prevent the other side from examining evidence. *Positran* simply holds that this is a consideration in assessing fault under *Schmid*, not a requirement. Rambus also cites *In re Daimler Chrysler AG Securities Litigation*, 2003 WL 22951696 (D. Del. Nov. 25, 2003). In that case, the Court applied *Schmid* and found that a personal assistant "acted unintentionally" when she discarded post-it notes and that there was no prejudice because the notes were transcribed verbatim. *Id.* at *1-2. These facts are a far cry from Rambus's intentional destruction campaign.

Rambus also asserts that *In re Stone & Webster, Inc.*, 359 B.R. 102 (Bankr. D. Del. 2007), stands for the proposition that "the failure to implement a 'litigation hold'--standing alone--will not give rise to sanctions." RB, at 37. *In re Stone & Webster* stands for no such thing. To the contrary, there the court denied sanctions because it found some of the allegedly destroyed documents never existed and that the spoliating party was not even under a duty to preserve another category of allegedly destroyed evidence. *Id.* at 117.

## IV.   RAMBUS DESTROYED NUMEROUS CATEGORIES OF MATERIALS RELEVANT TO PATENT LITIGATION

Micron also has made a compelling showing of prejudice. To claim Micron was not prejudiced, Rambus relies heavily on the grossly flawed argument that because some relevant documents survived destruction, all relevant documents survived. Neither logic nor the evidence supports Rambus's position. The trial record shows that Rambus's destruction program was instituted for the express purpose of ridding Rambus of information that would be discoverable in

10

to-be-filed patent litigation against the DRAM industry. MB, at 8-9. According to the policy itself, and the evidence establishing the manner in which it was executed, the destruction was far-reaching. The program required the cleansing of email accounts, backup tapes, floppy disks and paper documents.[29] From these facts alone, the logical conclusion is that relevant and material evidence was destroyed.

The illogic of Rambus's argument aside, its own witnesses testified that they destroyed relevant categories of documents and that the document retention policy called for such destruction. MB, at 15-30. To the extent Rambus is suggesting that the policy was simply disregarded, this is farfetched, particularly given that Joel Karp even spot-checked employees to verify their compliance with the policy.[30]

To try to validate its claim that no relevant documents were destroyed, Rambus also cites to the testimony of its lawyer, Sean Cunningham, that he collected certain categories of documents. RB, at 17. This proves nothing. Cunningham testified that he does not know what documents were destroyed prior to the time he collected documents.[31] He was not retained until November 1999, after the first two shred days and the degaussing had taken place.[32] He obviously could not collect destroyed documents.[33] Furthermore, he was in the dark about the extent of the shred days and did not know about the degaussing until the 2007 trial in this case.[34]

Micron delineated the categories of destroyed documents, as well as the evidence supporting the conclusion that they were destroyed, in its Opening Brief. Although Micron will respond below to Rambus's arguments as to each category, Micron respectfully refers the Court to its Opening

---

[29]   MTX 337, MTX 343.
[30]   Barth, 1453:3-7; MTX 346-9.
[31]   Cunningham, 1063:2-9, 1065:7-13, 1066:21-1067:6.
[32]   Cunningham, 1053:1-1054:15.
[33]   Cunningham, 1058:15-24.

11

Brief as it contains additional detail.

A.  **Documents and Evidence Relating to Rambus's Negotiations, Licenses and Contracts with DRAM Manufacturers and Intel Were Destroyed (Categories 1 and 9)**

Rambus's argument in its chart that documents relating to Rambus's negotiations and licenses with DRAM manufacturers and Intel were preserved is directly contradicted by its witnesses' own admissions and the document retention policy it adopted. The document retention policy specifically required the destruction of all drafts and materials used during contract negotiations, including negotiations under Rambus's patents.[35] It stated:

> All drafts (including computer and word processing files) and any materials used during negotiations that are not part of the final contract including, but not limited to, notes of meetings, telephonic conversations, drafts, slides, memos, overheads and checklists should be destroyed or systematically discarded.[36]

Karp's 1998 presentation on document retention also described the policy as it applies to contracts.[37] On July 17, 2000, Steinberg emailed all Rambus executives and reminded them to destroy drafts and other materials relating to license negotiations under Rambus's patents.[38]

Moreover, it is undisputed that Rambus's employees destroyed negotiation documents. Rambus's president, David Mooring, destroyed documents regarding licensing negotiations[39] and Laura Stark disposed of documents relating to negotiations too.[40] Rambus's counsel, Cecilia Gonzalez, testified that she did not find a complete set of documents regarding the interactions between Rambus and Hitachi when she searched for documents concerning the Hitachi litigation.[41]

Rambus's employees also repeatedly admitted in writing that they destroyed documents

---

[34]  Cunningham, 1055:12-1056:6.
[35]  MTX 343.
[36]  MTX 337.
[37]  MTX 343; Karp, 276:7-14.
[38]  MTX 541, Steinberg, 896:21-897:2, MTX 1011.
[39]  2 Hr. Designations, Stark, 215:8-218:6, 226:6-14.
[40]  2 Hr. Designations, Stark, 244:7-245:11, 252:4-253:1.

relating to negotiations with Intel. In response to a September 2000 e-mail regarding Intel documents, Gary Harmon wrote: "During the Karp document retention purge, I destroyed everything pertaining to these contracts."[42] Similarly, CEO Tate sent an e-mail to Steinberg and others on June 28, 2000 with the header "intel contract negotiations/ strategy items." In his e-mail, Tate said, "re intel 'bottom line'-this is all I could find guess I'm being zealous about 'document retention'."[43] Rambus's list of produced documents regarding negotiations with Intel does nothing to contradict these admissions.

### B.    Rambus Destroyed Correspondence, Electronic and Hard Copy (Category 10)

Rambus's employees also destroyed correspondence in both hard copy and electronic form.[44] Any claim to the contrary is again inconsistent with the policy itself and the testimony. In Karp's presentation to employees, he told employees that "email is discoverable in litigation or pursuant to a subpoena" and "elimination of email is an integral part of document control."[45] It is also undisputed that backup tapes containing internal e-mails, such as e-mails from CEO Tate to Allen Roberts, and e-mails from CEO Tate to others on his staff, were destroyed.[46] Rambus's citation in its chart to a list of emails it produced--many of which were subject to privilege piercing orders, and some of which were recovered from backup tapes in 2005--does nothing to suggest that employees did not destroy correspondence.

