# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICRON TECHNOLOGY, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| RAMBUS INC., ) | |
| ) | |
| Defendant. ) | |
| ) | Civ. No. 00-792-SLR |
| RAMBUS INC., ) | |
| ) | |
| Counterclaim Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| MICRON TECHNOLOGY, INC., ) | |
| MICRON ELECTRONICS, INC., and ) | |
| MICRON SEMICONDUCTOR ) | |
| PRODUCTS, INC., ) | |
| ) | |
| Counterclaim Defendants. ) | |

Frederick L. Cottrell, III, Esquire, and Anne Shea Gaza, Esquire of Richards, Layton & Finger, PA, Wilmington, Delaware. Counsel for Plaintiff/Counterclaim Defendants. Of Counsel: William C. Price, Esquire, and Robert J. Becher, Esquire of Quinn Emanuel Urquhart Oliver & Hedges, LLP, and Jared Bobrow, Esquire of Weil Gotshal & Manges LLP.

Mary B. Graham, Esquire, and Rodger D. Smith II, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Defendant/Counterclaim Plaintiff. Of Counsel: Gregory P. Stone, Esquire, of Munger, Tolles & Olson LLP, and Charles W. Douglas, Esquire, Thomas K. Cauley, Jr., Esquire, Brian A. McAleenan, Esquire, Rollin A. Ransom, Esquire, and Michelle B. Goodman, Esquire of Sidley Austin LLP.

**MEMORANDUM OPINION**

Dated: January 2, 2013
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

The instant action arises from a patent dispute between Micron Technology, Inc.,
Micron Electronics, Inc., and Micron Semiconductor Products, Inc. (collectively,
"Micron") and Rambus Inc. ("Rambus") over Micron's alleged infringement of twelve
Rambus patents: U.S. Patent Nos. 5,915,105; 5,953,263; 5,954,804; 5,995,443;
6,032,214; 6,032,215; 6,034,918; 6,038,195; 6,324,120; 6,378,020; 6,426,916; and
6,452,863 (collectively, "the patents-in-suit"). The court trifurcated the case (D.I. 739)
and held a bench trial in November 2007 on the issues of Rambus' alleged spoliation of
evidence and unclean hands and the appropriate sanction, if any, arising from those
allegations.

Following post-trial briefing, the court issued an opinion dated January 9, 2009
holding that Rambus had engaged in unlawful spoliation of discoverable documents and
that the patents-in-suit were unenforceable against Micron as a result. *Micron Tech.,
Inc. v. Rambus Inc. (Micron I)*, 255 F.R.D. 135, 150-51 (D. Del. 2009). Rambus
subsequently appealed, and the Court of Appeals for the Federal Circuit affirmed in
part, vacated in part, and remanded the case. Presently before the court is the
consideration of the case on remand. The parties have briefed the remanded issues,
and the court held oral argument on January 26, 2012. For the reasons that follow, the
court finds that Rambus' spoliation was done in bad faith and caused prejudice to
Micron. Furthermore, the appropriate sanction is to declare the patents-in-suit
unenforceable against Micron.

## II. BACKGROUND[1]

### A. The Parties and the Underlying Technology

Rambus, which has described itself as a company employing semiconductor, system architecture, and system packaging technologies, was founded in March 1990 by Professors Mike Farmwald and Mark Horowitz. (MTX 48 at 0003; RAMTX 212 at 0004) In April of that year, Farmwald and Horowitz filed a patent application on behalf of Rambus, relating to inventions for improving the speed with which computer memory can function. *Micron II*, 645 F.3d at 1316. All of the patents-in-suit are continuation or divisional applications based on that application and cover various aspects of dynamic random access memory ("DRAM"). (D.I. 1061 at 1134:6-17; 1357:15-1358:21) Rambus' plan was to license its proprietary DRAM technology, called Rambus DRAM ("RDRAM") to DRAM manufacturers and, ultimately, to achieve industry-wide adoption of RDRAM. (D.I. 1061 at 1226:6-17, 1247:4-1248:4, 1123:3-24:23, 1124:12-23; D.I. 1062 at 1656:3-9)

Micron manufactures DRAM computer chips, including two common types of DRAM: synchronous DRAM ("SDRAM") and double data rate SDRAM ("DDR SDRAM") (collectively, "SDRAM products"). (D.I. 1022) Micron asserts that its SDRAM products do not infringe the patents-in-suit. (*Id.*) Rambus, however, believes its inventions are broad enough to encompass SDRAM. *Micron II*, 645 F.3d at 1315.

---

[1]A more detailed description of the facts is set forth in both this court's previous opinion, *Micron I*, 255 F.R.D. at 137-48, and the Federal Circuit's opinion, *Micron II*, 645 F.3d at 1315-19. The court indicated during oral argument on January 26, 2012 that it would not disturb its factual findings because the Federal Circuit's opinion only required this court to explain its analysis more clearly. (D.I. 1150 at 34:19-22, 44:14-18) Accordingly, the court's analysis on remand is confined to the scope of the findings of fact already of record.

## B. Rambus' Participation in JEDEC

In 1991, Micron and Rambus, along with "all the major people in the electronics business," began meeting through the Joint Electronic Design Engineering Council ("JEDEC"), to discuss and adopt industry-wide standards for computer memory chips. (D.I. 1058 at 160:16-161:4; MTX 203 at 2) The standards adopted by JEDEC are meant to be open standards, meaning that, unless the holder of an intellectual property right has disclosed during the standards setting process that it has that right and agrees to license the technology for free, or at least on reasonable, nondiscriminatory terms, the holder waives its right. (D.I. 1058 at 161:12-165:8; MTX 203 at 2; MTX 808-0018)

One of the standards that JEDEC representatives sought to adopt was for what became SDRAM. (D.I. 1058 at 171:15-18) As early as 1992, Rambus learned of SDRAM and viewed it as a competing product. (MTX 48; MTX 56; D.I. 1062 at 1655:5-21) Rambus also became concerned that DRAM manufacturers were using Rambus' RDRAM technology to develop their own competing DRAM technology. (D.I. 1060 at 798:12-22, 686:2-13; D.I. 1061 at 1133:5-19, 1135:7-13, 1082:2-1083:9) From 1991 to 1995, Rambus representatives took information learned at JEDEC meetings and passed it along to Rambus' patent prosecution counsel in an effort to solidify and extend Rambus' patent claims to cover SDRAM and other potentially competing memory types. (D.I. 1060 at 693:23-695:21; see also id. at 724:23-725:18, 736:9-21, 798:12-799:8, 806:24-807:14; RAMTX 069; RAMTX 85; MTX 40) Rambus attended its last JEDEC meeting in December 1995 and formally resigned in June 1996. (D.I. 1060 at 791:7-15; D.I. 1071 at 223:1-10; MTX 214)

## C. Rambus' Business Strategy

3

## 1. Rambus formulates its strategy

Thereafter, Rambus pursued a two-prong business strategy: (1) it licensed chip makers to manufacture chips that complied with Rambus' RDRAM standards; and (2) it prepared to demand license fees and to potentially bring infringement suits against those manufacturers who insisted on adopting the competing SDRAM standard. (MTX 279 at ¶ 18(C); *see also* D.I. 1060 at 751:3-13) Statements made by Rambus employees in 1996 and 1997 reveal that Rambus planned to create a patent "minefield" that it could use to its advantage in dealing with other companies in the industry. (MTX 253; MTX 183; MTX 235)

In 1996, Intel agreed to use RDRAM with its microprocessors. (D.I. 1061 at 1128:22-29:5; D.I. 1062 at 1619:17-1620:2; RAMTX 241) The Intel agreement was significant to Rambus because, at that time, Intel's microprocessors and chipsets represented nearly half of the total DRAM market. (D.I. 1061 at 1127:14-17, 1128:13-18) Rambus also entered into licensing agreements for RDRAM with eleven of the twelve major DRAM manufacturers, including Micron, with the goal of developing a new version of RDRAM, called Direct RDRAM, with these manufacturers. (*Id.* at 1129:13-1130:6, 1148:3-8; RAMTX 67)

## 2. Rambus Hires Joel Karp

In October 1997, Rambus hired Joel Karp as Vice President of Intellectual Property to work on a licensing program for non-Rambus technologies, including SDRAM and DDR SDRAM, that Rambus CEO Geoff Tate thought infringed Rambus' patents. (D.I. 1058 at 154:1-4, 171:19-175:1, 291:23-292:1) Karp was responsible for "assessing [the Rambus] patent portfolio, determining when chips infringe [the Rambus]

4

patent portfolio, setting licensing strategies for infringing chips, and . . . negotiat[ing] with companies that build and sell infringing chips." (RAMTX 6) When Rambus hired Karp, Tate told him that any company wanting to license Rambus' present and future patents for infringing DRAM would have to pay a royalty greater than the royalty for RDRAM. (MTX 263) Rambus wanted to be able to "[g]et all infringers to license [its] IP with royalties [greater than] RDRAM . . . OR sue." (MTX 279 at ¶ 18(C); see also D.I. 1060 at 751:3-13)

### 3. Karp Meets with Cooley Godward Attorneys

In developing a strategy for Rambus, Karp called Diane Savage, an attorney in the Cooley Godward law firm's technology transactions group with whom he had previously worked, and asked to be referred to a litigator. (D.I. 1059 at 597:9-598:15, 441:7-19) Savage arranged a meeting for him with Dan Johnson, a litigation partner at Cooley Godward. (Id. at 599:1-7) Johnson's practice consisted primarily of patent litigation, trade secret litigation, and licensing litigation. (D.I. 1062 at 1479:3-11) Other Cooley Godward attorneys on the team that advised Rambus included John Girvin, who had primary responsibility for assisting Rambus; Peter Leal, who specialized in licensing matters; and William Winters. (RAMTX 83; D.I. 1062 at 1483:12-18, 1485:21-1486:12)