### C.    Rambus Destroyed Macintosh Backup Tapes (Category 11), Electronic Media and Other Backup Tapes (Category 12)

It is also undisputed that Rambus sent out 1,269 backup tapes to be degaussed.[47] Even

---

[41]   Gonzalez, 1288:7-12.
[42]   MTX 551.
[43]   MTX 544.
[44]   MTX 337, 343.
[45]   MTX 343; Karp, 276:7-277:1.
[46]   Roberts, 1170:17-1171:2.
[47]   Karp 262:12-263:4; MTX 326.

though Mr. Montaña testified that about 100,000 documents were stored on each backup tape,[48] Rambus apparently contends that its list of produced documents shows that nothing was destroyed. This position is not logical and is certainly not credible. Notably, every single document Rambus identifies in its chart under the heading backup tapes also appears on its list of correspondence. Rambus makes no effort, however, to demonstrate that the documents listed in its chart came from its backup tapes.

Separately, Rambus concedes in its Opening Brief that it destroyed a set of Macintosh backup tapes. It relies exclusively on the testimony of Mr. Gardner to claim that the tapes were destroyed before the retention policy was implemented. This alleged timing is suspicious given that Gardner testified he sought Allen Roberts' approval to destroy the tapes, and Roberts did not announce a backup tape policy until 1998.[49] Regardless, Rambus asserts that the documents from the Macintosh computers were transferred to the new computer systems.[50] Even if this transfer occurred before the rollout of the document retention policy, the electronic materials transferred from the Macintosh computers would have then been destroyed under the document retention policy. Rambus has proffered no evidence that these documents still exist.

D.   **Rambus Destroyed Documents from Vincent's Patent Files (Rambus Category 3)**

Rambus lists some documents recovered from Mr. Vincent's files--many of which were only produced due to piercing orders--to support its claim that his files and all relevant materials therein were preserved.[51] Again, the testimony and documents prove the opposite. It is undisputed that in 1999, at Rambus's instruction, Vincent purged in excess of 60 Rambus patent files in the Farmwald-

---

[48]   Montaña, 579:22-580:8.
[49]   2 Hr. Designations, Gardner, at 18:6-18.
[50]   2 Hr. Designations, Gardner, 19:4-8.
[51]   Rambus also fails to note that Micron contends that Rambus destroyed its internal patent files too.

14

Horowitz family.[52]  Rambus does not bother to address this in its chart.  Nevertheless, the evidence

shows that Vincent discarded:  (i) drafts of amendments and claims; (ii) handwritten notes from

attorneys working on divisionals and continuations; (iii) letters between Blakely Sokoloff and

Rambus regarding patent prosecution matters; (iv) printouts of e-mails maintained in the

prosecution files; and (v) diskettes or electronic files of drafts of patent applications or

continuations and drafts of papers regarding patent prosecution.[53]  Vincent conceded that some of

the documents he destroyed were unique and did not exist in any other form.[54]  Micron also

established that Vincent destroyed patent files that are directly relevant to the patents-in-suit.  For

example, U.S. Patent No. 5,915,105--one of the patents-in-suit--refers to five "related U.S.

applications."[55]  Vincent purged the files of all of these related applications in July 1999.[56]

### E.   Rambus Destroyed Documents Regarding Prior Art (Category 4)

While Rambus cites to Vincent's testimony that he did not destroy prior art itself, the record

is clear that documents related to prior art would have been in the patent files he destroyed.  By way

of example, Vincent's billing entries for P001[57]--a file cleaned in July 1999--reflect that he had

teleconferences and meetings with inventor Farmwald regarding prior art.[58]  Similarly, billing

entries associated with other cleaned files refer to meeting with the inventor to discuss the invention

and prior art references.[59]  Vincent testified that it was his custom to place notes about these types

of activities in the file.[60]

Moreover, as discussed in Micron's Opening Brief, an email from Mike Farmwald that was

---

[52]  Vincent, 1322:14-22; MTX 601.
[53]  Vincent, 1323:13-1325:1.
[54]  Vincent, 1325:2-11.
[55]  MTX 428, Vincent, 1343:19-1345:19.
[56]  Vincent, 1344:10-1347:1.
[57]  D.I. 1052.  This correlates to the '898 patent.
[58]  MTX 848-002, Vincent, 1407:5-1408:8.
[59]  MTX 65, Vincent, 1408:16-1409:20.

destroyed, and then recovered from a backup tape, demonstrates that internal emails explicitly discussed prior art and Rambus's knowledge of prior art. MB, at 23-24. It is fair to conclude that other such emails were permanently destroyed.

**F.      Rambus Purged Documents Related To Its Participation In JEDEC (Item 5)**

Despite Rambus's listing of JEDEC-related documents it produced, it is undisputed that Rambus also destroyed documents related to its involvement in JEDEC and its work to amend its patent claims to cover the JEDEC standards. Richard Crisp, Rambus's JEDEC representative, admitted that he placed documents in a burlap bag for shredding.[61] He testified that he destroyed JEDEC minutes, e-mails[62] and "anything that I had on paper I basically threw away."[63] JEDEC-related materials would also have been included within other categories of destroyed materials, such as backup tapes, e-mails, correspondence and patent files.

Rambus's claim that a very limited scope of material related to JEDEC was destroyed is also belied by notes from an interview of Crisp conducted by Gray Cary. The notes, which Crisp testified were accurate,[64] state, "after Joel joined the company all docs were then destroyed."[65] Moreover, Cecilia Gonzalez testified that Crisp told her during an interview that certain JEDEC documents had been destroyed.[66]

Although some of Crisp's emails abut JEDEC were produced, their existence does not evidence a large-scale effort to retain JEDEC materials. Nothing in the document retention policy called for keeping JEDEC materials. While Crisp's explanation for why he had certain emails has evolved over time, Crisp testified that he happened upon a computer in his attic containing one set

---

[60]   Vincent, 1408:9-15.
[61]   Crisp, 801:5-15.
[62]   Crisp, 817:3-10.
[63]   Crisp, 802:9-14, 802:24-803:5.
[64]   Crisp, 826:21-24, 829:2-9.
[65]   MTX 742; Cunningham, 978:5-980:14.

16

of JEDEC emails, and that he copied another set of e-mails onto the Rambus server when he was transferring computers and had forgotten about them.[67]

### G.    Rambus Destroyed Financial Documents (Rambus Category 2)

Rambus's claim in its chart that financial documents were preserved is also contradicted by its witnesses' testimony.  Rambus's outside counsel, Cecilia Gonzalez, testified that when she was looking for documents for the Hitachi litigation, she told Rambus's Neil Steinberg that there were financial documents she was unable to find.[68]  Harmon testified that documents relating to accounting, budgeting and investor relations, were destroyed in accordance with the document retention policy.[69]

To try to bolster the size of its list of produced financial documents, Rambus included several shredding invoices and degaussing invoices in its list of produced documents.  Rambus fails to mention, however, that the invoices were produced after this litigation had been ongoing for years.  Purchase orders related to degaussing were not produced until June 2005.[70]  Invoices related to shredding were produced for the first time on February 17, 2004, in the *Infineon* case.[71]  Moreover, Rambus's list of financial documents also consists in large part of privileged documents produced from its outside attorneys' files that were never expected to see the light of day and were not subject to the document retention policy, such as bills for legal services.