Although Cooley Godward identified its consultation with Rambus as concerning "licensing activity" (RAMTX 83), Leal's notes from a January 13, 1998 meeting indicate that Rambus wanted the following: "litigation strategy by [the] March board meeting," "[n]o negotiations [without] full strategy and prep[aration]," "[g]o in quickly [and] proceed to either a license or litigation," "[t]ry win-win first; do not prejudice [good faith] for litigation," "[l]ook[] for royalty rate that tells them it costs to infringe," and "[g]o to first

5

meeting but be ready (in advance) to go to litigation." (MTX 285 at 0001; D.I. 1058 at 187:18-188:2; D.I. 1059 at 615:9-616:5, 616:22-618:15, 622:12-623:20, 624:9-625:9, 628:24-629:15) Two days later, Karp met again with Leal and communicated his belief that two of Rambus' patents were being infringed. (MTX 287) Karp also brought a "claim chart" outlining some of his evidence of infringement. (Id. at 0003; D.I. 1058 at 175:12-18, 178:5-179:12)

On February 12, 1998, Karp met with Johnson, Leal, and Girvin. (MTX 290; see also MTX 304 at 0001; D.I. 1058 at 196:24-197:6, 199:23-200:16) Karp discussed both licensing and litigation strategies with the attorneys, but discussion of litigation strategy predominated. (MTX 290; MTX 506) Specific to litigation, Karp and the attorneys conferred about preparing trial graphics and claims; retaining experts; and building a case against potential litigation targets, including Micron,[2] Fujitsu, Samsung, and Hyundai. (MTX 290; MTX 506; D.I. 1058 at 198:24-199:16) They also discussed that Rambus would "[n]eed to litigate against someone to establish [a] royalty rate and have [a] court declare [the Rambus] patent[s] valid" and that a planned royalty rate of five percent would "probably push [Rambus] into litigation quickly." (MTX 290)

In this regard, Karp and the attorneys discussed gathering critical documents and implementing a document retention policy. (Id.; MTX 506; D.I. 1058 at 198:24-199:16) In his meeting notes, Karp characterized the implementation of a document retention

---

[2]At the time he was hired, Karp believed that any attempt to negotiate a license with Micron would result in litigation. (D.I. 1058 at 229:20-230:13; see also id. at 228:7-15)

policy as making Rambus "battle ready."[3] (MTX 290; D.I. 1058 at 211:13-212:15; D.I. 1062 at 1493:19-1494:5)

Shortly thereafter, Johnson prepared a memorandum outlining Rambus' proposed licensing and litigation strategies. (MTX 293 at 0001; MTX 304 at 0002) The memorandum discussed Rambus' competitors, features of the licensing program, a hierarchy of potential licensees and, in the event that licensing efforts failed, a tiered litigation strategy contemplating litigation in fora that "proceed at an accelerated schedule," making early preparation advantageous for Rambus. (MTX 293; see also D.I. 1059 at 444:17-445:9; D.I. 1062 at 1501:20-1503:7)

## 4. Karp presents the licensing and litigation strategies, which included a document retention policy, to the Rambus Board

On March 2, 1998, Karp presented the licensing and litigation strategies to the Rambus Board. (MTX 295; D.I. 1058 at 214:2-19; D.I. 1061 at 1269:14-1270:11) Karp proposed seeking an up-front payment and a five percent running royalty from licensees of non-compatible products, with incentives and penalties tied to licensees' production rates, and outlined the mechanics of the licensing negotiation.[4] (MTX 295 at 0001-

_____

[3]Johnson testified that he commonly advised clients to adopt a document retention policy but that "battle ready" was not a phrase he used. (D.I. 1062 at 1493:19-1494:5, 1498:24-1499:19)

[4]Rambus had charged RDRAM licensees a royalty rate of one to two percent. (D.I. 1071 at 216:15-18, 216:24-217:2) Johnson testified that Karp's suggested royalty rate was a "ridiculous number" "north of four percent" and recalled thinking that, if Rambus insisted on that rate, it would not "have a licensing program [but instead would have] a lawsuit on [its] hands." (D.I. 1062 at 1491:23-1493:18) Johnson was not aware of Tate's instruction to Karp to set a royalty rate that would show competitors that "it would cost to infringe." (Id. at 1555:18-1556:8, 1558:2-14, 1562:7-1563:5, 1568:14-1569:1) Karp believed that companies would "fiercely resist" five percent running royalty rates on licenses for non-compatible products (D.I. 1058 at 244:3-11), and Tate acknowledged that a five percent rate would possibly lead a potential licensee to reject

7

0002, 0006) Karp also explained the litigation strategy to be implemented if licensing

discussions failed, including Rambus' available causes of action and potential

defendants and fora. (Id. at 0003-0005) Finally, he proposed a timeline for the

strategies to play out and identified near term actions, including implementation of a

document retention policy, that were necessary to prepare for the "upcoming battle."[5]

(Id. at 0007-0008; see also D.I. 1058 at 241:2-10, 246:5-247:4, 260:14-261:14) In

March 1998, Savage sent Karp a memorandum ("the Savage memo") outlining general

considerations for creating a document retention policy.[6] (MTX 300; D.I. 1059 at 599:8-

600:9) Rambus then proceeded to implement Karp's suggested licensing and litigation

strategies.

## D. The Path to Litigation

### 1. Rambus learns about Intel exploring non-RDRAM options

On April 14, 1998, Tate and a colleague met with an Intel executive to discuss

the two companies' future relationship. (MTX 307) Tate summarized Intel's message at

this meeting thus: "[I]ntel says they are basically going to compete with us on next

generation [of DRAM]." (Id. at 1) Tate's notes indicate that Intel was considering

the licensing offer. (D.I. 1060 at 717:14-718:3) A memorandum that Karp wrote in late
1998 or early 1999 discussed using royalty rates in the "5-10% range, in cases where
[Rambus] is not interested in settling." (MTX 763 at 0004)

[5]Karp testified that he was not aware of a document retention policy being
discussed at Rambus prior to March 1998. (MTX 295 at 242:13-243:12)

[6]In April 1998, at Karp's request, Kroll Ontrack, Inc. performed an on-site
information security audit of Rambus. (D.I. 1062 at 1430:7-1431:16, 1436:5-21; RAMTX
99) Following the audit, Kroll recommended that Rambus "[w]ork[ ] with counsel . . . [to]
create a written plan covering how long various classes of files should be held."
(RAMTX 99 at 0026; D.I. 1062 at 1441:20-1446:1)

8

"whether to do RDRAM or extend/modestly improve [SDRAMs]." (*Id.* at 2) Tate's notes also capture Intel's belief that the "[R]ambus business model [of charging royalties] [was] fundamentally at odds with what the [DRAM] industry wants" and that it was "never guaranteed [Intel would] use Rambus forever." (*Id.* at 3-4) Tate understood that Intel, if it could develop a "best solution without using Rambus IP," would "use [the non-Rambus solution] and freeze out [R]ambus." (*Id.* at 6) Tate noted that, if DRAM companies found out that Intel was investigating next generation DRAM without Rambus, it might cause them to not want to work with Rambus on the next generation DRAM which could, in turn, "force [Rambus] to play [its] IP card with the [DRAM] companies earlier." (*Id.*) In May 1998, Karp asked Johnson and others at Fenwick & West[7] to consider potential litigation targets, including Micron and Hyundai. (MTX 345 at 0005-0007; D.I. 1058 at 255:13-256:13, 257:9-19)

### 2. Rambus continues in "stealth mode" to strengthen its patent portfolio and continue reverse engineering efforts

In August or September 1998, Rambus retained attorney Neil Steinberg as outside counsel. (D.I. 1060 at 835:4-7) Steinberg's work for Rambus included patent prosecution, licensing, and litigation preparation.[8] (*Id.* at 835:4-836:15; 837:16-24; MTX 375 at 0001)

---

[7]Johnson left Cooley Godward to join the law firm of Fenwick & West sometime after February 1998. (D.I. 1058 at 236:6-14) Karp continued to work with Johnson on Rambus' litigation preparations (MTX 345 at 0005-0007) but stopped dealing with Girvin and Leal soon thereafter. (D.I. 1058 at 236:10-237:15)

[8]Steinberg later performed this work as in-house counsel for Rambus, beginning in April 1999. (D.I. 1060 at 833:16-837:12)

On October 16, 1998, Intel announced that it would invest $500 million in Micron to support Micron's commitment to producing Direct RDRAM, the new RDRAM technology. (RAMTX 273; D.I. 1061 at 1106:9-1107:13) In meetings held sometime in October or November 1998, Micron executives told Allen Roberts, Rambus' Vice President and General Manager of Technology and Memory Implementations, that Micron planned to be in "volume production with Rambus parts . . . by the second half of 1999." (D.I. 1061 at 1108:21-1109:24)

Later in October 1998, Karp made a revised strategy presentation to Rambus executives. (D.I. 1058 at 294:1-4; MTX 375) At that time, Rambus was helping its manufacturing partners to work toward mass production of Direct RDRAM. (D.I. 1061 at 1102:6-11) With mass production hopefully imminent and, with it, the establishment of a "dominant [DRAM] standard," Karp advised against commencing litigation in 1999, even though he believed Rambus could have sued multiple alleged infringers in Quarters 1 and 2 of 1999. (MTX 375 at 0004) Karp advised "DO NOT ROCK THE DIRECT BOAT," pointed out that there was no "rush" to sue infringers, and recommended that Rambus not assert its patents against its Direct RDRAM manufacturing partners until their investment in the technology had reached "the point of no return," which he believed would probably not occur until Quarter 1 of 2000. (Id. at 0004; D.I. 1058 at 294:22-295:2, 296:22-298:2, 299:10-20) Accordingly, Karp advised that Rambus should continue in "stealth mode" during 1999 to strengthen its patent portfolio – which Karp labeled as the "top priority" – and proceed with reverse engineering efforts. (MTX 375 at 0005; D.I. 1058 at 298:11-300:1)

### 3. Rambus' strategy in light of deteriorating relations with Intel

10

By the end of 1998, Karp was preparing strategies to enable Rambus to survive a termination of relations with Intel. *Micron I*, 255 F.R.D. at 150. Karp drafted and circulated a memorandum outlining what he thought Rambus' strategy should be in the "very unlikely" event that Intel cancelled its RDRAM production and moved instead to a competing technology – what Karp termed a "nuclear winter scenario." (MTX 763 at 0002; D.I. 1058 at 193:3-6, 196:20-22) In this regard, Karp identified potential litigation targets, causes of action, and fora if negotiations with Intel failed. (MTX 763 at 0003-0006; D.I. 1058 at 303:12-22) Karp's memorandum also indicated that Rambus had completed claim charts asserting infringement against Micron. (MTX 763 at 0003; *see also* MTX 802) This court found that due to reasonably foreseeable litigation, Rambus' duty to preserve documents attached around this time, no later than December 1998, when litigation became reasonably foreseeable. *Micron I*, 255 F.R.D. at 150.