### H.    Rambus Shredded Documents Concerning Board of Directors Activities (Item 6)

Rambus claims that it preserved documents relating to the activities of its Board of

---

[66]   Gonzalez, 1280:13-19.
[67]   Crisp, 821:3-19, 801:16-802:8.
[68]   Gonzalez, 1287:14-1288:6.
[69]   2 Hr. Designations, Harmon, 135:7-22, 140:17-141:3, 144:10-16.
[70]   2 Hr. Designations, Kramer, 189:7-191:4 (referring to MTX 326, MTX 327 and MTX 829).
[71]    MTX 683 (production for MTX 398, 454 and 577). MTX 369 was produced February 24, 2005. MTX 707.

17

Directors. The document retention policy provides that Board materials are only required to be kept for three years and minutes are only kept in final form.[72] As a result, documents related to Board meetings were destroyed under the policy. For example, notes regarding Board of Directors meetings, such as those taken by Harmon, would have been destroyed.[73]

## I.   Rambus Destroyed Files from Dr. Horowitz's Office (Item 7) And Documents Concerning the Invention of Rambus's Technology (Item 8)

It is undisputed that, after the adoption of the document retention policy, a Rambus employee went into Horowitz's office and discarded materials Horowitz had left there when he ceased full-time work in 1991.[74] There is no inventory of these materials.[75] Instead, Rambus relies on founder Horowitz's memory ten years later to claim there was little left in his office. This claim is unreliable. The first entry in Horowitz's notebook that was produced in this litigation begins on August 1, 1990, months after he developed his purported inventions and drafted and filed the original patent application.[76] Horowitz claims that no earlier records exist because he took notes on pieces of paper and on a computer prior to August 1, 1990.[77] Horowitz, however, offered no explanation why his practice changed. Moreover, Horowitz admitted that notes left in his office may have been destroyed pursuant to the document retention policy.[78]

Documents concerning the invention that were destroyed would also include materials from inventor Farmwald. One of the documents Rambus cites in its chart of documents, MTX 136, is a telling email regarding the timing of Farmwald's invention. It discusses whether he had the idea while at another employer, MIPS, and subject to an invention agreement. It was destroyed,

---

[72]   MTX 337.
[73]   2 Hr. Designations, Harmon, 135:7-22, 140:17-141:3, 144:10-16.
[74]   Horowitz, 1233:8-12, 1233:12-1234:5.
[75]   Horowitz, 1234:15-19.
[76]   Horowitz, 1260:11-1261:3, RTX 81.
[77]   Horowitz, 1261:4-11.
[78]   Horowitz, 1263:21-1264:2.

recovered from a backup tape, and first produced in 2005.[79]

Moreover, Hampel's testimony that employees were told to destroy documents related to problems with patentability further proves that documents about the invention would have been destroyed.

## V.   THE RAW NUMBER OF DOCUMENTS PRODUCED AND COUNSEL'S STATEMENTS IN TRIAL PROVIDE NO INDICATION OF WHAT RAMBUS DESTROYED

Rambus argues that statements by counsel in another case show Micron was not prejudiced. Rambus quotes counsel at the recent trial in the Northern District of California, who stated that there was a "pretty good written record of what was going on in the '90s in terms of how Rambus got its monopoly power." RB, at 6. First, this statement only relates to the fact that Rambus attended JEDEC meetings and filed claims to cover the standards. Second, this statement was made by counsel for Hynix, a party that did not prevail on its unclean hands defense. Third, Rambus fails to point out that Micron and its co-defendants were prohibited from referring to spoliation at the trial in the Northern District of California and had to try the case based on the available evidence.

Rambus next relies on its production of many documents in this case to argue Micron was not prejudiced. RM, at 6. Rambus fails to address whether the documents produced are dated before or after the shred days, what topics they relate to and whether they even came from Rambus's files. Without any detail regarding the produced documents, the total number is meaningless.[80] Rambus employs the same sleight of hand by pointing to the size of Micron's initial exhibit list for the unclean hands trial. RM, at 7. It fails to inform the Court that the initial exhibit list included a range of materials that were never in Rambus's files, such as production letters, privilege logs,

---

[79]   MTX 718.

[80]   Rambus also tries to shoehorn in evidence from the Hynix trial by citing to the portion of the opinion in that case regarding the scope of the document production. This evidence was never introduced at trial and should not be considered.

19

discovery responses, expert reports, and articles drafted by Rambus's experts.   Proposed Final

Pretrial Order at 22, Exh. E (D.I. 912).   It is not indicative of what Rambus destroyed.

## VI.   THE DESTROYED DOCUMENTS RELATE TO MICRON'S DEFENSES, INFRINGEMENT AND DAMAGES

Micron's Opening Brief delineated in detail how the documents Rambus destroyed relate to

each of its defenses in this action, as well as damages.   Rambus's claim that the materials it

destroyed were irrelevant to this case contradicts its own witnesses' testimony.   For example,

Rambus in-house lawyer Neil Steinberg testified that a hold was needed because discoverable

documents relevant to patent litigation were being destroyed under the document retention policy.[81]

Rambus also conveniently glosses over the defenses Micron is asserting.   Rambus does not

even address Micron's defense that Rambus is not the legal owner of the patents and Micron's

defense of inequitable conduct based on Rambus's failure to cite prior art and to disclose material

information regarding the inventors' prior work.   Rambus destroyed materials relevant to these

defenses.   MB, at 21, 23-24; *see, e.g., Dippin' Dots, Inc v. Mosey*, 476 F.3d 1337, 1347 (Fed. Cir.

2007), *cert. denied*, 128 S. Ct. 375 (2007) (recognizing court can consider draft patent applications

in assessing failure to disclose prior art) (*citing Nobelpharma AB v. Implant Innovations, Inc.*, 141

F.3d 1059 (Fed. Cir. 1998), *cert. denied*, 525 U.S. 876 (1998)).