In September 1999, Karp and Steinberg made a presentation to Rambus management entitled "IS THERE LIFE AT RAMBUS AFTER INTEL?" (MTX 801; D.I. 1058 at 326:7-22) The presentation slides stated that, with Rambus' relationship with Intel waning, Rambus "must increase the industry's perception of [its] value through aggressive assertion of [its] IP rights . . . [i]f Rambus is to have a future." (*Id.* at 0001-0003) The slides went on to state that, for Rambus intellectual property to earn respect, Rambus would need to substantiate its patent claims by either a lucrative licensing deal with an "industry powerhouse" or "winning in court." (*Id.* at 0004) The slides stated further that the "[b]est route to IP credibility was through victory over a major DRAM

11

manufacturer" and acknowledged that "[c]ompanies like Micron [would] fight us tooth and nail and . . . never settle." (MTX 801 at 0004-0005)

After this meeting, on September 29, 1999, Tate sent an email indicating that consensus had been achieved on, inter alia, the "need to sue a [DRAM] company to set an example . . . ." (MTX 464 at 0001-0002) On October 14, 1999, Karp made another presentation to the Board. (MTX 468; D.I. 1059 at 359:9-19) This presentation set out a detailed analysis of why Hitachi was the most desirable litigation target. (MTX 468; D.I. 1059 at 360:13-361:22) On October 22, 1999, Karp sent a letter to Hitachi asserting three of its patents that are also at issue in the instant case. (MTX 473 at 0001)

## E. Implementation of Rambus' Document Retention Policy

### 1. Degaussing of back-up tapes

On March 16, 1998, just prior to Rambus' meeting with Intel to discuss the companies' future relationship, Karp conveyed to Roberts "growing worries [that] email back-ups [might contain] discoverable information." (D.I. 1061 at 1076:19-1078:23; MTX 299) Roberts then sent an email to Joseph Lau, manager of the computer systems, instructing him to add a Quarter 2 goal about a back-up policy and to implement that policy in Quarter 2 or 3. (MTX 299) The back-up tapes stored information dating back to Rambus' inception.[9] (D.I. 1061 at 1154:16-23; D.I. 1071 at 271:21-272:2, 275:23-276:22) Roberts instructed that the back-up policy should address how often files were backed up, how long they were kept, and where they were

---

[9]Each back-up tape could store approximately 100,000 documents, including internal emails. (D.I. 1060 at 579:22-580:8; see also D.I. 1061 at 1156:7-16, 1170:17-1171:2)

stored. (MTX 299) One of the reasons for implementing the policy was to allow Rambus to purge documents, including emails, from its files that might have been discoverable in litigation. (*Id.*; D.I. 1061 at 1076:19-1078:23, 1181:19-1182:8)

On May 14, 1998, after meeting with representatives of Rambus' operating divisions and consulting with Johnson, whom Karp identified as litigation counsel for Rambus, Karp sent an email to Rambus employees announcing that, effective immediately, full system back-up tapes would be saved for only three months and that data to be saved beyond three months would need to be archived separately. (MTX 314; D.I. 1058 at 249:12-250:4) Karp also announced, by email, the imminent implementation of a company-wide document retention policy. (MTX 314) In the email, Karp invited employees with questions, comments, or suggestions regarding the document retention policy to not "hesitate to come by to talk about it." (*Id.*) However, he added that he preferred to discuss the issue face to face and that any emails on the subject should be brief and narrowly distributed. (*Id.*)

All but one of Rambus' 1270 back-up tapes were degaussed, or demagnetized, in July 1998. (MTX 326) Prior to degaussing the back-up tapes, a Rambus engineer showed Karp a document on his computer that would help establish a conception date for a Rambus invention. (D.I. 1058 at 263:23-264:4) The act of retrieving and displaying the document on the engineer's computer, however, automatically altered the date of the document. (*Id.* at 264:5-10) To preserve the document with its true date, Karp and/or other Rambus employees searched through tapes to find the back-up of the document. (*Id.* at 264:11-17) When the document was found, it was printed out, and

13

the tape was saved. (*Id.* at 264:18-23) The remaining 1269 back-up tapes were then degaussed. (MTX 326)

## 2. Rambus' company-wide document retention policy

On July 22, 1998, Karp emailed the company-wide document retention policy, which he had alluded to earlier, to Rambus employees. (MTX 337; D.I. 1058 at 266:6-11) Most of the policy's substance "came directly from the Savage memo in a cut and paste fashion." (D.I. 1059 at 416:6-15) It was "very unexceptional," that is, it was consistent with industry practice and was content neutral. (D.I. 1059 at 551:4-9; *see also id.* at 510:6-511:21)

Around that time, Karp and Johnson also made presentations about document retention to Rambus employees. (D.I. 1058 at 271:3-23) Johnson's slides from those presentations characterized the policy as a "Document Retention/Destruction Policy" and focused on the policy vis-a-vis litigation. (*Id.* at 272:7-275:10; MTX 333 at 0002) Rambus employees testified that one of the reasons cited for the document retention policy was preparation for litigation. (D.I. 1061 at 1181:19-1182:8; D.I. 1062 at 1451:2-10; D.I. 1071 at 101:6-102:6) At the bottom of several slides, contrary to Johnson's advice (D.I. 1062 at 1539:8-1540:16), Karp wrote "LOOK FOR THINGS TO KEEP." (MTX 343; D.I. 1058 at 267:17-23) In particular, Karp instructed Rambus engineers to look for things to keep that would help establish conception and prove that Rambus had intellectual property. (D.I. 1058 at 267:5-16) Along those lines, Karp also explained to the engineers that one category of documents they should not keep – that is, one of the things the document retention policy was targeted to expunge – was documents questioning the patentability of Rambus inventions. (D.I. 1061 at 1303:21-1304:14)

14

After this presentation, Johnson did not advise Rambus further regarding document

retention. (D.I. 1062 at 1575:16-24, 1576:15-21) Between August 1998 and November

1999, Johnson advised Rambus only sporadically, answering Karp's "random"

questions. (*Id.* at 1571:13-23)

### 3. The first "shred day"

On September 3, 1998, Rambus employees participated in an event dubbed

"shred day," during which they destroyed documents pursuant to the company's new

document retention policy.[10] (D.I. 1058 at 283:14-284:13; D.I. 1059 at 526:15-20; MTX

368) David Rhoades, vice president of the company Rambus hired to shred the

documents, estimated that 400 banker's boxes-worth of documents were destroyed.

(D.I. 1062 at 1469:2-13; MTX 398 at 0027-0028)

Rambus employees did not keep records of what was destroyed during this, or

any subsequent, shred day. (D.I. 1058:285:9-24; D.I. 1060 at 813:23-814:1; D.I. 1061

at 1314:24-1315:11; D.I. 1071 at 119:19-23, 253:2–22) The trial record, however,

shows that they destroyed documents relating to, inter alia, contract and licensing

negotiations, patent prosecution, JEDEC meetings, Board meetings, and finances. (D.I.

1059 at 390:3-22; D.I. 1060 at 801:5-15, 802:9-14, 802:24-804:14, 817:3-10, 822:12-17;

D.I. 1061 at 1076:16-1077:1, 1140:19-22, 1141:3-1142:8, 1159:6-10, 1170:17-1171:11,

1307:23-1308:1, 1315:12-18, 1350:4-15; D.I. 1071 at 94:12-95:2, 99:4-14, 107:12-24,

108:1-8, 112:13-20, 116:6-8, 117:1-7, 134:24-135:22, 138:15-23, 139:6-17, 140:17-

---

[10]"Shred" days, or "office clean out" days, were common among firms in the area
and typically involved employees being excused from their regular duties for a period of
time so that they could remove materials from their offices or cubicles that were
scheduled to be disposed of according to an organization's document retention policy.
(D.I. 1059 at 524:3-526:14)

141:3, 144:10-16, 215:8-218:6, 226:6-14, 241:10-243:11, 244:7-245:11, 252:4-253:1; *see also* D.I. 1060 at 826:21-24, 829:2-9; D.I. 1061 at 1227:17-21, 1228:4-9, 1229:7-1231:23,1233:8-1234:5, 1280:13-19, 1286:23-1288:12; MTX 544; MTX 550; MTX 551; MTX 742)

## 4. Subsequent destruction of documents by Rambus

Rambus' subsequent intentional destruction of documents occurred after its duty to preserve documents arose and, thus, constituted spoliation. *Micron I*, 255 F.R.D. at 150; *Micron II*, 645 F.3d at 1321-26.