Rambus next asserts that the bulk of evidence of infringement and damages would come

from Micron's files.   This is incorrect.   Rambus itself would possess a variety of materials relevant

to these topics.   Documents in destroyed licensing files would reveal positions that Rambus and

licensees, or potential licensees, took regarding the interpretation of the patents and the value of the

patents.   *See, e.g., Intel Corp v. Commonwealth Scientific*, 455 F.3d 1364, 1371 (Fed. Cir. 2006)

(observing that the defendant's "representations as to the scope and validity of the '069 patent when

---

[81]   Steinberg, 861:2-23.

it offered licenses . . . are central to [plaintiffs'] claims of infringement, invalidity and patent misuse.").

In addition, documents reflecting what Rambus understood about the financial situation and market prospects of its licensees would also have been destroyed. Such documents are pertinent to an assessment of why certain companies agreed to Rambus's royalty rates and the reasonableness of the rates. *See, e.g., Albert L. de Graffenried v. U.S.*, 25 Cl. Ct. 209 (Cl. Ct. 1992)(considering evidence of licensing negotiations in determining a reasonably royalty).

Destroyed documents from Rambus's patent prosecution files would shed light on Rambus's construction of its claims and, as a result, on infringement. For example, destroyed documents from the patent prosecution files would discuss the scope of the invention, which is directly relevant to the proper interpretation of the claims. Emails and other correspondence would address the same issues. Even Rambus concedes that prosecution histories are relevant to claim construction. RB, at 7 n.2.

Rambus also argues that documents regarding patent validity are still available. Micron's Opening Brief sets forth what documents were destroyed that relate to Micron's defense of invalidity under 35 U.S.C. §§ 102 and 103, based on anticipation and obviousness, and invalidity under 35 U.S.C. § 112 for failure to comply with the written description requirement. The relevant materials that Rambus destroyed include correspondence, emails, negotiation materials under Rambus's patents, patent files and materials related to the purported invention.

Moreover, Rambus's characterization of what documents still exist is inaccurate. On validity, Rambus claims it produced drafts of patent applications, but only cites to one such produced document, which it recovered from a backup tape.[82]  There is no evidence that draft

---

[82]   RAMTX 206 (MTX 774 (indicating production from backup tape).

applications were preserved in general and Vincent testified that they were destroyed.[83]   Rambus also claims that it saved documents related to prior art, but the evidence suggests otherwise.   *See* Section IV.E., *supra*.

Rambus next asserts that documents regarding enforceability were produced, apparently relying on the fact that some of Mr. Crisp's JEDEC emails were fortuitously located.   These emails are only a small subset of the documents that would have existed at Rambus regarding JEDEC.   As stated above, Rambus's witnesses and attorneys testified JEDEC documents were destroyed.   The destruction would have extended to e-mails and correspondence regarding Rambus's understanding of the disclosure expectations of JEDEC members.

Rambus also argues in a footnote that the jury's finding in the Northern District of California renders JEDEC documents of questionable relevance.   RB, at 8 n.3.   The jury, however, was not allowed to consider Rambus's spoliation.   Its decision may have been different if it knew that critical documents were destroyed.   Indeed, the jury's decision further proves that Micron has been prejudiced.   While Rambus cites other decisions too, it does not assert that they somehow bar Micron's defenses based on JEDEC misconduct.   There is no dispute that Judge Whyte allowed Micron to proceed to trial on its JEDEC defenses.   Indeed, Judge Whyte has not yet even ruled on Micron's implied license defense.

## VII.   THROUGH ITS LIST OF SPECIFIC DOCUMENTS ALLEGEDLY CLAIMED BY MICRON TO HAVE BEEN DESTROYED, RAMBUS ATTEMPTS TO MISDIRECT THE COURT

Rambus's chart of specific documents that it claims Micron alleges were destroyed is inaccurate.   Rambus incorrectly suggests that Micron's claim of prejudice is predicated on whether the ten specific documents referenced in Rambus's chart were destroyed.   Micron's claim of prejudice has never been based on this contention.   Rambus has taken a series of discovery

---

[83]   Vincent, 1323:13-1325:1.

22

responses out of context in order to artificially restrict and limit Micron's assertions about the types of evidence Rambus destroyed. Notably, Rambus never moved these discovery responses into evidence at trial.[84]

Rambus also fails to explain to the Court the background or origin of the ten categories of documents. They stem from a series of discovery responses by both Micron and Rambus. As demonstrated by the discovery documents attached to Rambus's brief, Micron first served a request for production on Rambus, seeking the ten documents now listed in Rambus's chart. (RB, Exh. C) Micron then served interrogatories asking Rambus to identify the bates numbers of any of the documents listed in the chart, if they existed. Rambus Inc.'s Responses to Plaintiff's Fifth Set of Interrogatories, Interrogatory No. 60 (MB, Exh. A).[85] Rambus then served discovery on Micron asking whether it contended that the documents listed in the chart had been destroyed. Micron's responses varied and it did not contend that all had been destroyed. (RB, Exh. B).

| Document(s) Listed in Rambus's Brief | Response to Rambus's Assertion |
|---|---|
| **Item 1.** <br> **Claim charts: claim charts related to Micron and Fujitsu products (MTX 802) (RFP No. 150 ¶ 1).** | Rambus's only basis for claiming that these charts exist is an entry on a privilege log. Micron objected at trial to Rambus's reliance on the logs given that it had never seen the documents and attorneys prepared the descriptions. William Price, 435:11-438:23. The court stated, referring to the privilege log entries, "It proves nothing." Judge Robinson, 436:6-436:8. Rambus's claim is also suspect because Rambus only referenced two privilege log entries when it was asked to identify these claim charts in discovery, but it now identifies four. (MB, Exh. A, Interrogatory No. 60, subpart 1). |
| **Item 2.** <br> **Notebooks, diagrams and models prepared by Dr. Farmwald and** | When Rambus was asked in discovery whether the documents referred to in MTX 136, an e-mail from inventor Farmwald, still existed, the only document it identified was "R0154182-R0154333." (MB, Exh. A, Interrogatory No. 60, subpart 2). |

---

[84] Rambus's effort to slip these responses into the record by attaching them to the second round of post-trial briefing should be rejected.

[85] Micron does not believe any of these discovery responses should be considered at this time, but Micron is including this response as an exhibit hereto so the Court has a full record if it considers the discovery responses. (Exh. A).