### a. Destruction of Rambus' patent files

In April 1999, Karp instructed outside prosecution counsel Lester Vincent of the Blakely, Sokoloff, Taylor & Zafman firm to begin "clear[ing] out" all the Rambus files for patents that had issued.[11] (MTX 420 at 0004; *see also* MTX 412 at 0001-0012; MTX 427; MTX 601; MTX 934; D.I. 1058 at 304:8-11; D.I. 1061 at 1320:23-1321:8, 1322:6-13, 1328:22-1329:4) Vincent cleared out over 60 patent files between April and July of 1999. (D.I. 1061 at 1322:14-22; 1338:11-1339:16, 1341:21-1343:6; MTX 601) The purged documents included hard copies and electronic copies of draft amendments,

---

[11]Johnson had earlier advised Rambus that it should, in keeping with "very common practice," remove from its patent prosecution files – and have outside counsel remove from its Rambus patent prosecution files as well – all materials not part of the official record, which was advice Cooley Godward gave to all its clients. (D.I. 1062 at 1500:3-1501:9) By April 1999, Rambus had already purged its patent files pursuant to the document retention policy. (D.I. 1061 at 1350:4-15; D.I. 1071 at 94:12-95:2, 99:4-14, 107:12-24, 108:1-8, 112:13-20, 116:6-8, 117:1-7) Although Vincent had from time to time prior to April 1999 discarded drafts, notes or similar materials related to Rambus' patents, this was the first time that he had systematically reviewed the Rambus patent prosecution files for cleaning in connection with the Rambus document retention policy. (D.I. 1062 at 1406:14-1407:4) Vincent preserved and later produced in discovery at least some correspondence and meeting notes from his patent files. (*E.g.*, MTX 42; MTX 47; MTX 54; MTX 420; MTX 934; RAMTX 142; RAMTX 143; RAMTX 266)

16

draft claims, attorneys' handwritten notes, and correspondence regarding patent prosecution, some of which did not exist in any other form.[12] (D.I. 1061 at 1323:6-1325:12, 1347:17-1348:1)

### b. The second "shred day"

On or about June 27, 1999, Karp, with outside counsel's input, prepared goals for Quarter 3 of 1999. (D.I. 1058 at 305:15-306:24, 308:22-309:18; see also MTX 434, MTX 436, MTX 438) Karp's goals included "[i]nitiating reverse engineering of infringing devices as required for litigation prep;" "[m]onitor[ing] industry for potential infringing activity – all semiconductors;" "[d]evelop[ing] complete licensing strategy;" "[p]resent[ing] licensing strategy to exec and gain approval;" "[p]repar[ing] licensing positions against 3 manufacturers;" "[p]repar[ing] litigation strategy against 1 of the 3 manufacturers;" and being "[r]eady for litigation with 30 days notice."[13] (MTX 438 at 0001) The goals were in keeping with Tate's instruction to Karp in a June 24, 1999 email to think about a "target and bottom line terms for licensing [Rambus'] IP for infringing DRAMs;" the identity of

---

[12]Rambus' in-house patent counsel from September 1995 to May 1999, Anthony Diepenbrock, testified that he had purged similar materials from the Rambus patent files. (D.I. 1071 at 102:24-103:4, 103:16-104:7, 105:1-5, 108:1-8, 118:9-12) These kinds of materials are typically sought in discovery in patent cases. (D.I. 1061 at 1071:14-1072:13)

[13]Earlier in June 1999, Karp detailed his progress fulfilling his key results for 1999. (MTX 807 at 0014; D.I. 1058 at 311:21-313:2) Among the key results he was trying to achieve in 1999, Karp identifies "[c]ommencing licensing negotiation with one company and start clock for calculation of damages during Q4/99;" "[c]ommencing license negotiation with two additional companies during Q1/00;" "[c]hoos[ing] one company to litigate with during Q1/00;" and "[c]ommencing litigation during Q2/00, upon exec/board approval." (MTX 807 at 0014; see also D.I. 1058 at 313:3-12) Karp testified at trial that, by June 1999, litigation was a written goal and that suing was "maybe a likelihood." (D.I. 1059 at 348:17-349:22, 350:12-21)

17

the "first target and why;" and what Rambus' "strategy [would be] for the battle with the first target that we will launch in [O]ctober." (MTX 429 at 0003)

In the first two drafts of the Quarter 3 goals, Karp identified organizing a "1999 shredding party at Rambus" under the "Licensing/Litigation Readiness" heading. (MTX 434 at 0001, MTX 436 at 0002) In the final draft, after consulting with Steinberg, Karp amended the goals to eliminate reference to a shredding party as part of licensing/litigation readiness and instead added a goal of organizing "a document retention compliance event" under the "Database Maintenance" heading. (MTX 438 at 0002; D.I. 1059 at 468:18-469:19, 472:12-18)

On August 26, 1999, Rambus had another shred day ("the second shred day"). (D.I. 1062 at 1470:13-23; MTX 398 at 0034-0035; MTX 450) The shredding company's invoices reflect that around 300 boxes of documents were destroyed on the second shred day. (MTX 398 at 0034-0035; see also D.I. 1062 at 1470:24-1471:12)

In December 1999, Rambus instituted a litigation hold. (D.I. 1059 at 539:24-541:4, 551:15-552:10; D.I. 1060 at 857:11-24, 1002:11-1003:4; D.I. 1061 at 1312:2-13) Steinberg testified that, pursuant to the litigation hold, Rambus collected and maintained documents that reasonably would be sought in discovery but that would have otherwise been destroyed under its document retention policy. (D.I. 1060 at 861:2-862:7)

### c. Continued execution of Rambus' document retention policy

On January 18, 2000, Rambus sued Hitachi. (MTX 493; D.I. 1058 at 298:3-10) On June 22, 2000 Rambus and Hitachi settled and, as part of the settlement, entered into a licensing agreement for non-compatible DRAM products. (MTX 533; D.I. 1059 at

18

453:24-454:7) The following day, Vincent resumed purging the Rambus patent files. (D.I. 1061 at 1363:13-16; MTX 412 at 0014)

On July 17, 2000, Steinberg sent an email to Rambus executives reminding them to comply with the document retention policy vis-a-vis contracts. (MTX 541) At Rambus' request, on December 28, 2000, a shredding contractor disposed of as many as 480 boxes of Rambus materials in connection with an office move. (MTX 577; D.I. 1472:8-10, 1472:23-1473:2, 1474:11-16) On January 12, 2001, while Rambus was in litigation with Micron, Hynix, and Infineon, Steinberg sent another email to Rambus executives in which he stated his desire to implement a new document retention policy "similar to the previous policy – however, this time the IP group will attempt to execute the policy more effectively." (MTX 581)

## F. The Instant Litigation

On August 24, 2000, Tate emailed Micron CEO Steve Appleton threatening patent litigation. (RAMTX 8) Micron Technology, Inc. filed the instant case on August 28, 2000 seeking, in part, declaratory judgment of non-infringement, invalidity, and unenforceability of the patents-in-suit. (D.I. 1) It amended its complaint on February 1, 2001 to add an additional monopolization claim. (D.I. 76) On February 15, 2001, Rambus filed its answer and counterclaimed that Micron infringes the patents-in-suit. (D.I. 90) The court partially stayed the case pending the Federal Circuit's ruling in Rambus' action against Infineon Technologies AG. (D.I. 528) The court lifted the stay on January 13, 2006 (D.I. 705) and entered a scheduling order dated March 16, 2006, dividing the case into three substantive issues: unclean hands, infringement, and conduct underlying Micron's remaining claims for affirmative relief and defenses. (D.I.

739) On July 12, 2007, the court granted Micron's motion to add a claim for unfair competition under Cal. Bus. & Prof. Code § 17200 et seq. (D.I. 979), and Micron filed its second amended complaint on September 5, 2007. (D.I. 1022) On November 8-9 and November 13-15, 2007, the court held a bench trial on the issue of Rambus' alleged spoliation. (D.I. 1058; D.I. 1059; D.I. 1060; D.I. 1061; D.I. 1062)

During the course of litigation, Rambus engaged in several instances of litigation misconduct. One of Rambus' Rule 30(b)(6) witnesses testified that the document retention policy had not been presented to the Board (D.I. 1071 at 181:1-182:15), before changing that testimony to acknowledge that presentations regarding the document retention policy had been given to the Board at least twice. (Id. at 179:5-19) Likewise, Rambus' Rule 30(b)(6) witnesses testified that Rambus conducted only one shred day (D.I. 1060 at 856:11-19; D.I. 1071 at 173:8-21, 178:16-18), before changing their testimony to acknowledge that Rambus had conducted three shred days. (D.I. 1071 at 170:3-173:24) Rambus employees, in several instances, did not inform outside counsel of the Rambus shred days. (D.I. 1060 at 961:5-23, 962:8-963:14; 969:20-970:21, 971:2-15; D.I. 1061 at 1292:4-1293:18, 1294:23-1295:4) Nor did they otherwise inform outside counsel of the scope of the document destruction. (D.I. 1060 at 926:11-928:19; D.I. 1061 at 1054:23-1056:6; D.I. 1071 at 196:1-20) The record at bar is replete with misrepresentations on the part of Rambus, as detailed in the court's previous opinion. Micron I, 255 F.R.D. at 149-50.

Following post-trial briefing, the court issued an opinion dated January 9, 2009, finding that Rambus had engaged in spoliation, that the spoliation was done in bad faith and prejudiced Micron, and that the appropriate sanction was to hold the patents-in-suit

20

unenforceable against Micron. (D.I. 1088) Rambus timely appealed, and the Federal Circuit affirmed in part, vacated in part, and remanded the case. This is the court's decision on remand.

## III. ANALYSIS

### A. Issues on Remand

On appeal, the Federal Circuit reviewed the court's factual findings under a clearly erroneous standard and affirmed the court's finding of spoliation.[14] *Micron II*, 645 F.3d at 1321-26. However, under an abuse of discretion standard, it vacated the court's choice of sanction because the court "did not explain why only dismissal would 'vindicate the trifold aims of: (1) deterring future spoliation of evidence; (2) protecting the defendants' interest; and (3) remedying the prejudice defendants suffered as a result of [Rambus'] actions.'" *Id.* at 1326, 1329 (alteration in original) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 780 (2d Cir. 1999)). The Federal Court remanded so that this court could reconsider its bad faith and prejudice determinations related to Rambus' spoliation, as well as the appropriate sanction, if any, for Rambus' conduct. *Id.* at 1326-29. Although this court applied the correct law, the Federal Circuit instructed this court to more "fully explain" its reasoning. *Id.*

Accordingly, under the framework for determining the choice of sanction, the court will revisit whether Rambus acted in bad faith when it engaged in spoliation and the nature and extent of any prejudice suffered by Micron as a result of the spoliation.