23

| Document(s) Listed in Rambus's Brief | Response to Rambus's Assertion |
|---|---|
| referenced in Farmwald 1995 a-mail (MTX 136) (RFP No. 150 ¶ 2). | This bates range corresponds to Mr. Farmwald's notebook, portions of which were marked at trial as RAMTX 71. As a result, its newfound identification of additional documents is suspect. Moreover, the email from Farmwald, MTX 136, states he had a notebook from the "early to mid-1998 period," but Rambus did not produce a notebook from this period. MTX 136 also refers to "fairly detailed diagrams." Rambus never identified the referenced diagrams in its discovery responses and, at trial, Mr. Farmwald did not identify the diagrams he was referencing in this email. Mr. Farmwald's claim that the models were not left at Rambus is unreliable given his bias. As the Court will recall, he went out of his way to assist Rambus. He testified in response to Rambus's questioning that royalty rates were considered by the Board and he was involved in setting them, but was impeached with prior testimony that he had no involvement in setting rates. Farmwald, 1663:24-1664:12; 1688:17-1690:19. |
| Item 3. Documents referenced in Diepenbrock e-mail (MTX 196) (RFP No. 150 ¶ 3). | MTX 196, an e-mail from Anthony Diepenbrock, was not even moved into evidence at the trial and is not on the list of admitted exhibits. Notably, Rambus responded to Micron's interrogatory asking that it identify the documents listed in MTX 196 by referring to an entry on its privilege log. (MB, Exh. A, Interrogatory No. 60, subpart 3). Accordingly when Rambus asked Micron if the documents had been destroyed, Micron responded that it was unable to determine whether the documents existed because Rambus had refused to produce them. Micron's Objections and Responses to Rambus Inc.'s Sixth Set of Interrogatories, dated July 31, 2006, Interrogatory 65, no. 2 (RB, Exh. B). The documents Rambus now references were destroyed and later recovered from back up tapes. They were initially listed on Rambus's privilege log. MTX 774. They were not produced by Rambus until June 27, 2006. MTX 991 at 14. Moreover, the testimony cited by Rambus does not establish that "P001C.doc," the second document referenced in this email, still exists and Rambus did not introduce this document into evidence. Rambus also argues that the '755 and P001C3 are irrelevant. RB, at 10. This is incorrect. They are in the family of patents that claim priority to the same application as the patents-in-suit. Cases hold that documents regarding patents that are ancestors to the patents in suit are relevant to the proper construction of the claims in the patents in suit. *See, eg., Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1167 (Fed. Cir. 2004)(upholding consideration of prosecution history of parent of patent in suit in construing claims); *Microsoft Corp. v. Multi-Tech. Sys., Inc.*, 357 F.3d 1340 (Fed. Cir. 2004)(considering |

24

| Document(s) Listed in Rambus's Brief | Response to Rambus's Assertion |
|---|---|
| | prosecution history of sibling patent in construing patent in suit), *cert. denied*, 543 U.S. 821 (2004). |
| **Item 4.** **Summary of patent applications disclosed to Intel (MTX 955) (RFP No. 150 ¶ 4).** | The document that references the summary, MTX 955, was not an admitted exhibit. Moreover, outside counsel Cunningham lacks any foundation to testify whether Rambus sent this document to Intel. Rambus also fails to point out that, in response to discovery requests regarding this document, Micron simply stated that "Rambus has not produced any evidence that these charts are the charts provided to Intel . . . . To the extent the documents Rambus cites are the documents responsive to subpart 4, these documents were produced late." (RB, Exh. B, Interrogatory No. 60, subpart 4.) |
| **Items 5 & 8.** **"In-progress" reverse engineering reports and Semiconductor Insights report on Samsung DDR SDRAM discussed in Rambus presentation (MTX 375) and Karp *Hynix* testimony (RFP No. 150 ¶¶ 5 & 8).** | Again, Rambus only identified one reverse engineering report in its discovery responses and it was a version of the report dated December 20, 1999. (MB, Exh. A, Interrogatory No. 60, subparts 5 and 8); MTX 419. At least one of the other reports Rambus now identifies was found in Mr. Karp's garage weeks before the trial and produced for the first time. Stone, 84:11-19; Karp, 411:20-412:7. This report was never located in Rambus's files. Again, Rambus also overstates Micron's contentions. Micron asserted in discovery responses that Rambus had not proven that the document it identified was in fact the referenced document and that, to the extent it was, it was produced late. (RB, Exh. B, Interrogatory No. 60, subparts 4, 8). Rambus also argues that a reverse engineering report related to a Samsung DRAM is irrelevant. Not so. Because the Samsung product being reverse engineered was designed to meet the same JEDEC standards as Micron's products, the findings would be relevant to Rambus's infringement claims against Micron. |
| **Item 6.** **Claim charts showing infringement of allowed Rambus patents identified in Rambus presentation (MTX 807) (RFP No. 150 ¶ 6).** | Rambus has once again changed its position from its discovery responses. In its discovery responses, it claimed that page 25 of the Rambus presentation marked as MTX 807 did not even reference a specific claim chart. (MB, Exh. A, Interrogatory No. 60, subpart 6.) Moreover, Micron proved Rambus destroyed claim charts. Mr. Karp testified that he marked up a Samsung datasheet to create a claim chart in late 1997 and that this document no longer exists at Rambus. Karp, 175:12-18; 431:7-432:18. |
| **Items 7 & 10.** **Datasheets: original DDR datasheets from 1996/97 time period discussed in Rambus e-mail (MTX 477) and Samsung datasheets mentioned in Karp's *Hynix*** | Rambus produced no response to Mr. Crisp's email seeking an original DDR datasheet that "hasn't fallen victim to the document retention policy" so there is no indication that any Rambus employee believed they possessed the requested documents. MTX 477. Moreover, Mr. Karp testified that he marked up a Samsung datasheet to create a claim chart in late 1997 and that this document no longer exists at Rambus. Karp, |

| Document(s) Listed in Rambus's Brief | Response to Rambus's Assertion |
|---|---|
| testimony (RFP No. 150 ¶¶ 7 & 10). | 175:12-18; 431:7-432:18. |

## VIII.   RAMBUS MISSTATES THE APPLICABLE LEGAL STANDARD REGARDING PREJUDICE AND UNCLEAN HANDS

Rambus tries to raise the bar in terms of what is required for a party to prove it was prejudiced by spoliation and to show unclean hands. A careful review of the pertinent authorities reveals that Rambus's position regarding the law on these two issue is flawed.

### A.   Rambus Seeks To Further Gain From Its Destruction With The Meritless Argument That Micron Must Specifically Identify The Documents That Rambus Destroyed And The Content Thereof

On the subject of prejudice, Rambus claims that Micron has the burden to show that the destroyed documents would have supported its defenses. RB, at 23. This proposition is refuted by the very case law Rambus quotes in its brief which only requires a showing of "plausible, concrete suggestions as to what [the] evidence might have been." *Schmid*, 13 F.3d at 80; *In re Wechsler*, 121 F. Supp. 2d at 423; *see also* RB, at 2. Establishing a plausible suggestion of what the destroyed information might have been is a far cry from the task Rambus purports to lay at Micron's feet.