_____

[14]"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Micron II*, 645 F.3d at 1320 (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)) (internal quotation marks omitted).

The court then will reconsider its dispositive sanction and determine what sanction, if any, is appropriate under the circumstances.

## B. Bad Faith

To make a determination of bad faith, the court must find that the spoliating party "intended to impair the ability of the potential defendant to defend itself." *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 80 (3d Cir. 1994). The "fundamental element of bad faith spoliation is advantage-seeking behavior by the party with superior access to information necessary for the proper administration of justice." *Id.* at 1326-27. In effect, the court must find that Rambus implemented its document retention policy to disadvantage Micron or other potential defendants.

On the other hand, if the court determines that the document retention policy was employed for "legitimate business reasons such as general house-keeping," then it would be inappropriate for the court to find bad faith. *Id.* Consistent with the Federal Circuit's opinion, four categories of facts in this case support a finding of bad faith: (1) facts tending to show that Rambus' document retention policy was adopted as part of a firm litigation plan; (2) facts tending to show that the document retention policy was executed selectively; (3) facts tending to show that Rambus acknowledged the impropriety of the document retention policy; and (4) Rambus' litigation misconduct. *Id.*

### 1. Rambus' document retention policy was adopted as part of a firm litigation plan

Rambus contends that its document retention policy was a routine policy that was content neutral. (D.I. 1123 at 4) It avers that its policy was adopted with legal advice from Cooley Godward and points to the fact that "shred days" were common

22

among firms in the area. (*Id.* at 3 n.1) However, several of the court's findings of fact evince that Rambus adopted its document retention policy for a less innocent purpose: obtaining an advantage in litigation.

First, Karp developed the document retention policy in the context of being instructed by Tate to develop a licensing and litigation strategy. Rambus' goals for Quarters 2 and 3 in 1998 reflect Rambus' understanding that implementing a document retention policy was part of its larger litigation strategy. (MTX 276; MTX 278) When Karp introduced the policy to the Rambus Board in March 1998, he stated that the policy was "necessary to prepare for the 'upcoming battle'" in the context of Rambus' licensing and litigation strategies. *Micron I*, 255 F.R.D. at 140 n.20. Rambus employees also testified at trial that one of the reasons behind the document retention policy was to prepare for litigation. *Id.* at 142 n.29. The fact that Rambus wanted to destroy documents in an effort to prevent them from being discovered in the "upcoming battle" demonstrates that Rambus adopted the policy specifically for the purpose of gaining an advantage in litigation.

Second, although Karp did have the advice of outside counsel and an auditing company, he did not always follow their advice or inform them of his litigation objectives. Johnson testified that document retention policies were not inconsistent with putting a licensing program in place (D.I. 1062 at 1495:13-1496:7), but Rambus' policy was adopted to get Rambus "battle ready," or to further Rambus' "litigation strategy by frustrating the fact-finding efforts of parties adverse to Rambus." *Micron II*, 645 F.3d at 1322. Karp's view of the document retention policy for getting Rambus "battle ready" was not known to outside counsel – "battle ready" was not a phrase that Johnson used.

Therefore, Rambus' document retention policy, pursuant to which 1269 of 1270 email back-up tapes and roughly 400 boxes of documents were destroyed in July and September 1998, was implemented in preparation for patent litigation. As the court stated previously, "one of the reasons for implementing the policy was to allow Rambus to purge documents, including emails, from its files that might be discoverable in litigation." Micron I, 255 F.R.D. at 141.

Rambus argues that there is no evidence it destroyed documents to impair Micron's ability to defend itself. (D.I.1124 at 3) However, as the Federal Circuit made clear, the requisite bad faith need not be directed toward any specific litigant but only toward a potential litigant.[15] Micron II, 645 F.3d at 1320-25.

## 2. Rambus' document retention policy was executed selectively

Rambus' contention that its document retention policy was neutral is also not persuasive, as several facts evince Rambus' advantage-seeking conduct through its selective enforcement of the document retention policy. For example, at a presentation to employees, Karp instructed Rambus engineers to "look for things to keep" that would help establish that Rambus had intellectual property. (MTX 343; D.I. 1058 at 267:17-23) At the same time, he explained to the engineers that, under the policy, they should expunge documents questioning the patentability of Rambus inventions. (D.I. 1061 at 1303:21-1304:14) These instructions were contrary to outside counsel's advice, and Johnson testified that he would not advise a client to destroy documents if that client reasonably anticipates litigation. (D.I. 1062 at 1575:6-12)

---

[15]In any case, Micron was identified as a potential litigation target as early as May 1998. (MTX 345 at 0005-0007; D.I. 1058 at 255:13-256:13, 257:9-19)

Other facts also indicate selective execution of Rambus ' document retention policy. The only email back-up tape, out of a total of 1270, that was not degaussed was kept at Karp's specific direction because it contained data that could be used by Rambus to establish a conception date for an invention. (*Id*. at 264:11-23) Later, while Rambus was in litigation with Micron, Hynix, and Infineon in 2001, Steinberg sent an email to Rambus executives in which he stated his desire to implement a new document retention policy which would be "similar to the previous policy – however, this time the IP group will attempt to execute the policy more effectively." (MTX 581) Rambus' prior document destruction was thoroughly executed – all but one of the back-up tapes was degaussed, and well over 1000 boxes of documents were destroyed in total. It is unlikely that Steinberg's desire to execute the policy "more effectively" referred to any perceived lack of thorough execution; rather, a reasonable inference is that Rambus had failed to destroy all the unfavorable documents and/or retain all the favorable documents it had hoped to under its existing policy.

Despite the guise of a purportedly unexceptional document retention policy, Rambus destroyed documents selectively. The record demonstrates that Rambus attempted to destroy evidence that would be unfavorable to its litigation position and to keep other, more favorable evidence. The court finds that Rambus' document retention policy was not content neutral, and its selective implementation goes toward showing that Rambus tried to use the policy to seek an advantage in litigation.

### 3. Rambus acknowledged the impropriety of the document retention policy

25

Furthermore, there are facts tending to show Rambus' acknowledgment of the impropriety of its document retention policy. From the outset, Rambus was not forthcoming about the purpose of its document retention policy. Rambus' outside litigation counsel, Johnson, may have known about Rambus' licensing and litigation strategy, but Rambus did not inform him of other significant information, such as Tate's instruction to Karp to set a royalty rate that would show competitors that "it would cost to infringe." (D.I. 1062 at 1555:18-1556:8, 1558:2-14, 1562:7-1563:5, 1568:14-1569:1) Johnson also testified that he would not advise a client to destroy documents knowing that a client reasonably anticipates litigation (Id. at 1575:6-12), which suggests he may not have known the full extent of Rambus' "battle plan" for litigation.

In addition, when Karp later introduced the document retention policy to employees, he tried to keep it quiet. (MTX 314) He stated that he would answer questions from employees but preferred to do so face to face; if employees insisted on questioning him via email, the questions were to be "brief and narrowly distributed." (MTX 314)

Finally, in the first two drafts of goals for Quarter 3 of 1999, created in June and July of 1999, Karp identified organizing a "1999 shredding party at Rambus" (which turned out to be the second shred party) as a goal under the heading "Licensing/Litigation Readiness." (MTX 434 at 0001, MTX 436 at 0002) After consulting with Steinberg, Karp amended the goals in the final draft to eliminate this reference to the shredding party and instead replaced it with a goal of organizing "a document retention compliance event" under the heading "Database Maintenance." (MTX 438 at 0002; D.I. 1059 at 468:18-469:19, 472:12-18) Such conduct by Rambus is

26

sufficient to evince knowledge on Rambus' part that its document destruction was an improper attempt to gain a litigation advantage.

### 4. Rambus' litigation misconduct

The court found several instances of litigation misconduct by Rambus, which also weigh toward a finding of bad faith. Rambus' Rule 30(b)(6) witnesses gave false testimony on several subjects, including the presentation of the document retention to the Board and the number of shred days. *Micron I*, 255 F.R.D. at 147. Rambus employees also did not inform outside counsel of the shred days or the scope of document destruction. Additionally, Rambus' JEDEC representative Crisp testified that "he was minimally involved with Rambus' patent prosecution" (D.I. 1060 at 786:6-13, 792:12-793:21) despite several documents showing that he was actually significantly involved. (MTX 133; MTX 848, MTX 47; MTX 54; MTX 65; MTX 77; D.I. 1061 at 1351:5-1353:7) Documents revealed that Rambus CEO Tate's testimony was false as well when he claimed that he did not take any action to file additional patent claims or have pending claims modified after learning that Rambus' patents might not cover competing DRAMs. (D.I. 1059 at 651:15-652:4, 656:22-657:4, 663:9-18; MTX 848; MTX 40; MTX 188; *see also* MTX 48 at 0017)

Rambus made a number of other misrepresentations regarding its intentions behind adopting a document retention policy. For example, despite testimony that Rambus did not contemplate litigation before adopting the document retention policy, notes from a meeting between Karp and Cooley Godward counsel show that litigation was discussed prior to implementation of the policy. (MTX 290) And contrary to Rambus' position, several documents revealed that it considered the policy to be part of

its litigation preparation. (MTX 276; MTX 278, MTX 434, MTX 436, MTX 802; *see also* D.I. 1058 at 212:1-15, 243:1-12)

Rambus' many instances of litigation misconduct evince an understanding of the impropriety of its document retention policy. Other than to cover up its intentions for spoliating or to preserve its litigation advantage, Rambus would have little reason to hide the extent of its litigation preparation, the scope of its patent prosecution, and the instances of document destruction. In light of the full record, the court finds that Rambus' litigation misconduct further evidences bad faith.