Once this very modest burden is met--which Micron has most certainly done--the burden shifts to the destroying party to show by "clear and convincing" evidence that the documents destroyed were in fact of minimal import. *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 925 (1st Cir. 1988). As stated in *Anderson v. Cryovac*,

> A party who is guilty of, say, intentionally shredding documents in order to stymie the opposition, should not easily be able to excuse the misconduct by claiming that the vanished documents were of minimal import. Without the imposition of a heavy burden such as the "clear and convincing" standard, spoliators would almost certainly benefit from having destroyed the documents, since the opposing party could probably muster little evidence concerning the value of papers it never saw.

*Id.* at 925; *see also Estate of Leon Spear v. Commiss. of Internal Revenue Serv.*, 41 F.3d 103, 115 (3d Cir. 1994) (holding party should not be able to gain advantage by refusing to furnish

26

information).   Indeed, even the *Hynix* court adopted this burden-shifting approach.   *Hynix Semiconductor Inc. v. Rambus, Inc.*, 2006 WL 565893 (N.D. Cal. Jan. 5, 2006) (*citing Anderson*, 862 F.2d at 925).

Rambus's claim that Micron needs to show specifics about how the destroyed documents "would have been helpful" dramatically overstates the standard. RB, at 23. Identifying categories of destroyed documents is sufficient to show prejudice and to shift the burden to the spoliator. As stated in *Gates*, the party alleging spoliation need only show that "the lost materials had, or would have had, *some* relevance and materiality to the proceedings." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90, 105 (D. Colo. 1996); *see also In re Wechsler*, 121 F. Supp. 2d 404 (same). *Gates* cited to a series of cases where the document destroyed "fell within a category of documents which were relevant to the plaintiff's claims" and prejudice was established based on such a showing. *Gates*, 167 F.R.D. at 105 (*citing Telectron v. Overhead Door Corp.*, 116 F.R.D. 107 (S.D. Fla. 1987), *Wm. T. Thompson v. Gen. Nutrition Corp.*, 593 F. Supp. 1443 (C.D. Cal. 1984)).

The cases cited by Rambus are not to the contrary. *In re Hechinger Investment Co. of Delaware*, 489 F.3d 568 (3d Cir. 2007), simply states, without any description of the facts or what was allegedly destroyed, that the party alleging spoliation did not "identify any evidence that was destroyed . . . that would have aided [it]." *Id.* at 579. *Rhein-Hawes v. Vanguard Group, Inc.*, 2005 WL 3441228 (E.D. Pa. Dec. 14, 2005), is inapposite because the court was simply not persuaded that any relevant documents were even destroyed. In *Emerson v. Wetherill*, 1994 WL 249769 (E.D. Pa. June 1, 1994), the plaintiff was suing a police officer for sexual assault and the township for civil rights violations for allegedly failing to train the officer and ignoring prior acts of misconduct by the officer. The plaintiff sought a sanction on the grounds that certain records had been destroyed. *Id.* at *1. The court found no sanction warranted with respect to destroyed training

27

records because the presence or absence of training was irrelevant to her causes of action. *Id* at *2. With respect to the documents allegedly reflecting prior misconduct, the court found plaintiff had not made a direct or circumstantial showing that the documents contained relevant information. *Id* at * 3. Micron has certainly made such a showing here.

Rambus's cases from other jurisdictions are also unavailing. In *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806 (8th Cir. 2005), the court did not grant a sanction based on document destruction because the destroyed evidence--photographs of a truck--simply had no legal relevance to the party's claim. *Id* at 811-812. In *Riddle v. Liz Claiborne, Inc.*, 2003 WL 21976403 (S.D.N.Y. Aug. 19, 2003), a three page opinion, the court was skeptical as to whether the allegedly destroyed personnel documents ever existed. *Id* at *2. In assessing prejudice, the court simply pointed out that some of the allegedly destroyed documents were irrelevant to the plaintiff's employment discrimination action. *Id* at *2. Finally, the two paragraphs of *Flowers v. City of Minneapolis*, 2007 WL 2893349 (D. Minn. Sept. 28, 2007), which discuss spoliation give short shrift to prejudice because the court found no basis for finding the other required elements of spoliation. *Id* at *10.

**B.**    **Rambus's Statement Of The Law Regarding Unclean Hands Is Wrong**

As a transparent means to avoid liability for the conduct it cannot refute, Rambus also tries to raise the legal threshold for unclean hands by characterizing the doctrine as an "extreme sanction" applied only in the most "egregious" situations. RB, at 4. While Micron submits that Rambus's destruction of documents to further its litigation strategy is egregious and warrants an extreme sanction, this is not the appropriate legal standard. As stated by the Supreme Court, "[a]ny willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the [unclean hands] maxim . . . ." *Precision Instrument Mfg. Co. v Automotive Maintenance Machinery Co.*, 324 U.S. 806, 815 (1945). The Third Circuit cases cited by Rambus are limited to unfair competition claims. In

28

*Citizens Financial Group, Inc. v. Citizens National Bank of Evans City*, 383 F.3d 110 (3d Cir.

2004), a trademark and unfair competition case, the court required egregious misconduct to justify

the denial of injunctive relief (and to permit defendants' use of an infringing mark) "[b]ecause a

central concern in an unfair competition case is protection of the public from confusion. . . ." *Id* at

129. No such interest applies here. *Sanofi-Aventis v. Advancis Pharmaceutical Corp*, 453 F. Supp.

2d 834 (D. Del. 2006), also a trademark infringement and unfair competition case, cites *Citizens

Financial* without discussion. The Third Circuit has never required a heightened "egregious

misconduct" standard outside the context of unfair competition cases.[86]   Nor has the Supreme Court

ever adopted such a standard. All that is required is behavior that transgresses equitable standards

of conduct.

Rambus also argues for an elevated burden of proof for unclean hands. Contrary to

Rambus's assertion, the standard of proof for unclean hands is the same as that for most civil cases,

*i.e.*, a preponderance of the evidence. As the Supreme Court has stated:

> In a typical civil suit for money damages, plaintiffs must prove their case by a
> preponderance of the evidence. . . . [W]e have required proof by clear and
> convincing evidence where particularly important individual interests or rights are at
> stake. [proceeding to terminate parental rights; involuntary commitment proceeding;
> deportation]. By contrast, imposition of even severe civil sanctions that do not
> implicate such interests has been permitted after proof by a preponderance of the
> evidence.