Contrary to Rambus' assertions, bad faith and the duty to preserve are not coterminous. The Federal Circuit stated that it was "not clear error for the district court to conclude that the raison d'etre for Rambus' document retention policy was to further Rambus' litigation strategy by frustrating the fact-finding efforts of parties adverse to Rambus." *Micron II*, 645 F.3d at 1322. This bad faith underlies the entire policy and permeates any action taken pursuant to the policy. At some point, the bad faith upon which a policy is predicated may dissipate; however, that point has not been reached in the current case as it represents the exact sort of litigation that was meant to be frustrated by the document retention policy. Therefore, although Rambus' duty to preserve did not arise until after it first adopted its document retention policy, there was nevertheless bad faith insofar as the document retention policy was executed with the intention to impede the fact-finding efforts of Micron or other potential defendants.

Together, the facts demonstrate that Rambus' document retention policy was adopted as part of its litigation plan, that Rambus executed its policy selectively, that Rambus acknowledged the impropriety of its policy, and that Rambus engaged in

28

litigation misconduct. Such findings confirm that Rambus not only intended to destroy selective documents, it did so to impair the ability of potential defendants, such as Micron, to defend themselves.[16] It is in light of this cumulative evidence that the court finds clear and convincing evidence that Rambus' spoliation was carried out in bad faith.

## C. Prejudice[17]

The question of prejudice "turns largely" on whether a spoliating party destroyed evidence in bad faith. *Micron II*, 645 F.3d at 1328. Prejudice to the opposing party requires a showing that the spoliation "materially affect[s] the substantial rights of the adverse party and is prejudicial to the presentation of [its] case." *Wilson v. Volkswagen of Am., Inc.*, 561 F.2d 494, 504 (4th Cir. 1977). This showing only requires that a party "'come forward with plausible, concrete suggestions as to what [the destroyed] evidence might have been.'" *Micron II*, 645 F.3d at 1328 (quoting *Schmid*, 13 F.3d at 80). If the spoliation was not done in bad faith, then the burden lies with the non-spoliating party to show prejudice. On the other hand, if the spoliation was done in bad faith, the burden shifts to the spoliating party to show lack of prejudice. *Id.* A bad faith spoliator carries a "heavy burden" to show lack of prejudice because "[a] party who is guilty of . . .

---

[16]One further piece of evidence suggesting that Rambus' spoliation was done in bad faith is that the only reason Micron has as much evidence as it does is because the court pierced Rambus' attorney-client privilege based on the crime-fraud exception. (D.I. 711) The Federal Circuit affirmed the court's decision to pierce. *Micron II*, 645 F.3d at 1331.

[17]Rambus filed a motion for leave to file a reply brief to address newly raised issues in Micron's response remand brief. (D.I. 1132) Rambus' motion was based on Micron's arguments regarding prejudice to its defenses of prosecution laches and derivation (35 U.S.C. § 102(f)); these defenses were allegedly raised for the first time in Micron's responsive remand brief. Because the court finds that Rambus prejudiced several of Micron's other defenses, the court denies the motion as moot.

intentionally shredding documents . . . should not easily be able to excuse the misconduct by claiming that the vanished documents were of minimal import." *Id.* (quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 925 (1st Cir. 1988)) (internal quotation marks omitted).

Since bad faith has been found on Rambus' part, the burden shifts to Rambus to show lack of prejudice. The court finds that Rambus has not met its heavy burden to demonstrate lack of prejudice and that Rambus' spoliation materially affects Micron's substantial rights.

### 1. Anticipation, obviousness, and written description defenses

In *Micron I*, this court noted that the defenses of anticipation and obviousness do not seem likely to depend on internal Rambus documents because prior art references, by definition, must be publicly available. *Micron I*, 255 F.R.D. at 151 n.59. In addition, the written description requirement – which requires that a patent's written description enables one skilled in the art to make and use the claimed invention – is an objective one. *Id.* These defenses, based solely on publicly available references or on objective criteria, could not have been prejudiced by Rambus' spoliation.

However, the court finds that Rambus' spoliation did prejudice several other claims and defenses asserted by Micron. Rambus' spoliation at least prejudiced Micron's (1) claims and defenses related to patent misuse and violation of antitrust and unfair competition laws, and (2) defense of inequitable conduct.

### 2. "JEDEC-based" claims and defenses

Micron has asserted several claims and defenses related to Rambus' participation in JEDEC, including, inter alia, patent misuse, equitable estoppel, waiver,

and violations of antitrust and unfair competition laws. (D.I. 1022) Rambus contends that Micron could not have been prejudiced with respect to these JEDEC-based claims. In support, Rambus asserts that the Federal Circuit's decision in *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336 (Fed. Cir. 2011), decided contemporaneously with *Micron II*, establishes that Rambus' duty of disclosure before JEDEC was an objective one.[18] (D.I. 1124 at 12-14) Thus, Rambus argues, subjective beliefs had no bearing on whether it breached a duty of disclosure to JEDEC, and the destruction of any internal documents cannot prejudice Micron's JEDEC-based claims.

However, Rambus' argument does not encompass all of Micron's JEDEC-based claims and defenses. Several of Micron's claims do not, in fact, require proof that Rambus breached a duty of disclosure to JEDEC. These include claims and defenses based on patent misuse, antitrust violations, and unfair competition.[19] In other words,

---

[18]The Federal Circuit in *Hynix* adopted a prior holding regarding the scope and nature of the duty of disclosure to JEDEC. It held that "participation in JEDEC imposed a duty to disclose pending applications and issued patents with claims that a competitor or other JEDEC member reasonably would construe to cover the standardized technology." *Hynix*, 645 F.3d at 1348-49 (internal quotation marks omitted) (citing *Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1100-04 (Fed. Cir. 2003)).

[19]For example, monopolization and attempted monopolization require "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) (noting that the second element may be based on misrepresentations or intentionally false promises in the standard-setting process). Delaware's deceptive trade practices act prohibits conduct that "creates a likelihood of confusion or of misunderstanding." 6 DEL. C. § 2532(a)(12); *see also Accenture Global Servs. GmbH v. Guidewire Software Inc.*, 581 F. Supp. 2d 654, 665 (D. Del. 2008). California's unfair competition law regulates "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws . . ., or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 539-44 (Cal. 1999). And a patent misuse claim may relate "generally to the use of patent rights to obtain or

31

even if Rambus is correct that *Hynix* is binding and that its duty before JEDEC was an objective one, several of Micron's claims and defenses may be illuminated by evidence of a non-public nature.[20]

Micron demonstrated at trial that Rambus had destroyed hundreds of boxes of documents relating to at least contract and licensing negotiations, patent prosecution, JEDEC and Board meetings, and finances. *Micron I*, 255 F.R.D. at 142-43 n.33. These destroyed documents may have contained internal Rambus correspondence, presentations, meeting minutes, or notes pertaining to Rambus' plans to gain market power or advantages by using information learned at JEDEC meetings. They may also have revealed any deceptive intent behind the representations Rambus made during JEDEC meetings or to JEDEC participants. In other words, as the Federal Circuit suggested, "[d]ocuments relating to Rambus' conduct at JEDEC, together with documents reflecting Rambus' instructions to its patent prosecution counsel concerning its conduct at JEDEC, could have helped resolve Micron's claims relating to patent misuse, antitrust violations, and unfair competition." *Micron II*, 645 F.3d at 1328.

Rambus tries to neutralize the suggestion that such internal documents could have helped any of Micron's JEDEC-based claims by arguing, in a footnote, that all the

_____

to coerce an unfair commercial advantage." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998); *see also Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) ("[T]he key inquiry under the patent misuse doctrine is whether . . . the patentee has impermissibly broadened the physical or temporal scope of the patent grant and has done so in a manner that has anticompetitive effects.").

[20]By contrast, a defense of waiver, equitable estoppel, or fraud in the standard-setting organization context may require a showing that the patentee breached a duty of disclosure to the standard-setting organization. *See Hynix*, 645 F.3d at 1347-48 (addressing the defenses of waiver and equitable estoppel); *Infineon*, 318 F.3d at 1096 (addressing the defense of fraud in Virginia).

documents destroyed may have been either redundant or irrelevant to trial. (D.I. 1124 at 14 n.6) It also asserts that "there is no basis to believe" that any JEDEC-related documents were destroyed after its duty to preserve documents attached because any such documents would not have survived the first shred day. (*Id.* at 15) However, as a bad faith spoliator, Rambus should not now be permitted to so summarily dismiss the import of the documents it destroyed. *See Micron II*, 645 F.3d at 1328 ("A party who is guilty of . . . intentionally shredding documents . . . should not easily be able to excuse the misconduct by claiming that the vanished documents were of minimal import." (quoting *Anderson*, 862 F.2d at 925) (internal quotation marks omitted)).[21] Micron has made plausible, concrete suggestions as to what the JEDEC-related evidence might have been and how Micron may have been prejudiced by its destruction. The court finds that Rambus, on the other hand, has failed to meet its heavy burden of overcoming this suggestion. Therefore, the court finds clear and convincing evidence

---

[21]Rambus also contends that, in any case, it preserved its internal JEDEC documents. (D.I. 1124 at 14-15) For this argument, it relies on (1) the testimony of Crisp, Rambus' principal representative at JEDEC meetings, that the only JEDEC documents he discarded were publicly available materials (*Id.* at 14; *see* D.I. 1060 at 823:19-824:5, 824:23-825:3, 825:21-826:11); and (2) the testimony of Vincent, Rambus' outside patent prosecution counsel, that he maintained his documents regarding JEDEC and equitable estoppel issues. (D.I. 1061 at 1369:19-1374:17; *see also* RAMTX 143) Micron has rebutted Rambus' argument with contrary testimony in the record and with the assertion that other individuals may have generated documents related to Rambus' JEDEC participation. (D.I. 1126 at 13-15) Regardless, the court in *Micron I* did not make any factual finding that Rambus preserved its internal JEDEC-related documents, instead holding that "the record demonstrates that there were [destroyed] documents relevant to" Micron's JEDEC-based claims and defenses based in part on Rambus' conduct at JEDEC. *See Micron I*, 255 F.R.D. at 150-51 & n.60. The court does not make any new findings of fact in this case on remand. (D.I. 1150 at 34:19-25, 44:14-45:3)

that Rambus has prejudiced Micron's JEDEC-based claims and defenses related to patent misuse, antitrust violations, and unfair competition.