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 387-391 (1983) (citations & quotations omitted);

*see also United States v. Local 560 of Int'l Bros. of Teamsters, Chauffeurs, Warehousemen, &

Helpers of Am.*, 780 F.2d 267, 280 n.12 (3d Cir. 1985) ("The language in *Huddleston* mandates the

---

[86]   Perhaps attempting to reconcile the *Citizens Financial* court's "egregious misconduct"
formulation with other Third Circuit and Supreme Court authority, the court in *Merisant Co. v.
McNeil Nutritionals, LLC*, 515 F. Supp. 2d 509 (E.D. Pa. 2007)—a false advertising case cited by
Rambus—defined egregious misconduct broadly. It held that "'[e]gregious misconduct' can take the
(footnote continued)

"preponderance standard in all but a few civil cases."). On this basis, courts have applied the "preponderance of evidence" standard to the defense of unclean hands. *See, e.g., Sec. Exch. Comm'n v. Elmas Trading Corp.*, 683 F. Supp. 743, 753 (D. Nev. 1987) (applying preponderance of evidence standard to unclean hands); *MDO Dev. Corp. v. Kelly*, 735 F. Supp. 591, 592 (S.D.N.Y. 1990) (same). The Third Circuit cases Rambus cites that apply a "clear and convincing evidence" standard are distinct as they involve trademark infringement and unfair competition--such as *Citizens Financial* and *Sanofi-Aventis*--and false advertising--*Merisant*.

Rambus also asserts that "[a]ccidental, inadvertent, or even grossly negligent destruction of relevant documents is not unclean hands." RB, at 26. This question is immaterial given that Micron alleges Rambus intentionally destroyed documents. Regardless, not a single case on which Rambus relies for this incorrect proposition even addresses the destruction of documents.

## IX. THE SANCTION OF HOLDING RAMBUS'S PATENTS UNENFORCEABLE AND DISMISSING ITS CASE IS APPROPRIATE

Rambus argues that cases granting the sanction of dismissal all involve the loss of unique evidence of critical importance to a party's case. RB, at 24 (citing *In re Wechsler*, 121 F. Supp. 2d 404; *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 594 (4th Cir. 2001)) . While the cases Rambus cites involved the destruction of a specific piece of critical evidence, the destruction in this case is comparable, given that Rambus destroyed numerous categories of relevant evidence and placed Micron at a severe disadvantage in defending against Rambus's claims. Courts have ordered dismissal for spoliation based on a party's destruction of a category of materials. For example, the court in *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 133-134 (S.D. Fla. 1987), found that the sanction of dismissal was appropriate where sales documents were destroyed.

None of the other cases cited by Rambus involve the type of far-reaching, orchestrated

---

form of 'fraud, unconscionability, or bad faith on the part of the plaintiff.'" *Id* at 531 (citations (footnote continued)

destruction of unique evidence that is at issue here. Rambus cites to the one page order in *Motown Record Co., LP v. DePietro*, 2007 WL 1725604 (E.D. Pa. June 11, 2007), to claim the sanction of dismissal is improper. The *Motown* opinion contains no discussion of the parties' allegations or how the destroyed evidence intersected with the plaintiff's claims. The court simply found in a footnote that plaintiff was able to obtain sufficient evidence from other sources to prove its infringement claims.[87] *Id.* at 1 n.1. Rambus also cites *Positran Manuf., Inc. v. Diebold, Inc.*, 2003 WL 21104954 (D. Del. May 15, 2003), where the Court sanctioned the defendant for destroying a set of handwritten notes by ordering an adverse inference instruction, not dismissal. The court apparently found, without providing any explanation or details of the evidence, that there was substantial other evidence available to the plaintiff. *Id.* at 4.

## X.   MICRON IS NOT ESTOPPED FROM SEEKING OTHER RELIEF AND IT HAS DEMONSTRATED ITS ENTITLEMENT TO AN ADVERSE INFERENCE

Rambus concedes that Micron stated in its Pre-Trial Order, submitted on August 25, 2006, that it reserved the right to seek a lesser sanction, such as an adverse inference jury instruction.[88] Rambus's claim that it was denied the opportunity to develop a response to this request is disingenuous. Rambus took absolutely no action in the intervening 14 months before the November 2007 trial to further explore this contention. Nonetheless, to assert that Micron is estopped from seeking any alternative form of relief, Rambus inexplicably cites three federal cases, none of which are relevant to the matter at hand. The only case cited from within the Third Circuit indicates that parties are required to identify their factual and legal contentions in a Joint Pre-Trial Order or in response to discovery. *Thorn EMI N. Am., Inc. v. Intel Corp.*, 936 F. Supp. 1186 (D. Del. 1996). Micron did so. The other two cases Rambus cites are not germane to the question of whether

---

omitted).

    [87]   The *Motown* court precluded defendant from offering certain testimony and argument at trial and also stated that it would give the jury an adverse inference instruction. *Id.*

Micron is entitled to seek alternate remedies. *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476-77 (5th Cir. 2001) (affirming grant of summary judgment on finding that plaintiff had formally waived only actionable claim in prior testimony); *Design Strategies, Inc. v. Davis*, 367 F. Supp. 2d 630, 633-34 (S.D.N.Y. 2005) (barring lost profits evidence due to supplier's complete failure to respond to discovery requests without any justification).

Rambus also dramatically overstates what is required for a spoliation inference jury instruction and incorrectly claims bad faith is needed. In the Third Circuit, all that is required for an adverse inference to be warranted is that the destroyed evidence was within the party's control, was actually suppressed or withheld, was relevant to the claims or defenses, and it was reasonably foreseeable that it would later be discoverable. *Mosaid*, 348 F. Supp. 2d at 336 (citations omitted); *Scott v. IBM Corp.*, 196 F.R.D. 233, 248-249 (D. N.J. 2000). In *Mosaid Technologies, Inc. v. Samsung Electronics Co., Ltd.*, 348 F. Supp. 2d 332 (D. N.J. 2004), the court held that proving "actual suppression" only requires a showing that the destruction was intentional, and the "offending party's culpability is largely irrelevant." *Id.* at 337-338.

Rambus also claims, citing to *Schmid*, that the logical underpinning of an adverse inference instruction--that evidence was not preserved because it was harmful--is not present in this case. This misstates the showing required for an adverse inference. *Schmid* holds that a court can presume evidence was harmful if it was destroyed while litigation was anticipated, not that a party needs to show it was harmful. *Schmid*, 13 F.3d at 78. Rambus also argues that *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326 (3d Cir. 1995), holds that bad faith is required for an adverse inference. RB, at 42. This is incorrect. The *Brewer* court simply rejected an adverse inference instruction because the missing documents at issue were lost in connection with the death of a

---

[88]   Micron also is entitled to its attorneys' fees and costs.