### 3. Inequitable conduct

Rambus' spoliation also prejudiced Micron's defense of inequitable conduct. "Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011) (en banc). In order to ultimately prevail on an inequitable conduct defense, Micron would have to prove that Rambus "misrepresented or omitted material information with the specific intent to deceive the [Patent and Trademark Office]." *Therasense*, 649 F.3d at 1287. Inequitable conduct requires findings of both materiality and intent. *Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008). Whereas materiality and intent were once considered on a "sliding scale" so that a strong showing of materiality permitted a reduced showing of intent, and vice versa, *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1362 (Fed. Cir. 1984), the Federal Circuit has since tightened the inequitable conduct framework. Under *Therasense*, intent and materiality are now separate, independent requirements. *Therasense*, 649 F.3d at 1287, 1290.

As an initial matter, Rambus argues that Micron's complaint fails to meet the new pleading standard for inequitable conduct under *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312 (Fed. Cir. 2009).[22] (D.I. 1124 at 16-17) However, Micron's second

---

[22]In *Exergen*, the Federal Circuit held that the heightened standard for pleading inequitable conduct requires that the pleading identify the "who, what, when, where, and how" of the material misrepresentation or omission allegedly committed before the United States Patent and Trademark Office ("PTO"). *Exergen*, 575 F.3d at 1328. "At the pleading stage the proponent of the inequitable conduct theory need only plead

34

amended complaint was filed in 2007, two years before *Exergen* was decided.[23] "A
motion to amend a pleading is a procedural matter governed by the law of the regional
circuit. Whether inequitable conduct has been pleaded with particularity under Rule
9(b) is a question governed by Federal Circuit law." *Sanders*, 418 at 918 (internal
quotation marks omitted) (citing *Exergen*, 575 F.3d at 1318). The court does not find it
appropriate at this time to determine the sufficiency of Micron's pleadings and, in any
event, Rambus does not argue that Micron could not obtain leave to amend its pleading
under the new law.[24]

The Federal Circuit suggested that "documents reflecting Rambus' knowledge of
relevant prior art references could have helped resolve Micron's inequitable conduct
claims." *Micron II*, 645 F.3d at 1328. Micron has come forward with plausible, concrete
suggestions that such documents may have been found in the materials that Horowitz
cleaned out of his office, in Rambus' in-house patent prosecution files purged by
Diepenbrock, and in the 300 boxes of materials destroyed on the second shred day.
(D.I. 1061 at 1233:22-1235:3; D.I. 1062 at 1470:13-23; D.I. 1071 at 102:24-103:4; MTX
398 at 0034-0035; MTX 450) Documents relating to a patentee's knowledge of prior art

---

facts supporting a reasonable inference that a specific individual knew of the
misrepresentation and had the specific intent to deceive the PTO." *Sanders v. Mosaic
Co.*, 418 F. App'x 914, 918 (Fed. Cir. 2011).

[23]Moreover, *Exergen* was decided after final judgment and notice of appeal were
entered for the instant case.

[24]Prior to remand of the instant case, Rambus' only challenge to Micron's
inequitable conduct claim was a motion to dismiss based on lack of declaratory
judgment jurisdiction, which was denied. (D.I. 49) On remand briefing, Rambus makes
a de facto motion to dismiss and motion for summary judgment based on an alleged
lack of merit to the inequitable conduct claims. These de facto motions are procedurally
improper.

references would reasonably be found in its files. Whether the destruction of such internal documents is prejudicial to Micron or not requires an analysis of the proof required for an inequitable conduct defense.

To prevail on a claim of inequitable conduct, a defendant must first show that the patentee had specific intent to deceive the PTO. *Therasense*, 649 F.3d at 1290 (citing *Star Scientific*, 537 F.3d at 1366). "[T]he accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Id.* Whether a patentee knew of any specific reference is not a fact that can be gleaned from public documents; rather, non-public documents will be instrumental in showing that the patentee purposely chose not to disclose a known reference to the PTO. Non-public documents, such as notes or internal communications with patent prosecution counsel, may also shed light on the reasoning behind a decision to withhold a reference. As such, proving the intent prong of inequitable conduct would undoubtedly be more difficult for Micron given Rambus' bad faith spoliation.

Rambus' spoliation also prejudiced Micron's ability to meet the second requirement for inequitable conduct, materiality. In *Therasense,* the Federal Circuit clarified that the relevant standard for the materiality of withheld references is "but-for materiality." *Id.* at 1291. "When an applicant fails to disclose prior art, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* Rambus claims that the but-for materiality standard is objective, so its internal documents could not prejudice the materiality prong. (D.I. 1124 at 19-24)

However, the court need not address whether the materiality standard is objective. The Federal Circuit in *Therasense* created an exception to the general requirement that but-for materiality must be proven to satisfy the materiality prong of inequitable conduct. *Therasense*, 649 F.3d at 1292. "When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material," regardless of the but-for standard. *Id.* This "exception to the general rule" arises from "the early unclean hands cases before the Supreme Court, which dealt with 'deliberately planned and carefully executed scheme[s]' to defraud the PTO and the courts." *Id.* (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245 (1944)).

As Rambus' spoliation precluded Micron from possibly obtaining evidence of affirmative acts of egregious conduct, such as perjury, the manufacture of false arguments, or deliberate fraud during prosecution, Rambus has not satisfied its heavy burden of showing that its destruction of internal documents would not prejudice Micron's defense of inequitable conduct. Again, the fact that no record was made of what documents were destroyed can be of no avail to Rambus, the bad faith actor. As a result, the court finds clear and convincing evidence that Rambus' spoliation may have prejudiced Micron's inequitable conduct claim.

## D. Sanctions

### 1. Factors for determining the appropriate sanction for spoliation

To rectify Rambus' spoliation, the court must determine what sanction is appropriate. Because the court has the inherent power to control litigation and assure the fairness of proceedings before it, "[t]he particular sanction imposed is within the

sound discretion of the district court      . . . ."[25] *Micron II*, 645 F.3d at 1326 (citing *West*, 167 F.3d at 779; *Schmid*, 13 F.3d at 78). "Dismissal is a 'harsh sanction,' to be imposed only in particularly egregious situations where 'a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings.'" *Micron II*, 645 F.3d at 1328 (quoting *Leon v. IDX Sys. Corp.*, 464 F.3d at 951, 958 (9th Cir. 2006)).

If the court finds clear and convincing evidence that the spoliation was done in bad faith and was prejudicial to the opposing party, then dismissal may be an appropriate sanction. *Micron II*, 645 F.3d at 1328-29 (citing *Shepherd v. ABC*, 62 F.3d 1469, 1472, 1477 (D.C. Cir. 1995); *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90, 108 (D. Colo. 1996)). However, the Federal Circuit has indicated that "the presence of bad faith and prejudice, without more, do not justify the imposition of dispositive sanctions." *Id.* at 1329. The Third Circuit has established three factors that a district court, under its inherent power to impose sanctions, should consider in this regard: (1) the degree of fault of the spoliating party; (2) the degree of prejudice to the adverse party; and (3) whether there is a less severe punishment that would avoid substantial unfairness to the adverse party while still serving to deter similar spoliation by others in the future. *Schmid*, 13 F.3d at 79. The court's choice of sanction should

---

[25]Judge Ronald M. Whyte of the United States District Court for the Northern District of California recently issued Findings of Facts and Conclusions of Law on Spoliation and the Unclean Hands Defense in *Hynix Semiconductor Inc. v. Rambus Inc.*, No. C-00-20905, 2012 WL 4328999 (N.D. Cal. Sept. 21, 2012). Judge Whyte held that the sanction "most commensurate with Rambus' [spoliation] . . . [was] to strike from the record evidence supporting a royalty in excess of a reasonable, non-discriminatory royalty." *Id.* at *45. However, Judge Whyte's decision is not binding on this court and, in any case, his findings of fact were different from those of the instant case.

38

ultimately promote the trifold aims of: (1) deterring future spoliation of evidence; (2) protecting the defendants' interests; and (3) remedying the prejudice defendants suffered as a result of the spoliating party's actions. *West*, 167 F.3d at 780.

## 2. The *Schmid* factors

### a. Degree of fault

The first *Schmid* factor is the degree of fault of the spoliating party. Rambus' destruction of discoverable documents for the purpose of gaining an advantage in litigation reveals a high degree of fault. The court's determination that Rambus had spoliated in bad faith, alone, is enough to show that Rambus is at fault because it intended to impair the ability of potential defendants, like Micron, to defend themselves. Compounding the degree of fault is Rambus' purposeful, thorough document destruction, which did not occur just once, but several times in 1999 and 2000. Even after Rambus was engaged in litigation against Micron, Hynix, and Infineon, its in-house counsel at the time, Steinberg, expressed a desire to implement a new document retention policy "more effectively." In addition, as discussed above, Rambus recognized but, nevertheless, continued its wrongdoing during litigation. The degree of fault in Rambus' spoliation cannot be overstated by the court.

### b. Degree of prejudice

As discussed, several of Micron's affirmative defenses have been prejudiced by Rambus' bad faith spoliation. While the precise degree of prejudice cannot be known because Rambus did not keep any record of what was destroyed, Rambus should not easily be able to excuse its misconduct by claiming that the vanished documents were of minimal import. The wide range and sheer amount of materials destroyed, along with

39

Rambus' bad faith, make it almost certain that the misconduct interfered with the rightful resolution of the case.[26]

In a vacuum, Rambus' counterclaims of infringement would depend entirely on objective evidence supporting, for example, how the asserted claims should be construed or what features the alleged infringing products have. However, adjudication of the case, as a whole, on the merits requires that the infringement claims be viewed in light of all the claims. Here, the parties participated in standards-setting discussions together at JEDEC meetings; the success of Micron's affirmative defenses based on Rambus' participation in JEDEC and patent prosecution and licensing strategies may estop Rambus from prevailing on its infringement claims. In addition, the success of Micron's affirmative defense of inequitable conduct would have rendered the patents-in-suit unenforceable against it. Because Rambus' wrongdoing impaired many of Micron's most potent affirmative defenses, it has prejudiced Micron to the extent that adjudication of the case on the merits is not possible.