32

party's attorney and were not even destroyed intentionally. *Brewer*, 72 F.3d at 334.

Rambus's final assertion that Micron has failed to identify any missing evidence and, therefore, cannot obtain an adverse inference instruction is also flat-out wrong and is addressed in detail elsewhere in this brief.

## XI.   RAMBUS'S ARGUMENTS REGARDING LITIGATION MISCONDUCT IGNORE THE KEY EVIDENCE

Rambus claims that dismissal for litigation misconduct is reserved for extreme situations. The law, however, does not support Rambus's position. As explained in Micron's Opening Brief, the court weighs the various factors set forth in *Poulis v State Farm Fire & Cas Co* , 747 F.2d 863, 868 (3d Cir. 1984), to decide on an appropriate sanction. Even if Rambus's statement of the law were true, this case qualifies as extreme because of Rambus's pattern of deception. As explained in Micron's Opening Brief, providing false testimony at deposition, making false statements in briefs submitted to courts, and failing to produce documents, have all been held sufficiently grave to warrant a sanction that disposes of a party's claims. MB, at 46.

Rambus also states in its brief that it will wait until it receives Micron's Opening Brief to address Micron's claims of litigation misconduct. RB, at 39. As a result, most of the misconduct detailed in Micron's Opening Brief is not even addressed by Rambus. Rambus tries to explain away its witnesses' false deposition testimony in general by pointing out that they were deposed many times. This claim falls flat. Messrs. Crisp, Steinberg and Tate offered false testimony at depositions taken in 2000 and 2001, soon after Rambus initiated litigation. Moreover, the incorrect testimony about the shred days was offered by 30(b)(6) witnesses who were testifying on behalf of the company in 2001 and 2003. Rambus argues that Micron's litigation misconduct claim relies on "snippets of testimony" and "imposes an unrealistic expectation of perfection" on the witnesses. RB, at 40. It is not unrealistic to expect the truth. As set forth in Micron's Opening Brief, the false and erroneous testimony from Rambus's witnesses was part of a deliberate effort by Rambus to hide

33

the truth, and many of Rambus's false statements would have never been revealed without piercing orders.

The only example of litigation misconduct that Rambus addresses specifically is Allen Roberts' statement that Rambus was not a member of JEDEC. On January 23, 2001, Allen Roberts testified at deposition that "up until" 2000, he "wasn't aware that we [Rambus] were a member" of JEDEC.[89] This was shown to be false when, after the March 7, 2001 piercing order in *Infineon*, Rambus produced Lester Vincent's March 27, 1992 notes of a conference with Crisp, Rambus's JEDEC representative, and Roberts that state, "Rambus is a member of JEDEC" and that "Allen [Roberts] is obtaining JEDEC bylaws."[90] Even after seeing the notes, Roberts continued to testify that he did not recall requesting JEDEC's bylaws or that Rambus was a member of JEDEC.[91] While admittedly Micron knew that Rambus was a member of JEDEC and that Roberts' purported understanding was untrue, Micron was still forced to devote time and resources to demonstrating that Roberts' claim about his own mindset was false.

Rambus also claims that the litigation misconduct that took place in other cases did not prejudice Micron. Micron's Opening Brief details how lies and misconduct in parallel proceedings harmed Micron. MB, at 47-49. Indeed, this argument and the authorities cited in Rambus's brief were the subject of a motion *in limine*. After considering the same authorities Rambus cites in its brief, the Special Master found,

> [W]ere Rambus to prevail in any one suit, it would be in a stronger position to persuade other DRAM manufacturers to enter into a license or to enter other suits in a stronger position at least at the preliminary injunction stage. It is, therefore, conceivable that proven misdeeds in prior litigation were part of a purposeful plan to

---

[89]  MTX 1015; 154:10-155:5.
[90]  MTX 42; Vincent, 1353:14-1354:9; MTX 953.
[91]  Roberts, 1091:3-13.

lay a foundation for success in suits similar to this suit.[92]
Micron proved at trial that Rambus planned to leverage an early victory to its advantage.

The case cited by Rambus, *In re New Valley Corp*, 181 F.3d 517, 525 (3d Cir. 1999), is unavailing. It states that the unclean hands doctrine only requires that "the alleged inequitable conduct must be connected, *i.e.,* have a relationship to the matters before the court for resolution." Indeed, the Supreme Court has upheld a finding of unclean hands based on inequitable conduct in a prior case. *See Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 246 (1933). Finally, *Bio-Technology Gen'l Corp. v Genetech, Inc.*, 80 F.3d 1553 (Fed. Cir. 1996), is inapposite because there was no showing that the alleged prior misconduct concerned a matter before the court. *See id*

## Conclusion

Rambus's brief ignores and contradicts much of the evidence presented at trial. Micron has made a compelling showing that it is entitled to a finding that Rambus's patents are unenforceable due to its spoliation and litigation misconduct.

*Of Counsel:*
William C. Price
Robert J. Becher
QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
(213) 443-3000

Jared Bobrow
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065-1175
(650) 802-3000

Dated: August 4, 2008

*Anne Shea Gaza*

Frederick L. Cottrell, III (#2555)
Cottrell@rlf.com
Anne Shea Gaza (#4093)
Gaza@rlf.com
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
(302) 651-7700

*Attorneys for Plaintiffs and Counterclaim Defendants Micron Technology, Inc. and Micron Semiconductor Products, Inc.*

---

[92] Special Master's Report and Recommendations on Micron's Motion in Limine Regarding Allegation of Misconduct in Other Cases at 7-8 (D.I. 1015). This order was approved on September 26, 2007.

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2008, I electronically filed the foregoing with the Clerk of

Court using CM/ECF which will send notification of such filing(s) to the following and which has

also been served as noted:

### BY HAND & BY EMAIL

Mary B. Graham, Esquire
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P. O. Box 1347
Wilmington, DE  19899-1347


I hereby certify that on August 4, 2008, the foregoing document was sent to the following

non-registered participants in the manner indicated:

### BY E-MAIL

Gregory P. Stone, Esquire
Munger Tolles & Olson LLP
355 South Grande Avenue
35th Floor
Los Angeles, CA  90071

Charles W. Douglas
Thomas K. Cauley, Jr.
Brian A. McAleenan
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

Rollin A. Ransom
Michelle B. Goodman
Sidley Austin LLP
555 West Fifth Street
Los Angelos, CA 90013


Anne Shea Gaza (#4093)
gaza@rlf.com