### c. Consideration of lesser sanctions

The court must consider whether there are less onerous punishments available that would avoid substantial unfairness and still serve as an adequate deterrent. Among the options for the court's choice of sanctions are attorney fees and costs, other monetary sanctions, adverse jury instructions, evidentiary sanctions, dispositive sanctions, or a combination of those sanctions.

### (1) Attorney fees or monetary sanction

_____

[26]The selective execution of the document retention policy relating to Rambus' position on patentability also increases the likelihood that the document destruction interfered with the rightful resolution of the case.

Attorney fees or a monetary sanction, when used alone, is inappropriate here. Both are relatively mild sanctions, disproportionate to the degree of fault and prejudice at hand, and neither would compensate Micron for the irretrievable loss of evidence that may be dispositive to the case. *See Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 135 (S.D. Fla. 1987) (finding that the sanction of attorney fees, alone, "falls far short of making the wronged party whole, as it does not compensate [defendant] for the irretrievable loss of evidence potentially crucial to its substantive claims"). Moreover, the deterrent effect of fees and costs or monetary sanctions would be insufficient; the temptation to destroy unfavorable evidence at the outset of high stakes litigation would overshadow the prospect of being sanctioned with paying fees and costs or other monetary sanctions. *See, e.g., Telectron*, 116 F.R.D. at 135 ("Faced with liability of [great magnitude], a corporation fearing only the imposition of attorneys' fees and costs might be sorely tempted to destroy documents thought to be potentially damaging . . . rather than gamble on defending itself successfully on the merits at trial."). The risk of having to pay an opponent's fees and costs, or even punitive damages, is likely to pale in comparison to the potential windfall that would-be spoliators could otherwise receive. The court is not prepared to create such a perverse incentive.

### (2) Adverse jury instructions

The deterrent effect of an adverse jury instruction is "limited in scope" because of the uncertainty as to whether a jury would draw an inference against the spoliator. *See MOSAID Techs., Inc. v. Samsung Elecs. Co., Ltd.*, 348 F. Supp. 2d 332, 337-38 & n.10 (D.N.J. 2004). It provides a permissible inference but does not necessarily restore the prejudiced party to the same position in which it would otherwise have been. *Id.* at 338

n.10. A party might decide "that an unfavorable inference as to document destruction would be less detrimental than allowing certain evidence to be presented at trial." *Telectron*, 116 F.R.D. at 136.

As primarily a remedial sanction, adverse jury instructions are appropriately used in cases where a party's spoliation was not done in bad faith and where the degree of prejudice is low. *See, e.g., Baliotis v. McNeil*, 870 F. Supp. 1285 (M.D. Pa. 1994).[27] Adverse jury instructions, however, do not adequately serve as punishment or deterrence in cases involving spoliation as extensive as Rambus'. *See Samsung*, 348 F. Supp. 2d at 338 n.10 (noting that the rationales of punishment and deterrence "play a secondary role with respect to the spoliation inference" of a jury instruction). Where, as here, Rambus' spoliation was not only extensive, but there is no record of exactly what documents were destroyed, Micron would be "helpless to rebut" anything that Rambus might use to try to overcome the adverse presumption. *See id.* at 337. Therefore, a sanction of adverse jury instructions would be ineffective as a remedy, punishment, or deterrent.

### (3) Evidentiary sanction

An evidentiary sanction foreclosing Rambus from offering evidence on issues related to the subject matter of the destroyed documents would also be inappropriate for

---

[27]In *Baliotis*, the district court found that the spoliator did not act in bad faith and that the prejudice was not severe because the evidence destroyed had been captured in scores of photographs and video, plus other evidence central to the products liability claim had been preserved. *Baliotis*, 870 F. Supp. at 1289-93. Accordingly, the court sanctioned the spoliating party with the "lesser sanction" of an instruction to the jury that it may consider that the lost evidence would be unfavorable to the spoliating party. *Id.* at 1293. In doing so, the court drew a contrast to cases where dispositive sanctions were imposed because the destroyed evidence was "necessary" or "absolutely critical." *Id.* at 1292 n.11 (citations omitted) (internal quotation marks omitted).

the instant case. Next to a dispositive sanction, suppression of evidence is one of the most "drastic" sanctions available, *Samsung*, 348 F. Supp. 2d at 335, and might, in other circumstances, be a sufficient sanction. However, it would not be an appropriate remedial measure here because the nature of Rambus' spoliation has made it impossible to know "the precise contours of the destroyed materials." *See Telectron*, 116 F.R.D. at 135. What is known is that the destroyed materials covered a very broad range of documents, including at least Rambus' contract and licensing negotiations, patent prosecution, JEDEC and Board meetings, and finances. Such documents could have been central to Micron's claims and defenses related to patent misuse, antitrust violations, and unfair competition, as well as its defense of inequitable conduct.[28]

The remedy for successful assertion of Micron's inequitable conduct defense is unenforceability. *See Therasense*, 649 F.3d at 1288 ("Unlike validity defenses, which are claim specific, inequitable conduct regarding any single claim renders the entire patent unenforceable." (citation omitted)). The successful assertion of patent misuse may also result in unenforceability. *See Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1025 (Fed. Cir. 2008) (recognizing a limited unenforceability remedy in the patent misuse context). To bar Rambus from presenting any evidence to defend itself on affirmative defenses that would be dispositive of the entire case would effectively compel default judgment. An evidentiary sanction, in other words, would have the same substantive outcome as a dispositive sanction but with much less efficiency. *See*

---

[28]To the extent an evidentiary sanction would preclude evidence of documents missing from the record, such a sanction would be futile. It is Micron, not Rambus, that would seek to introduce the destroyed evidence; to preclude such evidence would not remedy the prejudice to Micron but would allow Rambus to succeed in going to trial with an incomplete record.

*Telectron*, 116 F.R.D. at 135 (finding that an evidentiary sanction is not appropriate where it would result in "the same substantive outcome as entry of default will achieve with much greater efficiency and at substantially lower cost"). As a result, an evidentiary sanction in the instant case would be no less onerous than a dispositive sanction.[29]

## (4) Dispositive sanction

Having considered the exceptional circumstances of this case and lesser sanctions available,[30] the court finds that the only appropriate sanction is to hold the patents-in-suit unenforceable against Micron.[31] Rambus' destruction of evidence was of the worst type: intentional, widespread, advantage-seeking, and concealed.

---

[29]Given the egregious nature of Rambus' misconduct, an evidentiary sanction is also troubling in that it would still permit Rambus to present its case before a jury.

[30]As the lesser sanctions are ineffective or inappropriate, the court finds that a combination of those sanctions would similarly be ineffective or inappropriate.

[31]The Federal Circuit also noted a five-factor choice-of-sanction analysis from the Ninth Circuit that considers: (1) the public's interest in speedy resolution of litigation, (2) the court's need to manage its docket, (3) risk of prejudice to the non-spoliating party, (4) the public policy in favor of deciding cases on their merits, and (5) availability of less severe sanctions. *Micron II*, 645 F.3d at 1329 (citing *Leon*, 464 F.3d at 958). Two of the *Leon* factors overlap with *Schmid* (prejudice and lesser sanctions) and, although *Leon* is not binding, the court notes that the other three considerations weigh in favor of a dispositive sanction.

First, the public's interest in speedy resolution of litigation weighs in favor of holding the patents-in-suit unenforceable against Micron. The instant action has been pending since 2000, and an evidentiary sanction would further delay the case while producing the same substantive result. Second, the court's need to manage its docket so that judicial resources are being used for fair litigation also weighs in favor of a dispositive action. Finally, while the policy of deciding cases on their merits might ordinarily disfavor a dispositive sanction, the sheer degree of bad faith and prejudice in this case renders resolution on the merits virtually impossible.

44

A dispositive sanction promotes the trifold aims of remedying the prejudice that Micron suffered as a result of Rambus' actions, protecting Micron's interests, and deterring future spoliation of evidence. Though drastic, the nature and degree of Rambus' wrongdoing merits such a sanction.[32] Attorney fees, monetary sanctions, and adverse jury instructions will not restore Micron to the same position in which it would have been absent Rambus' unlawful spoliation, and an evidentiary sanction would likely result in the same substantive outcome but in a less efficient manner. Moreover, a dispositive sanction ensures that Micron's interests are protected, as Micron will not find itself in the position of litigating on an unfair playing field. Finally, a dispositive sanction serves as an effective deterrent to future misconduct of this severity, which will in turn advance the ability of the court to decide cases on the merits. Any lesser sanction would, in effect, reward Rambus for the gamble it took by spoliating and tempt others to do the same.

The court has considered lesser sanctions and found them inappropriate for the unique circumstances of this case. The appropriate sanction is to hold the patents-in-suit unenforceable against Micron.

## IV. CONCLUSION

For the foregoing reasons, the court finds that Rambus' spoliation was done in bad faith, that the spoliation prejudiced Micron, and that the appropriate sanction is to

---

[32]The International Trade Commission ("ITC"), in a recent determination and opinion, also found that the appropriate sanction for Rambus' unclean hands was to hold the asserted patents unenforceable. (See D.I. 1136 at 265-317; D.I. 1146 at 51-55) Although the patents before the ITC were not the same as the patents-in-suit, the ITC's determination and opinion recognize that egregious misconduct can lead to a dispositive sanction.

45

declare the patents-in-suit unenforceable against Micron. An appropriate order will issue.